UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JUSTIN L.,

                                  Plaintiff,

         v.                                             6:21-cv-01316-BKS-TWD

COMMISSIONER OF SOCIAL SECURITY,

                                  Defendant.
_____

APPEARANCES:                             OF COUNSEL:

JUSTIN L., PLAINTIFF, PRO SE

SOCIAL SECURITY ADMINISTRATION          JASON P. PECK, ESQ.
OFFICE OF THE GENERAL COUNSEL
*Counsel for Defendant*
6401 Security Boulevard
Baltimore, MD 21235

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## <u>REPORT-RECOMMENDATION AND ORDER</u>

       Justin L. ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial

review of a final decision of the Commissioner of Social Security ("Defendant" or

"Commissioner") denying his application for disability insurance benefits ("DIB").  (Dkt. No. 1.)

Plaintiff did not consent to the jurisdiction of a Magistrate Judge.  (Dkt. No. 24.)  The matter was

referred to the undersigned for the issuance of a report and recommendation, pursuant to 28

U.S.C. § 636(b) and Local Rule 72.3.  Both parties filed briefs, which the Court treats as cross-

motions for judgment on the pleadings under Federal Rule of Civil Procedure Rule 12(c) in

accordance with General Order 18.  (Dkt. Nos. 30, 31.)  With permission from the Court,

Plaintiff filed a reply brief.  (Dkt. No. 35.)  For the reasons discussed below, the Court

recommends that the Commissioner's decision denying Plaintiff Social Security benefits be

affirmed, and that Plaintiff's complaint be dismissed.

## I.     BACKGROUND

Plaintiff was born in 1975 and is a high school graduate.  (Administrative Transcript at

32, 69, 248.[1])  He had previously worked at the University of California, San Francisco

("UCSF"), where he assembled enrollment contracts for doctors and nurses to enroll in Medicare

and Medi-Cal.  (T. 56.)

On May 19, 2016, Plaintiff filed an application for DIB.  (T. 248.)  His alleged disability

onset date is May 2, 2016.  *Id.*  On July 21, 2016, his application was denied, after which he

timely requested a hearing before an Administrative Law Judge ("ALJ").  (T. 115-19; 132-39.)

On August 23, 2018, Plaintiff, represented by counsel, first appeared before ALJ Mary P.

Parnow, who found Plaintiff not disabled under the Social Security Act.  (T. 30-47; 97-104.)

Plaintiff appealed and on February 14, 2020, the Social Security Administration Appeals

Council remanded the case to the ALJ to further consider Plaintiff's anxiety disorder; to provide

additional consideration of Plaintiff's compliance with his medical regimen; and to further

consider Dr. Kollath's opinion.  (T. 111-13.)  On September 1, 2020, Plaintiff, represented by

counsel, again appeared before ALJ Parnow.  (T. 51-68.)  Both the Plaintiff and a Vocational

Expert ("VE") testified.  *Id.*  On September 21, 2020, the ALJ issued a written decision finding

Plaintiff not disabled under the Social Security Act.  (T. 12-23.)  On April 5, 2021, the Appeals

---

[1]  The Administrative Transcript is found at Dkt. No. 11.  Citations to the Administrative
Transcript will be referenced as "T." and the Bates-stamped page numbers as set forth therein
will be used rather than the numbers assigned by the Court's CM/ECF electronic filing system.
Citations not made to the Administrative Transcript will use the page numbers assigned by the
Court's CM/ECF electronic filing system.

Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (T. 1-6.)  This action followed.  (Dkt. No. 1.)

## II.    LEGAL STANDARDS

### A.    Standard of Review

A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled.  42 U.S.C. § 405(g); *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the Commissioner's determination will be reversed only if the correct legal standards were not applied, or it was not supported by substantial evidence.  *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); *accord Grey v. Heckler*, 721 F.2d 41, 46 (2d Cir. 1983), *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979).  "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.  *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).

If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, a court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984).

**B.    Determination of Disability**[2]

The Commissioner has established a five-step evaluation process to determine whether an individual is disabled as defined by the Social Security Act. 20 C.F.R. §§ 404.1520, 416.920. The Supreme Court has recognized the validity of this sequential evaluation process. *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under the five-step sequential evaluation process, the ALJ determines:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

---

[2] The requirements for establishing disability under Title XVI, 42 U.S.C. § 1382c(a)(3) and Title II, 42 U.S.C. § 423(d), are identical, so "decisions under these sections are cited interchangeably." *Donato v. Sec'y of Health and Human Servs.*, 721 F.2d 414, 418 n.3 (2d Cir. 1983) (citation omitted).

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *accord McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014).  "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further."  *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003).

### C.    Standards for ALJ Evaluation of Opinion Evidence

In making a disability determination, the ALJ weighs all the evidence of record and carefully considers medical source opinions about any issue.  SSR 96-5p, 1996 WL 374183, at *2-3 (1996).  Under 20 C.F.R. §§ 404.1527(e) and 416.927(e), some issues are not "medical issues," but are "administrative findings."  The responsibility for determining these issues belongs to the Commissioner.  *See* SSR 96-5p, 1996 WL 374183, at *2.  These issues include whether the plaintiff's impairments meet or equal a listed impairment; the plaintiff's residual functional capacity ("RFC"); how the vocational factors apply; and whether the plaintiff is "disabled" under the Act.  *Id.*

In evaluating medical opinions on issues reserved to the Commissioner, the ALJ must apply the factors listed in 20 C.F.R. §§ 404.1527(d) and 416.927(d).  The ALJ must clearly state the legal rules that he applies and the weight that he accords the evidence considered.  *Drysdale v. Colvin*, No. 14-CV-722, 2015 WL 3776382, at *2 (S.D.N.Y. June 16, 2015) (citing *Rivera v. Astrue*, No. 10 Civ. 4324, 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted)).

In terms of weighing opinion evidence, the Second Circuit has long recognized the treating physician rule set out in 20 C.F.R. § 404.1527(c)[3].  "Thus, the opinion of a claimant's

---

[3] For claims filed on or after March 27, 2017, a new set of regulations apply.  These new regulations do "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)."  20 C.F.R. § 416.920c(a).  But since Plaintiff filed his claim on May 19, 2016, the treating physician rule applies.  *See Claudio v. Berryhill*, No. 3:17-CV-1228 (MPS),

treating physician as to the nature and severity of the impairment is given controlling weight so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (quoting *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008)).

However, there are situations where the treating physician's opinion is not entitled to controlling weight, in which case "the ALJ must explicitly consider, *inter alia*: (1) the frequen[c]y, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Greek*, 802 F.3d at 375 (quoting *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013)). "Where an ALJ's reasoning and adherence to the Regulations is clear, she is not required to explicitly go through each and every factor of the Regulation." *Blinkovitch v. Comm'r of Soc. Sec.*, No. 3:15-CV-1196 (GTS/WBC), 2017 WL 782979, at *4 (N.D.N.Y. Jan. 23, 2017) (citing *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013)), *adopted by* 2017 WL 782901 (N.D.N.Y. Feb. 28, 2017). After considering these factors, "the ALJ must 'comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion.'" *Greek*, 802 F.3d at 375 (quoting *Burgess*, 537 F.3d at 129) (alteration in original). "The failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Id.* (quoting *Burgess*, 537 F.3d at 129-30).

The factors for considering opinions from non-treating medical sources are the same as those for assessing treating sources, with the consideration of whether the source examined the claimant replacing the consideration of the treatment relationship between the source and the

---

2018 WL 3455409 at *3 n.2 (D. Conn. July 18, 2018) ("Since [the plaintiff] filed her claim before March 27, 2017, I apply the treating physician rule under the earlier regulations.").

claimant.  *See* 20 C.F.R. § 404.1527(c)(1)-(6).  Additionally, when weighing opinions from

sources who are not considered "medically acceptable" sources under the regulations, the ALJ

must consider the same factors as used for evaluating opinions from medically acceptable

sources.  *Saxon v. Astrue*, 781 F. Supp. 2d 92, 104 (N.D.N.Y. 2011) (citing *Canales v. Comm'r*

*of Soc. Sec.*, 698 F. Supp. 2d 335, 344 (E.D.N.Y. 2010)); SSR 06-03p, 2006 WL 2329939.

## III.    PLAINTIFF'S MEDICAL HISTORY

On August 13, 2014, Dr. Zachary Torry, MD, performed a psychological intake on

Plaintiff.  (T. 459.)  Dr. Torry noted Plaintiff presented with anxiety in the context of his job

stress.  *Id.*  Plaintiff told Dr. Torry that he felt compelled to leave his job because of his strained

relationship with his new boss.  He said he felt angry, panicked, overwhelmed, and like he could

not catch his breath.  *Id.*  Dr. Torry diagnosed Plaintiff with Major Depressive Disorder and

attention-deficit/hyperactivity disorder ("ADHD").  *Id.*

On March 3, 2016, Shivani Beri, DO, a psychiatrist, examined Plaintiff whose chief

complaint was ADHD.  (T. 391.)  Plaintiff told Dr. Beri he was worried his ADHD symptoms

would affect his performance at work.  *Id.*  Plaintiff reported that without medication he makes

careless mistakes, has low motivation, is easily distracted, and has a hard time sitting and

completing tasks.  *Id.*  However, when he is on medication, he noted that he was able to sit and

work for longer periods of time without getting distracted and he was able to work through the

day without constantly looking at the time.  *Id.*  Plaintiff denied history of anxiety or depressive

episodes.  *Id.*  He reported no symptoms of Post-traumatic Stress Disorder, Obsessive

Compulsive Disorder, General Anxiety Disorder, social anxiety, panic, or anhedonia.  *Id.*

Plaintiff reported his mood was "good," he was sleeping well at night, he was able to enjoy

things, his energy level was normal, and his appetite was normal.  *Id.*  Dr. Beri diagnosed

Plaintiff with ADHD and restarted Plaintiff on Dexedrine.  (T. 392-93.)

Plaintiff returned to Dr. Beri on April 4, 2016, for a follow-up.  (T. 394.)  Plaintiff

reported he was doing well overall and noticed an improvement since restarting Dexedrine.  *Id.*

He was able to focus much better at work, was able to sit at his desk for longer periods of time

rather than getting very distracted or having to get up and walk around, and felt more productive

throughout the day.  *Id.*  He further reported that his anxiety levels had been lower, he felt

calmer, and his mood was "good."  *Id.*  He denied feeling depressed or hopeless and reported his

appetite was normal, he was sleeping well, and he had no jittery feelings or increased anxiety.

*Id.*  Dr. Beri noted Plaintiff was cooperative, had good eye contact, and presented with a

congruent mood.  (T. 395.)  Dr. Beri further noted Plaintiff's insight/judgment, recent memory,

and attention were intact and his thought process and content were goal directed, future oriented,

organized, logical, and linear.  *Id.*

On June 8, 2016, Plaintiff visited Joseph L. Pace, MD, for joint paint.  (T. 398.)  Dr. Pace

diagnosed Plaintiff with psoriasis, ADHD, knee pain, and hand pain.  *Id.*  Dr. Pace prescribed

cream for Plaintiff's psoriasis and an x-ray for Plaintiff's hand.  *Id.*  Dr. Pace noted Plaintiff had

recently lost medical insurance and could not return to his psychiatrist who had been prescribing

him medication for his ADHD.  *Id.*

On June 17, 2016, Plaintiff presented to Alicia Carrasco, MD, as a new patient.  (T. 440.)

Dr. Carrasco diagnosed Plaintiff with ADHD, anxiety, depression, elevated blood pressure,

psoriasis, and obesity.  *Id.*  She prescribed Plaintiff sertraline for ADHD and clonazepam for

anxiety.  (T. 441.)

On June 24, 2016, Plaintiff went to Licensed Clinical Social Worker ("LCSW") Crispin Tombo at Maxine Hall Health Center for anxiety and depression. (T. 437.) Plaintiff reported symptoms of anxiety and depression including depressed mood, anhedonia, low energy, poor appetite, trouble concentrating, low self-esteem, restlessness, and poor sleep quality. (T. 438.) He reported he was unemployed due to a change in supervisor, difficulty focusing, and a limited contract, and he had since applied for DIB. *Id.* Plaintiff told LCSW Tombo that he had taken Dexedrine from 2005 to 2013. *Id.* Plaintiff took Ritalin and Adderall for a brief period but discontinued them as they were not as effective as Dexedrine. *Id.* Plaintiff had been prescribed Prozac 3 years ago but stopped taking it after 3 months due to its possible interference with the Dexedrine. *Id.* Plaintiff had also been prescribed Zoloft (sertraline) in the past but reported being "being kind of scared of Zoloft and [its] possible side-effects." *Id.* When LCSW Tombo asked Plaintiff whether he was interested in seeing a psychiatrist, Plaintiff declined because he "[did not] want more pills." *Id.* LCSW Tombo reported Plaintiff was alert, oriented, amiable, and cooperative with a tense affect and anxious mood. *Id.*

On July 5, 2016, Plaintiff visited Dr. Carrasco for a routine follow-up where he was diagnosed with ADHD, hypertriglyceridemia, anxiety, depression, psoriasis, obesity, hypothyroidism, and hypertension. (T. 431.) Dr. Carrasco prescribed Plaintiff a cream for his psoriasis and amlodipine for his hypertension. (T. 432.) Dr. Carrasco increased Plaintiff's sertraline dose to treat his anxiety, depression, and ADHD as Plaintiff refused further medication. (T. 431-32.) Plaintiff reported he was crying more and felt more nervous and confused than usual during the first week of taking sertraline. (T. 433.) He also reported the clonazepam made him fall asleep at 5PM and he was still "thinking a lot about everything." *Id.*

On July 8, 2016, Plaintiff returned to LCSW Tombo complaining of symptoms of anxiety and depression. (T. 429.) LCSW Tombo went over breathing exercises to help Plaintiff with his anxiety. (T. 430.) Plaintiff said the exercises helped his anxiety temporarily. *Id.* LCSW Tombo discussed pleasurable activities Plaintiff could do to help with his symptoms. *Id.* LCSW Tombo again reported Plaintiff was alert, oriented, amiable, and cooperative with a tense affect and anxious mood. *Id.*

On July 25, 2016, Plaintiff presented to LCSW Tombo with anxiety which was exacerbated by concerns about the denial of his social security application, no source of income, owing back taxes to the IRS, and not being able to pay rent for the month. (T. 427.) LCSW Tombo reported Plaintiff was alert, oriented, amiable, and cooperative with a tense and, at times, tearful affect and anxious mood. *Id.*

On September 8, 2016, Plaintiff presented to Dr. Carrasco for a follow-up regarding thyroid lab results and refills on prescriptions. (T. 422.) Dr. Carrasco again diagnosed Plaintiff with ADHD, anxiety, depression, psoriasis, obesity, hypothyroidism, and hypertension. *Id.* Plaintiff reported sertraline made him "unnaturally angry" and he stopped taking it when he ran out. (T. 424.) He also reported that clonazepam helped his anxiety, but he preferred to stay off medication for his ADHD because he did not like the sensation. *Id.* Plaintiff was prescribed buspirone, gabapentin, and clonazepam for his anxiety. (T. 423.) Dr. Carrasco noted she thought it would be a "good for [Plaintiff]" to see a psychiatrist. *Id.* Plaintiff reported occasional tightness in his chest but no other physical issues. *Id.*

On the same day, Plaintiff saw LCSW Tombo, who assessed Plaintiff with major depressive disorder, single episode with anxious distress. (T. 419.) Plaintiff reported his social security application was being appealed and if it was not approved, he would have to return to

New York to stay with his uncle. (T. 420.) He also reported he cashed out his retirement and invited his wife's friend to move in to meet his financial obligations. *Id.* Plaintiff floated being open to the idea of part-time work but had concerns no one would hire him given his work history or he could not find work that was a good fit for him. *Id.* LCSW Tombo reported Plaintiff was alert, oriented, amiable, and cooperative with a tense and, at times, tearful affect and anxious mood. *Id.*

On October 30, 2016, Anna M. Franco, Psy.D., a state agency psychologist, determined from her review of the record Plaintiff had no restriction of activities of daily living; no difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation, each of extended duration. (T. 89.) She further found Plaintiff's impairments were not severe and Plaintiff could perform his past relevant work. (T. 90, 91.)

On June 29, 2018, Ute Kollath, Ph.D., performed a consultative mental status evaluation on Plaintiff. (T. 450.) Plaintiff's chief complaints were ADHD, persistent depressive disorder, anxiety disorder, panic disorder, and hypertension. *Id.* Plaintiff described his past work at UCSF where he received special accommodations to address issues related to his ADHD and anxiety. *Id.* Plaintiff stated he could not "work and sit and concentrate for a long time" and he was let go from most jobs due to his ADHD symptoms. *Id.* At UCSF, Plaintiff stated he "made a lot of trouble at work," asked for additional accommodations, and filed frequent complaints. *Id.* He further stated he did not show up for work for a while, he only worked at night, and he did not talk to his manager. *Id.* Plaintiff claimed he did not get along with his manager and received severance pay to leave. *Id.* Plaintiff reported he lived with his ex-wife and son in Thailand and had to borrow money to buy the plane ticket to undergo the evaluation. *Id.* He

11

declared he was unable to work because he had been fired from every job and he could not sit still.  *Id.*  Plaintiff further declared he is prone to mistakes due to his poor concentration and attempts to focus triggers his anxiety.  *Id.*  While Plaintiff claimed to be polite to everybody, he stated he had no friends.  *Id.*

Dr. Kollath noted Plaintiff's economic hardship and diagnosed him with moderate ADHD, unspecified anxiety disorder, and unspecified depressive disorder.  (T. 453.)  Plaintiff presented with an anxious mood and affect.  (T. 452.)  Plaintiff's cognitive functioning was intact; his emotional functioning was impaired; and he appeared guarded.  *Id.*  Dr. Kollath observed Plaintiff was adequately groomed with short hair, cooperative, alert, fully oriented with adequate attention, concentration, fund of knowledge, and memory.  *Id.*  Dr. Kollath opined Plaintiff was either unimpaired, mildly impaired, or moderately impaired in all work-related abilities except one.  (T. 453.)  Plaintiff was markedly impaired regarding work stress per Dr. Kollath.  *Id.*

## IV.    THE ALJ'S DECISION

After reviewing the procedural history of Plaintiff's applications and stating the applicable law, the ALJ found he met the insured status requirements through December 31, 2019, and had not engaged in substantial gainful activity since May 2, 2016, the alleged onset date.  (T. 14.)  At step two, the ALJ determined Plaintiff has the following severe impairments: anxiety disorder, depressive disorder, and ADHD.  *Id.*

At step three, the ALJ found Plaintiff's impairments either singly or in combination did not meet or medically equal the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings").  (T. 15.)  Specifically, the ALJ considered Listings 12.04

(depressive, bipolar, and related disorders) and 12.06 (anxiety and obsessive-compulsive disorders).  *Id.*

Next, the ALJ determined Plaintiff has the RFC to perform a full range of work at all exertional levels but with the following non-exertional limitations: precluded from complex and detailed tasks but remains capable of simple, repetitive tasks in a routine work environment, capable of maintaining concentration, persistence or pace for simple repetitive tasks in two-hour increments which presupposes that the morning, lunch, and afternoon breaks would form the natural barriers for those increments, able to respond appropriately to coworkers and supervisors but should have no more than occasional interaction with the general public.  (T. 16.)

At steps four and five of the sequential evaluation, based upon the RFC, the Medical Vocational Guidelines, and the testimony of the VE, the ALJ determined Plaintiff was unable to perform any past relevant work; however, there were jobs that existed in significant numbers in the national economy Plaintiff could perform.  (T. 21-23.)

Thus, the ALJ determined Plaintiff has not been under a disability, as defined in the Social Security Act, from May 12, 2016, through the date of the decision.  (T. 23.)

## V.    DISCUSSION

Plaintiff contends the ALJ erred in the RFC and step five determinations.  (Dkt. No. 30 at 1.)  The Commissioner responds there is substantial evidence to support the RFC and Plaintiff demonstrates no harmful error stemming from the vocational expert and medical evidence allegations.  (Dkt. No. 31 at 6-13, 14-17.)

"In a case such as this, where Plaintiff is proceeding *pro se*, General Order No. 18's promise of a consideration of the merits complies with the special solicitude that the Second Circuit mandates for *pro se* litigants."  *Hubbard v. Comm'r of Soc. Sec.*, No. 6:14-CV-1401

(GTS/WBC), 2016 WL 551783, at *4 (N.D.N.Y. Jan. 14, 2016).  As such, this Court will

"examine[ ] the record to determine whether the ALJ applied the correct legal standards and

reached a decision based on substantial evidence."  *Id.*  (citing *Gregorka v. Comm'r of Soc. Sec.*,

No. 6:13-CV-1408 (GTS/TWD), 2015 WL 3915959, at *4 (N.D.N.Y. June 25, 2015)).

After carefully considering the matter and for the reasons stated in Defendant's

memorandum of law (Dkt. No. 31 at 6-17), the Court finds the ALJ did not err in determining the

RFC and in the step five analysis.  The Court also finds substantial evidence supports the ALJ's

ultimate decision that Plaintiff was not under a disability within the meaning of the SSA.  20

C.F.R. §§ 404.1520(g), 416.920(g).

### A.    Substantial Evidence Supports the ALJ's RFC Determination

#### 1.  Legal Standards

A claimant's RFC is the most he or she can do despite his or her limitations.  20 C.F.R. §

404.1545(a)(1).  "Ordinarily, RFC is the individual's maximum remaining ability to do sustained

work activities in an ordinary work setting on a regular and continuing basis.  A regular and

continuing basis means eight hours a day, for five days a week, or an equivalent work schedule."

*Pardee v. Astrue*, 631 F. Supp. 2d 200, 210 (N.D.N.Y. 2009) (citing *Melville v. Apfel*, 198 F.3d

45 52 (2d Cir. 1999)).  "In making a residual functional capacity determination, the ALJ must

consider a claimant's physical abilities, mental abilities, symptomology, including pain and other

limitations which could interfere with work activities on a regular and continuing basis."  *Id*.

(citing 20 C.F.R. § 404.1545(a)).  "Ultimately, '[a]ny impairment-related limitations created by

an individual's response to demands of work . . . must be reflected in the RFC assessment.'"

*Hendrickson v. Astrue*, No. 11-CV-0927 (ESH), 2012 WL 7784156, at *3 (N.D.N.Y. Dec. 11,

2012) (quoting SSR 85-15, 1985 WL 56857, at *8).  The RFC determination "must be set forth

with sufficient specificity to enable [the Court] to decide whether the determination is supported by substantial evidence." *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

The regulations mandate procedures an ALJ must follow in determining the appropriate weight to assign a treating physician's opinion. The Second Circuit has articulated the procedure as a two-part analysis. *See Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019). First, the ALJ must decide whether the opinion is entitled to controlling weight. *Id*. "[T]he opinion of a claimant's treating physician as to the nature and severity of [an] impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess*, 537 F.3d at 128 (quoting 20 C.F.R. § 404.1527(c)(2)); *see, e.g.*, *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam) (holding "the opinion of the treating physician is not afforded controlling weight where, as here, the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts").

Second, if the ALJ decides the opinion is not entitled to controlling weight, he must determine how much weight, if any, to give it. *Estrella*, 925 F.3d at 95. In doing so, the ALJ must "explicitly consider" the following, nonexclusive "*Burgess* factors": "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (per curiam) (citing *Burgess*, 537 F.3d at 129 (citing 20 C.F.R. § 404.1527(c)(2)). In *Estrella*, the court emphasizes the importance of a treating source's opinion in cases concerning mental impairments, as "cycles of improvement and debilitating symptoms [of mental illness] are a

common occurrence." *Estrella*, 925 F.3d at 97 (quoting *Garrison v. Colvin*, 759 F. 3d 995, 1017 (9th Cir. 2014)).

At both steps, the ALJ must give "good reasons" for the weight given to a treating physician's opinion. *Id*. at 96 (quoting *Halloran*, 362 F.3d at 32). An ALJ's failure to "explicitly" apply the *Burgess* factors when assigning weight to a treating physician's opinion is a procedural error. *Id*. (citing *Selian*, 708 F.3d at 419-20). However, if "a searching review of the record" assures the court "that the substance of the treating physician rule was not traversed," the court will nonetheless affirm. *See id*. (citing *Halloran*, 362 F.3d at 32).

In evaluating a plaintiff's RFC for work in the national economy, the ALJ must take into account the plaintiff's reports of pain and other symptoms. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). "The ALJ must 'carefully consider' all the evidence presented by claimants regarding their symptoms, which fall into seven relevant factors including 'daily activities' and the 'location, duration, frequency, and intensity of [their] pain or other symptoms.'" *Del Carmen Fernandez v. Berryhill*, No. 18-CV-326, 2019 WL 667743, at *9 (S.D.N.Y. Feb. 19, 2019) (citing 20 C.F.R. § 404.1529(c)(3); SSR 16-3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims, 81 FR 14166-01 at 14169-70, 2016 WL 1020935 (Mar. 16, 2016)).

In 2016 the Commissioner eliminated the use of term "credibility" from the "sub-regulatory policy" because the regulations themselves do not use that term. SSR 16-3p, 81 FR at 14167. Instead, symptom evaluation tracks the language of the regulations.[4] The evaluation of symptoms involves a two-step process. First, the ALJ must determine, based upon the objective

---

[4] The standard for evaluating subjective symptoms has not changed in the regulations. Rather, the term "credibility" is no longer used, and SSR 16-3p makes it clear that the evaluation of the claimant's symptoms is not "an evaluation of the claimant's character." SSR 16-3p, 81 FR at 14167. The Court will remain consistent with the terms as used by the Commissioner.

medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ."  20 C.F.R. §§ 404.1529(a), (b); 416.929(a), (b).

If so, at the second step, the ALJ must consider "'the extent to which [the claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the [objective medical evidence] and other evidence to decide how [the claimant's] symptoms affect [her] ability to work.'"  *Barry v. Colvin*, 606 F. App'x 621, 623 (2d Cir. 2015) (citing *inter alia* 20 C.F.R. § 404.1529(a); *Genier,* 606 F.3d at 49) (alterations in original).

If the objective medical evidence does not substantiate the claimant's symptoms, the ALJ must consider the other evidence.  *Cichocki v. Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013) (citing superseded SSR 96-7p).  The ALJ must assess the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

### 2.  Application

Plaintiff argues, albeit indirectly, the RFC determination is not supported by substantial evidence because the ALJ did not consider Plaintiff's history of depression, his adverse reaction to sertraline, the onset of hypertension, and his negative experience with his supervisor at his last job.  (Dkt. No. 30 at 1, 2, 6.)

17

As stated above, the ALJ determined Plaintiff has the RFC to perform a full range of work at all exertional levels but with the following non-exertional limitations: precluded from complex and detailed tasks but remains capable of simple, repetitive tasks in a routine work environment, capable of maintaining concentration, persistence or pace for simple repetitive tasks in two hour increments which presupposes that the morning, lunch, and afternoon breaks would form the natural barriers for those increments, able to respond appropriately to coworkers and supervisors but should have no more than occasional interaction with the general public. (T. 16.)

In evaluating potential limitations imposed by Plaintiff's mental impairments, the ALJ considered the opinions of psychiatric consultative examiner Dr. Kollath and state agency psychologist Dr. Franco. (T. 16-21.) Although no mental health treating source opinion was available, the ALJ reviewed Plaintiff's treatment notes and Plaintiff's testimony regarding his symptoms. *Id.*

During the May 2018 consultative examination with Dr. Kollath, Plaintiff's chief complaints were ADHD, persistent depressive disorder, anxiety disorder, panic disorder, and hypertension. (T. 450.) He was casually dressed and adequately groomed. (T. 452.) Plaintiff had agitated leg and foot movement, poor eye contact, and pressured speech, but was alert and fully oriented. *Id.* His attention, concentration, fund of knowledge, and memory were all adequate. *Id.* His judgment and insight were fair and his mood and affect were anxious. *Id.* Plaintiff did not have suicidal ideations, his thought process was intact, and he had unremarkable thought content. *Id.* Plaintiff's cognitive functioning was intact, but his emotional functioning was impaired. *Id.* Plaintiff denied physical limitations due to medical problems and was independent for basic activities of daily living. (T. 451.) Moreover, he reported that he did not

18

need help preparing meals; he was able to drive and make change at the store; and he typically spent his day taking care of his son and doing chores around the house. *Id.*

Based on his examination, Dr. Kollath concluded Plaintiff had no limitations following simple instructions and could manage his own funds. (T. 453.) He opined Plaintiff had mild limitations following complex/detailed instructions; maintaining adequate pace or persistence to perform one or two step simple repetitive tasks; and interacting appropriately with co-workers, supervisors, and the public on a regular basis. *Id.* Dr. Kollath further opined Plaintiff had moderate limitations maintaining adequate pace or persistence to perform complex tasks; maintaining adequate attention/concentration; adapting to changes in job routine; and adapting to changes, hazards, or stressors in a workplace setting. *Id.* Finally, he found Plaintiff's ability to withstand the stress of a routine workday was markedly impaired. *Id.*

However, in the same report, Dr. Kollath seemingly made different determinations about the same limitations. Dr. Kollath opined Plaintiff had no limitations understanding and remembering simple or complex instructions. (T. 454.) Moreover, he noted Plaintiff had mild limitations carrying out simple instructions; making judgments on simple work-related decisions; and interacting appropriately with the public and coworkers. (T. 454-55.) Additionally, he observed Plaintiff had moderate limitations carrying out complex instructions; making judgments on complex work-related decisions; interacting appropriately with supervisors; and responding appropriately to usual work situations and to changes in a routine work setting. *Id.* Finally, Dr. Kollath opined Plaintiff's other capabilities were not affected by his impairments. (T. 455.)

The ALJ accorded Dr. Kollath's opinion "little weight because of the [internal] inconsistencies." (T. 21.) The ALJ noted Dr. Kollath found a marked limitation in Plaintiff's ability to withstand the stress of a routine workday but had noted in the same report Plaintiff had

moderate limitations in his ability to respond appropriately to the usual work situations and to changes in a routine work setting. *Id.* Moreover, Dr. Kollath noted moderate limitations in Plaintiff's ability to interact appropriately with supervisors on the check box form but noted only mild limitations in the body of the report. *Id.* Despite these alleged limitations, Plaintiff's current level of functioning at the time of the report showed he was independent for activities of daily living. *Id.*

State consultative examiner Dr. Franco determined from her review of the record Plaintiff did not have a severe mental impairment. (T. 89-90.) Dr. Franco relied on medical records which documented Plaintiff's mental health treatment through 2016. *Id.* Dr. Franco noted Plaintiff had complained of anxiety and stress and had discussed not taking medications with his healthcare provider. (T. 80.) Moreover, while Plaintiff was tense and anxious, he was cognitively intact. *Id.* Dr. Franco opined that most of his mental status examinations did not indicate ADHD symptoms. *Id.* Finally, she opined that Plaintiff did not have any restrictions of activities of daily living or difficulties in maintaining social functioning but did have mild difficulties in maintaining concentration, persistence, or pace. *Id.*

The courts have long recognized an ALJ has discretion to rely on a non-examining medical consultant's opinion. *See Baszto v. Astrue*, 700 F. Supp. 2d 242, 249 (N.D.N.Y. 2010) ("[A]n ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability."); *see Leach v. Barnhart*, No. 02-CV-3561, 2004 WL 99935, at *9 (S.D.N.Y. Jan. 22, 2004) ("State agency physicians are qualified as experts in the evaluation of medical issues in disability claims. As such, their opinions may constitute substantial evidence if they are consistent with the record as a whole."). Here, after reviewing Dr. Franco's opinion, the

ALJ found, "[i]n an abundance of caution," Plaintiff's mental conditions were severe despite "minimal evidence" related to a mental health impairment and noted Plaintiff was not taking any mental health medication due to his remote location. (T. 21.)

As part of his evaluation, the ALJ reviewed Plaintiff's testimony, medical records, and history of mental health treatment dating back to at least 2014, and found the record was not consistent with and did not support more than mild to moderate work-related limitations. (T. 15.)

According to Plaintiff's testimony, he last worked in 2016 at UCSF, although it is unclear to this Court whether Plaintiff stopped working there because he did not pass the probation period, because of an issue with a supervisor, or some combination of both, or something else. (T. 17, 20, 43, 56, 57, 285, 438.) Plaintiff claimed to have trouble sleeping and was afforded accommodations at UCSF where he could work from home and overnight at the office. (T. 17, 34, 35, 57, 58, 438.) He also claimed that he had a reputation at work as a troublemaker. (T. 17, 35, 42, 57, 450.) Plaintiff testified he could not keep jobs due to the number of errors he makes and often clashed with supervisors. (T. 17, 34, 35, 58.) He testified he currently was living with his ex-wife, their child, and his ex-wife's parents in Thailand. (T. 17, 39.) He had taken medication in the past to try to better himself and do a better job, but he has limited access to medication and mental health treatment where he resides in Thailand. (T. 17, 35, 40-43, 58, 60-62.) Plaintiff claimed his mental health was about the same as before but his current stressors were different. (T. 17, 60.) He testified he is alone most of the day—he sleeps, tries to read, and watches TV he has already seen. (T. 17, 40-41, 62.) He claimed he did not do chores where he resides and mostly sees his son at dinnertime. (T. 17, 61-62.)

Plaintiff's June 8, 2016, Adult Function Report indicated he had problems squatting, standing, walking, sitting, talking, stair-climbing, maintaining concentration, completing tasks, following instructions, understanding things, and poor memory.  (T. 17, 316, 319, 320, 323.) Plaintiff reported pain and fatigue limited his ability to walk, stand, or sit more than 20 minutes. (T. 320.)  Plaintiff further reported he had problems handling stress and had been fired from 15 jobs due to problems with supervisors.  (T. 321.)

Plaintiff had initially alleged disability due to ADHD, depression, anxiety, panic disorder, psoriatic arthritis, motor skill impairment, and cognitive difficulties, but in his brief noted disability due to anxiety and depression which would cause too many workplace absences to sustain a full-time job.  (T. 284-85; Dkt. No. 30 at 2, 3, 4.)  The ALJ found Plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms, but Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were "not entirely consistent" with the medical record and other evidence.  (T. 16-18.)

To that end, Plaintiff's mental status examinations were generally benign.  *Id*.  He was typically alert, oriented, amiable, and cooperative with adequate attention, concentration, fund of knowledge, and memory.  (T. 395, 420, 427, 430, 438, 452.)  Moreover, his judgment and insight were fair, he had intact thought process and cognitive functioning, and he had unremarkable thought content.  (T. 452.)  Finally, as the ALJ noted, Plaintiff himself reported that while on medication for his ADHD, he was able to work through the day without constantly looking at the time and specifically noticed an improvement on Dexedrine but stopped taking medication in 2016 because he lost insurance.  (T. 19-20; 392-94.)

Moreover, the ALJ found Plaintiff's activities do not support more than mild to moderate mental limitations.  (T. 15.)  At his consultative examination in 2018, Plaintiff arrived on time to

his appointment having walked there.  (T. 450.)  He could attend to personal hygiene, prepare meals, drive, take public transportation, go out alone, shop, and make change at the store.  (T. 316-20; 429-30; 438; 450-52.)  He continued to enjoy trips to the beach, out-of-town adventures, and watching movies on Hulu.  (T. 429-30.)  While Plaintiff did not work in 2015, he was able to move across the country to New York to live with a family friend.  (T. 438.)  Plaintiff was also able to travel from Thailand to attend his consultative exam in the United States.  (T. 450.)  Despite Plaintiff's testimony that he did not do household chores and he only spent limited time with his son, the ALJ found there were no additional medical records to support any greater limits than those found in the RFC.  (T. 20.)

As a general matter, moderate limitations are not an impediment to the ability to perform gainful activity, particularly when an RFC has already limited a claimant to unskilled or low-stress work.  *Elizabeth B. v. Comm'r of Soc. Sec.*, No. 8:21-CV-00100 (TWD), 2022 WL 17721254, at *16 (N.D.N.Y. Dec. 15, 2022); *see also Melisa G. v. Berryhill*, No. 3:18-CV-508 (DJS), 2019 WL 2502726, at *5 (N.D.N.Y. June 17, 2019) (holding "moderate limitations are not prohibitive of performing unskilled work").  Thus, the ALJ identified substantial evidence to reasonably conclude Plaintiff's mental impairments did not prevent him from working in unskilled positions involving simple, repetitive tasks in a routine work environment, only occasional interaction with the general public, and requiring concentration for two-hour increments.  (T. 16.)

Finally, as to Plaintiff's argument the ALJ did not consider Plaintiff's history of depression, his adverse reaction to sertraline, the onset of hypertension, and his negative experience with his supervisor at his last job, the Court notes it is the province of the ALJ to resolve genuine conflicts in the record.  (Dkt. No. 30 at 1, 2, 6.); *Veino v. Barnhart*, 312 F.3d

578, 588 (2d Cir. 2002).  However, the Commissioner need not "reconcile explicitly every shred of medical testimony."  *Galiotti v. Astrue*, 266 F. App'x 66, 67 (2d Cir. 2008) (citing *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)); *see also Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) ("When, as here, the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.").

Accordingly, the ALJ had substantial evidence to support his RFC determination related to Plaintiff's mental impairments, and there is no basis for remand with regard to the step four determination.

**B.    Substantial Evidence Supports the Commissioner's Step Five Determination Regarding Plaintiff's Ability to Perform Jobs Existing in Significant Numbers in the National Economy**

At step five, the burden shifts to the Commissioner "to show there is other work that [the claimant] can perform."  *McIntyre*, 758 F.3d at 150 (quoting *Brault v. Soc Sec. Admin, Comm'r*, 683 F.3d 443, 445 (2d Cir. 2012).  "If a claimant has non-exertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert."  *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986)).

If the ALJ utilizes a VE at the hearing, the VE is generally questioned using a hypothetical incorporating Plaintiff's limitations.  *See Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981).  The ALJ may rely on a VE's testimony regarding the availability of work as long as the hypothetical facts the expert is asked to consider are based on substantial evidence and accurately reflect Plaintiff's limitations.  *Calabrese v. Astrue*, 358 F. App'x 274, 276 (2d Cir.

2009). Where the hypothetical is based on an ALJ's RFC analysis which is supported by substantial facts, the hypothetical is proper. *Id.* at 276-77.

Here, the VE's hearing testimony included a response to a hypothetical question based upon Plaintiff's RFC, where she identified three occupations a similarly situated individual could perform. (T. 65-67.) Because this Court has found the ALJ's RFC determination was supported by substantial evidence, it also finds the ALJ's hypothetical to the VE was proper, and his step five determination was supported by substantial evidence. Plaintiff's reliance on the VE's answers to hypotheticals which the ALJ ultimately determined were not part of the RFC to support his claim the ALJ erred at the step five determination is unavailing. Therefore, there is no basis for remand with regard to the ALJ's step five determination.

## VI.    CONCLUSION

For all the reasons discussed above, the Court finds the ALJ properly applied the correct legal standards and considered the evidence of record including the medical opinion evidence, the treatment notes, and the objective findings, as well as Plaintiff's range of daily activities. The ALJ's findings are supported by substantial evidence. Accordingly, the Court finds no error.

**WHEREFORE**, based on the foregoing, it is hereby

**RECOMMENDED** that Plaintiff's motion for judgment on the pleadings (Dkt. No. 30) be **DENIED**; and it is further

**RECOMMENDED** that Defendant's motion for judgment on the pleadings (Dkt. No. 31) be **GRANTED**; and it is further

**RECOMMENDED** that the Commissioner's decision denying Plaintiff's application for DIB be **AFFIRMED**; and it is further

**ORDERED** that the Clerk of the Court serve copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam); and it is further

**ORDERED** that the Clerk of the Court serve copies of this Report-Recommendation on the parties in accordance with the Local Rules.  Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**IT IS SO ORDERED.**


Dated: January 30, 2023
       Syracuse, New York


Thérèse Wiley Dancks
United States Magistrate Judge

2015 WL 3776382
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

April K. DRYSDALE, Plaintiff,

v.

Carolyn W. COLVIN, Acting Commissioner
of Social Security, Defendant.

No. 14–CV–01722 (SN).
|
Signed June 16, 2015.

### OPINION AND ORDER

SARAH NETBURN, United States Magistrate Judge.

**\*1** Plaintiff April K. Drysdale brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of the final determination of the Commissioner of Social Security (the "Commissioner") denying her application for Disability Insurance Benefits ("DIBs") and Supplemental Security Income ("SSI") (collectively, "disability benefits"). The plaintiff moved, and the Commissioner cross-moved, for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

The Court finds that the administrative law judge ("ALJ") correctly applied the treating physician rule, and the new evidence submitted to the Appeals Council is either cumulative or not material. Accordingly, the plaintiff's motion for judgment on the pleadings is DENIED, and the Commissioner's cross-motion is GRANTED.

### BACKGROUND

On August 30, 2010, Drysdale applied for disability benefits, alleging a disability onset date of March 1, 2009, due to depression, bipolar disorder, and an injury to both arms. It is her fourth application for benefits since 2002. On December 22, 2010, the Social Security Administration ("SSA") denied the application, and Drysdale requested a hearing. Her request was untimely, but the SSA found that she had "demonstrated good cause for the late filing by explaining

that she had been preoccupied with pressing housing issues and court appearances to resolve rent arrears." (AR 161.) On February 9, 2012, Drysdale appeared for a hearing before ALJ Mark Hecht. On June 8, 2012, the ALJ denied Drysdale's application, finding her not disabled under the Act. Drysdale filed an appeal, to which she attached new evidence. On December 3, 2013, the Appeals Council declined to consider the newly submitted evidence and denied her request for review, rendering the ALJ's decision final. On March 5, 2014, Drysdale filed this action, and on August 22, 2014, *pro bono* counsel entered an appearance on her behalf. [1]

[1]    The Court acknowledges and appreciates the appearance of *pro bono* counsel on behalf of Ms. Drysdale.

Drysdale and the Commissioner have each provided a summary of the relevant evidence contained in the administrative record. *See* Pl Mem. at 2–9 (ECF No. 45); Comm'r Mem. at 1–14 (ECF No. 47). The Court adopts the parties' summaries, which do not conflict in any material way, as accurate and complete for purposes of the issues raised in this suit. We discuss the portions of the record pertinent to the adjudication of this case in section III below.

### DISCUSSION

### I. Standard of Review

A party may move for judgment on the pleadings "[a]fter the pleadings are closed-but early enough not to delay trial." Fed.R.Civ.P. 12(c). A Rule 12(c) motion should be granted "if, from the pleadings, the moving party is entitled to judgment as a matter of law." *Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am. & Its Local 537,* 47 F.3d 14, 16 (2d Cir.1995) (*per curiam* ). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner ... with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

**\*2** A determination of the ALJ may be set aside only if it is based upon legal error or is not supported by substantial evidence. *Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir.1999). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Halloran v. Barnhart,* 362 F.3d 28, 31 (2d Cir.2004) (quoting

*Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. *Diaz v. Shalala,* 59 F.3d 307, 312 (2d Cir.1995). *See also Alston v. Sullivan,* 904 F.2d 122, 126 (2d Cir.1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."). This means that if there is sufficient evidence to support the final decision, the Court must grant judgment in favor of the Commissioner, even if there also is substantial evidence for the plaintiff's position. *See Brault v. Comm'r of Soc. Sec'y,* 683 F.3d 443, 448 (2d Cir.2012) (finding that "[t]he substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise*" (citation and quotation marks omitted; emphasis in original)).

"[I]n order to accommodate 'limited and meaningful' review by a district court, the ALJ must clearly state the legal rules he applies and the weight he accords the evidence considered." *Rivera v. Astrue,* 10 Civ. 4324(RJD), 2012 WL 3614323, at *8 (E.D.N.Y. August 21, 2012) (citation omitted). Without doing so, the ALJ deprives the Court of the ability to determine accurately whether his opinion is supported by substantial evidence and free of legal error. Where the ALJ fails to provide an adequate roadmap for his reasoning, remand is appropriate. *Ferraris v. Heckler,* 728 F.2d 582, 587 (2d Cir.1984) ("[W]e do believe that the crucial factors in any determination must be set forth with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.").

## II. Definition of Disability

A claimant is disabled under the Act if he demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A determinable physical or mental impairment is defined as one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A claimant will be determined to be disabled only if the impairments are "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

**\*3** Under the authority of the Act, the SSA has established a five-step sequential evaluation process when making disability determinations. *See* 20 C.F.R. § 404.1520; *Jasinski v. Barnhart,* 341 F.3d 182, 183–84 (2d Cir.2003). The steps are followed in order: if it is determined that the claimant is not disabled at a step of the evaluation process, the evaluation will not progress to the next step. First, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. Second, the Commissioner determines whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. Third, if the claimant has a severe impairment, the Commissioner determines whether the claimant has an impairment included in the Listings. 20 C.F.R. Pt. 404, subpt. P, app'x 1. Fourth, if the claimant does not have a listed impairment, the Commissioner determines whether the claimant retains the residual functional capacity ("RFC"), despite her severe impairment, to perform past work. If not, the burden shifts to the Commissioner at the fifth and last step to show that other work exists in the national and local economies that the claimant can perform, given her RFC, age, education, and past relevant work experience. 20 C.F.R. § 404.1560(c)(2); *Jasinski,* 341 F.3d at 183–84. A claimant bears the burden of proof as to the first four steps. *Melville v. Apfel,* 198 F.3d 45, 51 (2d Cir.1999).

The regulations provide additional guidance for evaluating mental impairments. 20 C.F.R. § 404.1520a(c)(1). Calling it a "complex and highly individualized process," the section focuses the ALJ's inquiry on determining how the impairment "interferes with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. § 404.1520a(c) (2). For mental disorders, a claimant must show in part that she has at least two of the so-called "paragraph B criteria" or the "paragraph C criteria." The paragraph B criteria require at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; and (4) repeated episodes of decompensation. 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 12.04(B). The first three are rated on a "five-point scale": none, mild, moderate, marked, and extreme. 20 C.F.R. § 404.1520a(c)(4). A "marked" limitation is "more than moderate but less than extreme" and "may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively and on

2015 WL 3776382

a sustained basis." 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 12.00(c). The last area—episodes of decompensation—is rated on a "four-point scale": none, one or two, three, and four or more. *Id.* The paragraph C criteria require: (1) repeated episodes of decompensation, each for extended duration; (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 12.04(B).

**\*4** The Diagnostic and Statistical Manual of Mental Disorders ("DSM") defines "bipolar disorder, mixed" as:

> a period of time (lasting at least 1 week) in which the criteria are met both for a Manic Episode and for a Major Depressive Episode nearly every day [ ]. The individual experiences rapidly alternating moods (sadness, irritability, euphoria) .... The symptom presentation frequently includes agitation, insomnia, appetite dysregulation, psychotic features, and suicidal thinking. The disturbance must be sufficiently severe to cause marked impairment in social or occupational functioning or to require hospitalization, or it is characterized by the presence of psychotic features [ ]. The disturbance is not due to the direct physiological effects of a substance.

Am. Psychiatric Ass'n, *DSM–IV* 333 (4th ed. rev.2000).

## III. Analysis

On appeal, Drysdale argues that remand is appropriate because (1) the ALJ failed to apply the treating physician rule properly, and (2) the Appeals Council erred when it did not consider newly submitted evidence. The Commissioner argues that the Appeals Council's decision not to consider the new evidence was proper and that the ALJ's decision

otherwise is free of legal error and supported by substantial evidence.

### A. Treating Physician Rule

#### 1. Standard

The "treating physician rule" instructs the ALJ to give controlling weight to the opinions of a claimant's treating physician, as long as the opinion is well-supported by medical findings and is not inconsistent with the other evidence in the record. 20 C.F.R. § 404.1527(c)(2). Affording a treating physician's opinion controlling weight reflects the reasoned judgment that treating physicians are "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2). *See also Petrie v. Astrue,* 412 F. App'x 401, 405 (2d Cir.2011); *Mongeur v. Heckler,* 722 F.2d 1033, 1039 n. 2 (2d Cir.1983) (*per curiam* ); *Mejia v. Barnhart,* 261 F.Supp.2d 142, 148 (E.D.N.Y.2003) ("[A]s the report of a primary treatment provider, [the psychotherapist's] report should have been accorded more than Tittle' weight." (citations omitted)).

Licensed clinical social workers are not "acceptable medical sources" due controlling weight under the treating physician rule, but they are still "important" "other sources" to whom the ALJ should look to show the severity of a claimant's impairments or ability to work. *See Diaz,* 59 F.3d at 313 (citing 20 C.F.R. § 404.1527); 20 C.F.R. § 404.1513(a)-(d) (listing five categories of "acceptable medical sources"); Social Security Ruling ("SSR") 06–03p, 2006 WL 2329939, at \*2–3 (Aug. 9, 2006).

**\*5** Where mental health treatment is at issue, the treating physician rule takes on added importance. A mental health patient may have good days and bad days; she may respond to different stressors that are not always active. Thus, the longitudinal relationship between a mental health patient and her treating physician provides the physician with a rich and nuanced understanding of the patient's health that cannot be readily achieved by a single consultative examination. *See Canales v. Comm'r of Soc. Sec'y,* 698 F.Supp.2d 335, 342 (E.D.N.Y.2010) ("Because mental disabilities are difficult to diagnose without subjective, in-person examination, the treating physician rule is particularly important in the context of mental health") (citing *Richardson v. Astrue,* 09 Civ.

2015 WL 3776382

1841(SAS), 2009 WL 4793994, at *7 (S.D.N.Y. Dec. 14, 2009)).

The ALJ can discount a treating physician's opinion, however, if the ALJ believes that it "lack[s] support or [is] internally inconsistent." *Duncan v. Astrue,* 09 Civ. 4462(KAM), 2011 WL 1748549, at *19 (E.D.N.Y. May 6, 2011). "When other substantial evidence in the record conflicts with the treating physician's opinion, [ ] that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given." *Snell v. Apfel,* 177 F.3d 128, 133 (2d Cir.1999).

When the ALJ discredits the opinion of a treating physician, the regulations direct her to "always give good reasons in [her] notice of determination or decision for the weight [given a] treating source's opinion." 20 C.F.R. § 404.1527(c)(2); *Snell,* 177 F.3d at 134. The ALJ first must consider: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other significant factors. 20 C.F.R. § 404.1527(c)(2)-(6). She need not recite every piece of evidence in relation to these factors, however, so long as "the evidence of record permits [the Court] to glean the rationale of an ALJ's decision." *Mongeur,* 722 F.2d at 1040. *See Marinez–Paulino v. Astrue,* 11 Civ. 5485(RPP), 2012 WL 3564140, at *16 (S.D.N.Y. Aug. 20, 2010) ("It is not necessary that the ALJ recite each factor explicitly, only that the decision reflects application of the substance of the rule."). "Failure to properly apply the treating physician's rule, or consider the required factors, constitutes legal error and is a sufficient basis for remand." *Rolon v. Comm'r of Soc. Sec'y,* 994 F.Supp.2d 496, 506 (S.D.N.Y.2014). *See Schaal v. Apfel,* 134 F.3d 496, 505 (2d Cir.1998) ("[B]ecause the Commissioner failed to provide plaintiff with 'good reasons' for the lack of weight attributed to her treating physician's opinion as required by SSA regulations ... remand is necessary.").

### 2. Application
**\*6** The ALJ gave "significant weight" to the findings of treating psychiatrist Dr. Pierre–Antoine from his October 2011 report that Drysdale was "moderately limited" for most mental tasks. (AR 169.) Neither party disputes that this portion of the ALJ's decision is supported by substantial evidence and does not contain legal error. The ALJ gave

"little weight," however, to the conclusion that Drysdale has "markedly limited ability to maintain socially appropriate behavior, respond appropriately to changes in the work setting, or tolerate even low stress work." (*Id.*) In so doing, the ALJ found that there is "simply no objective evidence" to support this conclusion. (*Id.*)

Drysdale contends that the ALJ set the bar too high when deciding whether to afford Dr. Pierre–Antoine's opinion controlling weight. She argues that requiring "objective evidence" guts the treating physician rule because that rule favors *opinions* supported by appropriate diagnostic techniques, not cold objective *facts.*

Drysdale's argument is well taken to the extent it highlights the value the SSA assigns to opinion evidence. But that opinion cannot be unmoored from clinical findings, which are, of course, a form of objective evidence. And it cannot be substantially contradicted by the evidence in the record. Dr. Pierre–Antoine's opinion is not supported by clinical findings and is undermined by his own conclusions and the conclusions of other examiners. Accordingly, because the Court must affirm the ALJ so long as the decision is supported by substantial evidence and free of legal error—even if the Court might come to a different disability determination—Drysdale's argument is rejected. *See Brault,* 683 F.3d at 448 (finding that "[t]he substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise"* (citation and internal quotation marks omitted; emphasis in original)); *Alston,* 904 F.2d at 126 ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.").

Drysdale saw Dr. Pierre–Antoine and social worker Gilbert Calcano of the Upper Manhattan Mental Health Center ("UMMHC") bi-weekly for 21 months, beginning on March 9, 2010. Midway through her treatment, on October 29, 2011, Dr. Pierre–Antoine completed a Psychiatric/Psychological Impairment Questionnaire. He identified the following "positive clinical findings" in support of his opinion: poor memory; decreased energy; generalized persistent anxiety; feelings of guilt/worthlessness; difficulty thinking or concentrating; and disturbances of appetite, sleep, and mood. (AR 446.) These clinical findings are also consistent with her "primary symptoms" that he identified as dysphoria, sleep disturbance, fluctuating appetite, and poor concentration and memory problems. (AR 445.) He did not list a deficiency in social functioning as a symptom. Moreover, Dr. Pierre–

2015 WL 3776382

Antoine did not indicate other positive clinical findings that would have supported the marked limitations he later identified and which the ALJ rejected. For example, he did not select from a list of clinical findings that Drysdale exhibits "hostility or irritability," "catatonia or grossly disorganized behavior," "social withdrawal or isolation," or "illogical thinking or loosening of associations ." (AR 446.) These findings would have been more consistent with a conclusion that Drysdale was markedly limited in her ability to maintain socially appropriate behavior, respond appropriately to changes in the work setting, or adhere to basic standards of neatness.

**\*7** In addition, Dr. Pierre–Antoine concluded that Drysdale was "incapable" of even low work stress. (AR 457.) But again, when identifying the positive clinical findings to support his diagnosis, he did not select from the list "emotional lability" or "recurrent panic attacks"—both of which might be present for someone incapable of experiencing any workplace stress. (AR 446.) Finally, while Dr. Pierre–Antoine concluded that Drysdale's impairments—her generalized dissatisfaction with life and sleep, appetite, and mood disturbances—were expected to last 12 months and that she would likely miss work more than three times a month, he also diagnosed her as a malingerer. In light of these clinical findings, which the Court assumes are supported by diagnostic techniques, the ALJ was well within his discretion to reject certain of Dr. Pierre–Antoine's conclusions.

Otherwise, and throughout her treatment with Dr. Pierre–Antoine and Calcano, Drysdale was calm and cooperative with coherent and goal-directed thought processes and appropriate affect. These records are inconsistent with a marked limitation in social functioning. For example, at her January and February 2012 appointments, Calcano described her as well-dressed with fair insight and judgment. Drysdale described feeling anxious and depressed because she had moved in with her mother and her fourth disability benefits application was pending.

She also exhibited limited intellectual capacity and poor impulse control. Dr. Pierre–Antoine diagnosed Drysdale with multiple substance abuse and bipolar disorder, mixed (296.62), and assigned her a global assessment of functioning ("GAF") score that varied during her treatment between 50 and 60. In a form letter dated November 19, 2011, Calcano checked a box indicating that Drysdale "is totally disabled without consideration of any past or present drug and/or alcohol use. Drug and/or alcohol use is not a material

cause of this individuals' disability." (AR 450.) He further concluded that her "use of drugs and/or alcohol is a symptom of her condition, and/or is a form of self-medication. The disability is independent of any use." (*Id.*) Despite continuing to struggle with alcohol and drug abuse, Calcano described her condition as "stable." (AR 459.)

The record also contains reports by providers at Conifer Park inpatient treatment program, consultative psychiatrist Dr. Haruyo Fujiwaki, and consultative internist Dr. Aurelio Salon. These records provide substantial support for the ALJ's findings.

Before being admitted to Conifer Park in May 2010, Drysdale reported that she had been using alcohol at a rate of four to five pints daily; using cocaine at the rate of an "eight ball" every three to four days; and was still smoking cigarettes, "3–4 pkg when high, 3–4 days per week." (AR 397–406.) Upon admission, mental status findings indicated that Drysdale was wellgroomed, cooperative, and hyperactive. Her mood was moderately anxious and depressed, and her affect was appropriate. She reported isolation and poor sleep. Upon discharge approximately two weeks later, her mental status findings indicated that her thought process was coherent, goal directed and appropriate. She was diagnosed with general anxiety disorder. Her prognosis was "fair," and Drysdale was deemed "employable." (AR 393–94, 408.) She relapsed at least twice since her discharge. At her hearing before the ALJ on February 9, 2012, Drysdale admitted that she had started to use cocaine again the month before.

**\*8** On November 9, 2010, Drysdale took the subway to her appointments with Drs. Fujiwaki and Salon. She reported that she was drinking two to three bottles of liquor two to three times per week, and used cocaine one month ago. She self-reported feeling "always depressed," frequently waking during the night, and sometimes hearing voices calling her name. (AR 409.) She described being able to dress, bathe, and groom herself, but that she lacked the energy to "do cooking, cleaning, laundry, and food shopping." (AR 411.) Dr. Fujiwaki found that Drysdale was cooperative, related well to him, and had "adequate" social skills and overall presentation. (AR 410.) Her thought processes were coherent and goal directed, her insight and judgment were "fair to poor," and she had below average intellectual functioning. (*Id.*) Speaking to Drysdale's RFC, Dr. Fujiwaki concluded:

Vocationally, she is able to follow and understand simple directions and instructions. She can perform simple tasks independently. She has some difficulty to maintain attention and concentration. She is able to maintain a regular schedule with some difficulty due to substance abuse problems. She can learn new tasks with extended time.... She can make some simple decisions. She can relate with others and [ ] deal with stress to a certain extent.

(AR 412.) Dr. Fujiwaki attributed much of the limitations on Drysdale's ability to work to her substance abuse. He diagnosed her with mood disorder not otherwise specified ("NOS"), depressive disorder NOS, anxiety disorder NOS, psychotic disorder NOS, and alcohol and cocaine dependence.

Drysdale was also examined by Dr. Salon, an internist. The mental health screen was a minor part of her overall physical examination (and Drysdale does not challenge the ALJ's conclusions related to physical limitations). Dr. Salon noted that Drysdale was accompanied to the exam facility by a social worker, dressed appropriately, maintained good eye contact, and appeared oriented. He also found her affect to be "normal" and indicated that there was no evidence of hallucinations, delusions, impaired judgment, or "significant memory impairment." (ARE 416.)

The ALJ considered all of this evidence. Overall, all of the providers found that Drysdale consistently related well, was cooperative, and had coherent, goal-directed thoughts. She also consistently demonstrated fair to poor judgment, was limited to average intellectual functioning, and demonstrated poor impulse control. The ALJ acknowledged Drysdale's moderate impairments, but also found that her impairments were not as "marked" as she purports them to be. The evidence in the record supports the ALJ's decision to give "little weight" to the findings of marked limitation.

That the ALJ weighed the evidence and reached a different conclusion than another factfinder might have reached does not establish legal error. He was not required to afford every finding by Dr. Pierre–Antoine controlling weight in light of the less favorable findings in the record. See *Veino v. Barnhart,* 312 F.3d 578, 588 (2d Cir.2002) (where "the record plainly contained conflicting psychological evaluations of [the claimant's] present condition ... it was within the province of the ALJ" to accept portions of a doctor's opinion while rejecting other portions); *Snell,* 177 F.3d at 133 (where the record contained evidence from several consultative physicians who made less favorable findings with which the treating physicians' opinions were "inconsistent," the treating physician's opinions were not due controlling weight) (citing 20 C.F.R. § 404.1527(d)(2)); *Legg v. Colvin,* 574 F. App'x 48, 49 (2d Cir.2014) ("The ALJ appropriately noted that the objective medical evidence, the reports of other physicians, and [the treating physician's] own treatment notes did not support the diagnoses and serious functional limitations contained in his statements.").

**\*9** Finally, despite Drysdale's significant impairments, DIBs and SSI are not simply a diagnosis-based benefits program: under the Act, it is not enough for an applicant to be diagnosed with bipolar disorder or to have some impairments. An applicant must have diagnoses that impair her capacity *plus* an inability to do past work or adjust to other work. See 42 U.S.C. § 423(d)(1)-(2). It is the duty of the ALJ to weigh the evidence in the record and, where appropriate, conclude that a claimant is not *so* impaired as to require a finding of disabled under the Act. See *Veino,* 312 F.3d at 588. See *Matta v. Astrue,* 508 F. App'x 53, 56–57 (2d Cir.2013) (affirming the ALJ's denial of benefits to a claimant with bipolar disorder where "substantial evidence revealed [the claimant's] condition stabilized and at the most, he had moderate symptoms"). Accordingly, the ALJ's decision did not violate the treating physician rule when he rejected some of Dr. Pierre–Antoine's findings.

**B. New Evidence**

**1. Standard**

"Disputes concerning the relevancy of diagnoses made after a denial of SSI benefits are driven by the tension between the need for finality and the search for truth." *Tirado v. Bowen,* 705 F.Supp. 179, 181–82 (S.D.N.Y.1989). "[C]laimants ordinarily should have but one opportunity to prove entitlement to benefits, otherwise disability administrative proceedings would be an unending merry-go-round with no finality to administrative and judicial determinations. It is a truism nonetheless, that nothing is permanent except change, and for that reason room must be allowed in the process for the fact that a claimant's medical condition may not be

2015 WL 3776382

fully diagnosed or comprehended at the time of her hearing." *Tirado v. Bowen,* 842 F.2d 595, 596 (2d Cir.1988). As a result, the Court "must attempt to strike a balance between these extremes." *Tirado,* 705 F.Supp. at 182.

Under 42 U.S.C. § 405(g), the Court may remand a case "upon a showing that there is *new evidence* which is *material* and that there is good cause for the failure to incorporate the evidence into the record in a prior proceedings." *See also* 20 C.F.R. §§ 404.970, 416.1570(b) (emphasis supplied); *Perez v. Chater,* 77 F.3d 41, 44–46 (2d Cir.1996); *Tirado,* 842 F.2d at 597; *Canales,* 698 F.Supp.2d at 341. Because new evidence submitted to the Appeals Council is part of the administrative record for judicial review, however, a showing of good cause is not necessary where the evidence was presented to the Appeals Council, but the Appeals Council declined to consider it. *See, e.g., Knight v. Astrue,* 10 Civ. 5301(BMC), 2011 WL 4073603, at *12 (E.D.N.Y. Sept. 13, 2011).

Evidence is new if it did not exist before the ALJ decision and it is not merely cumulative of evidence already in the record. *Tirado,* 842 F.2d at 597. Evidence is material where it "relates to the period on or before the date of the [ALJ] hearing decision," is probative, and there is "a reasonable possibility" that it would have influenced the ALJ's decision. *Id. See also* 20 C.F.R. §§ 404.970, 416.1570(b). Documents generated after the ALJ rendered a decision are not categorically barred so long as the documents are relevant to the time period, before the ALJ's decision, for which benefits were denied. *Pollard v. Halter,* 377 F.3d 183, 193 (2d Cir.2004). *See* 20 C.F.R. § 416.330 (a disability claim remains in effect through the decision of the ALJ). This is because new evidence may "disclose the severity and continuity of impairments existing" before the ALJ's decision and "may identify additional impairments which could reasonably be presumed to have been present and to have imposed limitations" previously. *Lisa v. Sec'y of Dep't of Health and Human Servs.,* 940 F.2d 40, 44 (2d Cir.1991). New and material evidence will not warrant remand if it "does not add so much as to make the ALJ's decision contrary to the weight of the evidence." *Rutkowski v. Astrue,* 368 F. App'x 226, 229 (2d Cir.2010). *See also Perez,* 77 F.3d at 45 ("When the Appeals Council denies review after considering new evidence, we simply review the entire administrative record, which includes the new evidence, and determine, as in every case, whether there is substantial evidence to support the decision of the Secretary").

**\*10** The vast majority of cases remanded to consider new evidence involve physical, rather than mental, disabilities. *See, e.g., Patterson v. Colvin,* 24 F.Supp.3d 356, 373 (S.D.N.Y.2014) (knee injury); *Rolon,* 994 F.Supp.2d at 509–10 (herniated disc); *Lopez v. Astrue,* 03 Civ. 0313(CBA), 2011 WL 6000550, at *11 (E.D.N.Y. Nov. 28, 2011) (lumbar and cervical spine); *Melvin v. Barnhart,* 02 Civ. 4527(GBD)(JCF), 2004 WL 2591948, at *6–7 (S.D.N.Y. Nov. 8, 2004) (degenerative disc disease). *Cf. Mulrain v. Comm'r of Soc. Sec'y,* 431 F. App'x 38, 39–40 (2d Cir.2011) (refusing to remand where the new evidence of the claimant's foot pain did not indicate that the condition was more serious than originally thought or that the condition had worsened); *Beach v. Comm'r of Soc. Sec'y,* 11 Civ.2089(JMF), 2012 WL 3135621, at *15 (S.D.N.Y. Aug. 2, 2012) (declining to remand because, "[a]lthough the new evidence supports [the claimant's] reports of joint pain in her ankles and hip," it "is more likely a reflection of [the claimant's] condition worsening after the cutoff date than an indication that she was disabled before the cutoff date.").

The results in cases involving new evidence related to mental developments are less consistent. In part, this is due to the difficulty of distinguishing between new evidence which "reflects the severity of the plaintiff's impairment as it existed during the time period for which benefits were denied" and that which "represents new impairments which would not have affected the decision below, and which would be better considered in a new application for benefits." *Hernandez v. Sullivan,* 91 Civ. 1836(LBS), 1992 WL 315637, at *3 (S.D.N.Y. Oct. 22, 1992]. *See also Bosmond v. Apfel,* 97 Civ. 4109(RPP), 1998 WL 851508, at *12 (S.D.N.Y. Dec. 8, 1998) (inquiring whether a new "diagnosis relates to a previously unrecognized condition, or whether it reveals the depth of an illness recognized, but not fully appreciated at the time of the hearing" (citations omitted)). *Compare Crowley v. Colvin,* 13 Civ. 1723(AJN)(RLE), 2014 WL 4631888, at *4–5 (S.D.N.Y. Sept. 15, 2014) (remanding where newly submitted psychological evaluations, conducted after the ALJ's decision, affirmatively stated that the "onset of" the claimant's psychiatric impairments, which made him unable to work, predated and were present during the relevant time period before the ALJ decision), *with Brown v. Comm'r of Soc. Sec'y,* 709 F.Supp.2d 248, 257–58 (S.D.N.Y.2010) (declining to remand where new evidence regarding the claimant's pain, depression, and muscle spasms from a time period many years after the period in issue "provides no reliable information as to the severity or nature of his condition" *before* the ALJ's decision).

**2. Application**

Drysdale submitted to the Appeals Council additional medical records that pertain to and are dated after June 8, 2012. These records are "new" because they "did not exist at the time of the ALJ's hearing." *Pollard,* 377 F.3d at 193. Further, a showing of good cause is not required because the new evidence was submitted to the Appeals Council and was a part of the record on appeal to this Court. *See Knight,* 2011 WL 4073603, at *12. The more difficult question is whether the evidence is (1) new, as in not merely cumulative, and (2) material, as in "relate[s] to the time period for which benefits were denied," and does not only "concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." *Tirado I,* 705 F.Supp. at 182 (citation omitted).

 **\*11** The new evidence includes (1) five months of social worker reports from Harlem East Life Plan Chemical Dependency Program ("Harlem East") from February 11, 2013 through July 13, 2013; (2) a one-time psychiatric assessment by Dr. Moussavian, dated July 1, 2013; and (3) a one-time Federation Employment & Guidance Service ("FEGS") biopsychosocial assessment, dated August 20, 2013. The earliest of these is eight months after the ALJ's decision.

The Harlem East reports and Dr. Moussavian's report do not paint a significantly different picture of Drysdale than the evidence already considered by the ALJ. In the Harlem East reports, Drysdale exhibited average intelligence, was described as cooperative, motivated, and self-aware, and demonstrated positive communication skills. She also described feeling depressed, suffering from mood swings, and self-reported that she did "not want to work" and did "not want help to find employment and/or further education/training ." (AR 118–32.) She was diagnosed with bipolar disorder, diagnosed a GAF of 60, and characterized as suffering from low self-esteem. In addition to her mental health impairments, the reports also demonstrate significant external stressors weighing on Drysdale: her recent homelessness, the absence of vocational training, her lack of family or peer support, limited recreational/leisure skills, and substance abuse. Despite these stressors, Drysdale reported attending Alcoholics Anonymous and Narcotics Anonymous and expressed interest in obtaining her GED. Dr. Moussavian's report is similar, but noteworthy for Drysdale's update that she stopped attending appointments at UMMHC and stopped taking her medications, causing her to feel more

depressed and anxious. Accordingly, regardless of whether the Harlem East and Dr. Moussavian reports relate back to the time period before the ALJ's decision, they are cumulative of the medical evidence in the record and would "not add so much as to make the ALJ's decision contrary to the weight of the evidence." *Rutkowski,* 368 F. App'x at 229. *See Tirado II,* 842 F.2d at 597. They do not warrant remand.

The one-time consultative FEGS evaluation, conducted a month after Dr. Moussavian's report, represents stronger evidence of the severity of Drysdale's impairments—although it is unclear whether Drysdale had resumed taking her prescribed medications and/or had reacclimated to them by that point. Dr. Hun Han opined that Drysdale would need a low stress environment, and that she has restrictions of activities of daily living that prevent adherence to a regular work routine. Dr. Beatrice Spinelli recommended that Drysdale's exertion level of her workload or pacing be modified, that she be allowed a flexible/modified schedule that allows taking leave as needed, that she be allowed to use stress reducing devices/equipment, and that she receive additional time to be trained. Both doctors ultimately concluded that Drysdale has substantial functional limitations to employment and a regular work routine due to medical conditions that will last for at least 12 months and make her unable to work.

 **\*12** The FEGS evaluation, however, is a one-time consultative examination based on Drysdale's self-reporting, rather than a doctor's longitudinal relationship with, and observations of, Drysdale. It is possible that, as a malingerer, her self-reporting does not accurately reflect her impairments. It is also possible that her condition worsened after the ALJ's decision because she was not compliant with her medications and continued to abuse cocaine and alcohol. The Court finds that this report does not necessarily disclose the severity and continuity of impairments existing before the ALJ's decision, make the ALJ's decision contrary to the weight of the evidence, or contain a reasonable likelihood of influencing the ALJ's decision. *See Tirado II,* 842 F.2d at 597; *Lisa,* 940 F.2d at 44; *Rutkowski,* 368 F. App'x at 229–30. As a result, it, too, does not warrant remand.

## CONCLUSION

For these reasons, the plaintiff's motion is DENIED, and the Commissioner's cross-motion is GRANTED. The Clerk of

2015 WL 3776382

Court is directed to terminate the motions at Docket Entry No. 44 and 46 and close this case.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 3776382

**Footnotes**

                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 3614323, 181 Soc.Sec.Rep.Serv. 694

2012 WL 3614323
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Angel L. Alvelo RIVERA, Plaintiff,
v.
Michael ASTRUE Commissioner
of Social Security, Defendant.

No. 10 CV 4324(RJD).
|
Aug. 21, 2012.

**Attorneys and Law Firms**

Milton J. Carlier, Milton J. Carlier, Esq., New York, NY, for
Plaintiff.

Michelle L. Christ, United States Attorneys Office, Eastern
District of New York, Brooklyn, NY, Social Security
Administration, for Defendant.

**MEMORANDUM & ORDER**

DEARIE, District Judge.

**\*1** Plaintiff Angel Rivera challenges the Commissioner
of the Social Security Administration's ("SSA") denial
of Supplemental Security Income ("SSI") benefits for his
claimed disabilities, which include diabetes, neuropathy,
headaches, arthritis, and severe depression. ECF Docket #
16, Record ("R.") at 16, 18, 66, 69.[1] The Commissioner
moves for judgment on the pleadings pursuant to Federal
Rule of Civil Procedure 12(c), arguing that the administrative
law judge's ("ALJ") decision is supported by "substantial
evidence" in the record, including plaintiff's testimony, and
that the ALJ applied the correct legal standards. Def.'s Mem.
at 2. In response, plaintiff asserts that (1) the ALJ improperly
rejected plaintiff's claims of pain and depression as not
credible; (2) the ALJ violated the "treating physician rule"
by affording insufficient weight to the opinion of plaintiff's
primary care physicians; and (3) the ALJ failed to fully
develop the record of plaintiff's mental illness, as is required
for *pro se* litigants. Pl.'s Mem. at 3–9. For the reasons stated
below, the Court remands the case to the ALJ for further
proceedings consistent with this Memorandum and Order.

[1]    Hereinafter, "R." refers to the compilation of
documents prepared by the SSA's Office of
Disability Adjudication and Review for review by
the Court.

**I. BACKGROUND**

A. Medical History: 1995–2007

Plaintiff is a 56–year–old native of Puerto Rico who has
lived in the United States on and off since 1974. R. at 29–
30. Plaintiff was diagnosed with diabetes in 1998, kidney
stones in 2000, and arthritis, asthma, high cholesterol, and
neuropathy in 2002. R. at 256. Records from Grupo Medico
Enmanuel, a Puerto Rican clinic, show that from 2005 to
2007, plaintiff's diabetes was uncontrolled, with consistently
elevated blood sugar and Hemoglobin A1C levels. R. at 156–
64; *see also* R. at 182–84.

Plaintiff also suffers from severe depression and suicidal
ideation, which resulted in at least five suicide attempts.[2]
Despite numerous bouts of depression without meaningful
recovery, plaintiff apparently received no mental health care
beyond two years of treatment prior to 1995 in Puerto Rico,
until the period immediately preceding his application for SSI
benefits in January of 2008. R. at 16, 190, 197.

[2]    Plaintiff reported elsewhere up to ten suicide
attempts. R. at 190. Plaintiff first attempted suicide
around 2002 when he attempted to drive off a
bridge, but crashed his car into the side railings.
R. at 280. Also in approximately 2002, plaintiff
reportedly injected himself twenty-five times with
insulin in the stomach. *Id.* In 2006, plaintiff placed
a gun in his mouth, but fired the bullet into the air
instead. R. at 34. In 2007, he tried to jump from
a moving subway train, but was restrained by his
brother. R. at 40.

Plaintiff was last gainfully employed in February of 2007,
at which time he quit his job in construction because of
dizziness, depression, "nerves," and pain stemming from his
arthritis and diabetic neuropathy. R. at 33, 38, 188. Plaintiff
claims he felt the neuropathic pain throughout his entire body,
but especially in his brain, his hands, and his feet, and that the
neuropathy induced lethargy and swelling of his legs, which
made working difficult. R. at 38–39, 42.

Between August 31 and September 18, 2007, plaintiff underwent biopsychosocial examinations at FEGS Health and Human Services, [3] which revealed major depressive disorder as well as physical ailments. R. at 186–212. Plaintiff reported to FEGS that "[n]early [e]veryday" he felt depressed or hopeless; had trouble falling or staying asleep or sleeping too much; felt tired or had little energy; felt bad about himself; had trouble concentrating; and thought he would be better off dead or hurting himself in some way. R. at 190. These feelings made it "[e]xtremely [d]ifficult" for him to do work, take care of things at home, and get along with other people, although plaintiff acknowledged that he could wash dishes and clothes, sweep the floor, vacuum, watch television, shop for groceries, cook meals, read, socialize, bathe, and get dressed. R. at 191. Plaintiff denied having any immediate intent to take his life, but reported that he thought about suicide on a daily basis. R. at 198. In addition, he complained of decreased concentration, insomnia, agoraphobia, panic attacks, crying spells, and "near-persistent anxious mood and fears," R. at 195, including of traveling alone and "being in the city." R. at 191.

[3]    Founded in 1934 by the Federation of Jewish Philanthropies, FEGS is a not-for-profit healthcare network with over 300 locations in the New York City area. About FEGS, *FEGS Health & Human Services,* http:// www.fegs.org/# /about_fegs/ (last visited July 27, 2012).

**\*2** On August 31, 2007, plaintiff scored a 19 on the Patient Health Questionnaire ("PHQ")–9—a screening tool for depressive syndromes—a score, which corresponds to moderately severe depression. R. at 192, 200–01. A Phase II psychiatric exam found that plaintiff was oriented to time and place, possessed sufficient general knowledge, had a neat appearance and normal speech cadence, and appeared cooperative and logical. R. at 206–07. The exam also revealed, however, that plaintiff had "severe" impairments in his ability to follow work rules, accept supervision, deal with the public, relate to co-workers, and adapt to change and stressful situations, and had a "moderate" impairment in his ability to maintain attention. R. at 206. Plaintiff's mood was depressed, and his Global Assessment of Functioning ("GAF") score was a 39.[4] R. at 207–08. A physical examination showed that plaintiff suffered from diabetes and associated peripheral neuropathy, lower back pain, hyperlipidemia, and decreased visual acuity bilaterally. R. at 195.

[4]    The GAF is a 0–100 scale that "indicates the clinician's overall opinion of an individual's psychological, social, and occupational functioning." *Petrie v. Astrue,* 412 F. App'x 401, 406 n. 2 (2d Cir.2011). A score of 39 corresponds to "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant)" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed.1995).

The examiners at FEGS concluded that plaintiff suffered from major depressive disorder, severe, R. at 197, and labeled him "[t]emporarily disabled from work," but projected he would be able to return to full-time employment within six months if he received proper mental health treatment. R. at 209. FEGS recommended that plaintiff obtain outpatient psychotherapy and rehabilitation and begin antidepressant medications. R. at 209.

B. Care by Treating Physicians

1. Dr. Billy Geris, M.D. (2007–present)

Billy N. Geris, M.D., an internist operating out of BG Medical on Staten Island, first saw plaintiff on October 18, 2007. R. at 219. Plaintiff's first exam revealed uncontrolled diabetes, malaise and fatigue, generalized arthritis in his lower leg, mixed hyperlipidemia, and diabetic neuropathy. R. at 219–20. Dr. Geris prescribed Cymbalta for plaintiff's neuropathic pain and ordered a series of X-rays performed the same day. R. at 220. The X-rays showed early marginal osteophytosis in the lateral patellar margins of plaintiff's knees, straightening of the normal cervical lordosis and early anterior bridging osteophytes in plaintiff's lower cervical spine, and early multi-level degenerative changes in plaintiff's lumbar spine. R. at 237–39. The X-rays were otherwise normal. R. at 237–39. Dr. Geris prescribed Topamax for headaches, Vicodin for arthritis pain, Lyrica for joint pain, and a continued regimen of Ambien for insomnia. R. at 223, 225.

In February of 2008, Dr. Geris diagnosed plaintiff with bronchitis, benign hypertensive heart disease without congestive heart failure, myalgia and myositis, and thoracic

2012 WL 3614323, 181 Soc.Sec.Rep.Serv. 694

or lumbosacral neuritis or radiculitis, and, in March of 2008, with asthma, gastritis, and gastroduodenitis. R. at 226–30. Chest X-rays performed on February 6, 2006, showed the lungs to be clear, bony structures to be intact, and heart and mediastinal structures to be unremarkable. R. at 234. A March 6, 2008 neurological evaluation revealed mildly decreased range of motion and pain upon extremes of motion in the cervical spine, as well as abnormal spontaneous activities in the left C5–6 nerve roots, consistent with radiculopathy; the exam also showed normal variance in amplitude among all tested nerves and no significant delay in motor and sensory nerve responses. R. at 249–53.

**\*3** On January 18, 2010, Dr. Geris completed a questionnaire provided by the SSA to assess plaintiff's physical impairments and resulting limitations. [5] R. at 336–40. According to the report, plaintiff had to lie down during the day as a result of his back pain and the prognosis for plaintiff's back and neck pain was "poor." R. at 337. Dr. Geris estimated that plaintiff could sit for up to four hours continuously, for a total of four hours in an eight-hour workday; stand for up to one hour continuously, for a total of four hours in an eight-hour workday; and walk for up to 15 minutes continuously, for a total of 45 minutes in an eight-hour workday. R. at 338. Plaintiff would be limited during an eight-hour workday to "[o]ccasionally" lifting or carrying between zero and five pounds, and plaintiff could "[o]ccasionally" bend or reach but could never squat or climb. R. at 338–39. Because of his COPD, plaintiff had "[t]otal" restrictions in his ability to work in an area exposed to dust, fumes, gases, or marked changes in temperature and humidity. R. at 339–40. Dr. Geris reported that plaintiff was "total[ly]" restricted in his ability to work at unprotected heights, to be around moving machinery, or to drive a motor vehicle. R. at 339. Plaintiff was physically unable to travel to and from work. R. at 340.

[5]     This questionnaire, which was completed after the ALJ rendered his decision, was included in plaintiff's application for review to the SSA Appeals Council. R. at 5, 144–46. Evidence submitted to the Appeals Council becomes part of the administrative record on review in a district court as long as it (1) is new; (2) is material; and (3) "relate[s] to the period on or before the ALJ's decision." *Perez v. Chater,* 77 F.3d 41, 45 (2d Cir.1996). Dr. Geris' report qualifies as "new," since it had not yet been written when the ALJ rendered his decision. *Pollard v. Halter,* 377 F.3d

183, 193 (2d Cir.2004) ("Because the new evidence submitted by [the claimant's mother] did not exist at the time of the ALJ's hearing, there is no question that the evidence is 'new.' "). It is also "material," as (1) it lends credence to plaintiff's description of his impairments; (2) it "may disclose the severity and continuity of impairments" even though it "did not explicitly discuss [plaintiff's] condition during the relevant time period"; and (3) there is a "reasonable possibility that the new evidence would have influenced the [ALJ] to decide [plaintiff's] application differently." *Id.* at 193–94 (internal citation and quotation marks omitted). The only question is whether Dr. Geris' report relates to the window of time "on or before the ALJ's decision"—between January 1, 1998, and November 20, 2009, *see* R. at 16, 23. The ALJ must ascertain the answer on remand.

2. Dr. Javier Garcia, M.D. (2007–2008)

Plaintiff began seeing his primary psychiatrist, Dr. Javier Garcia, M.D., on November 6, 2007. R. at 279, 293. Dr. Garcia's first exam revealed that plaintiff experienced a depressed mood, poor sleep, decreased energy, and passive suicidal ideation. R. at 279. Plaintiff also reported hearing voices in times of stress, complained of being stressed about his physical ailments, which were preventing him from working, and described his current level of pain as a seven on a scale from zero to ten. R. at 279–81. Although plaintiff did not appear to be suffering from hallucinations or delusions and had a coherent thought process, his mood was depressed and his affect constricted; he scored a 51 on the GAF test. [6] R. at 282. Dr. Garcia prescribed Lexapro for plaintiff's depression and Ambien for insomnia, and at a follow-up meeting one week later, directed plaintiff to attend weekly individual therapy sessions. R. at 212–13, 283. Dr. Garcia noted that he needed more information before he could assess plaintiff's ability to return to work, but that plaintiff continued to have "significant depressive" symptoms. R. at 213.

[6]     A patient with a score of 51 suffers from "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks)" or "moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." American Psychiatric Association, *supra,* note 4, at 32.

At a series of—on average—monthly checkups between February and June of 2008, plaintiff continued to complain that he remained depressed about the limitations his physical impairments imposed on his ability to work, although his psychiatric medications improved his depressive symptoms somewhat, R. at 286, 288, 302, 305, 307; that he continued to have passive suicidal ideation, though less frequently, R. at 302; and that his "major problem" was his neuropathic pain, which was getting worse, R. at 304, 307. Accordingly, on a New York City Department of Social Services form dated February 20, 2008, Dr. Garcia reported that plaintiff was temporarily unemployable, but did not indicate a date on which he expected plaintiff to be able to return to work. R. at 215. In May of 2008, Dr. Garcia assigned plaintiff a GAF score of 56. [7] R. at 286.

[7]   A score of 56 corresponds to the same set of symptoms as described by a score of 51. *See supra* note 6.

**\*4** From November of 2007 through June of 2008, as prescribed by Dr. Garcia, plaintiff also attended weekly therapy sessions with Gloria Mendoza at the St. George Clinic. See R. at 296–308. Plaintiff also reported that the medication Dr. Geris prescribed had significantly alleviated his psychiatric symptoms. R. at 300.

C. Consultative Examinations

Under the Social Security regulations, an ALJ is permitted to consider the opinions of medical or psychological consultants retained by state agencies, as well as other outside physicians, psychologists, and medical experts. *See* 20 C.F.R. § 404.1527(e) (2). Plaintiff was referred for a consultative exam to Dr. Jerome Caiati, M.D., an internist at Industrial Medicine Associates, P.C. in Queens, and on that same day, plaintiff also underwent a consultative psychiatric evaluation performed by Sanam Hafeez–Khan, Ph.D., also at Industrial Medicine Associates. R. at 256, 261.

1. Dr. Jerome Caiati, M.D.

Dr. Caiati examined plaintiff once, on April 17, 2008. R. at 256. At the examination, plaintiff complained of knee pain and balanced himself with a cane, which he claimed had been prescribed by a doctor, but according to Dr. Caiati, plaintiff had no trouble rising from his chair or getting on or off the exam table. R. at 257. As plaintiff's treating physicians had done previously, Dr. Caiati diagnosed plaintiff with obesity, diabetes, hyperlipidemia, asthma, diabetic neuropathy, hypertension, and arthritis. R. at 259. Yet according to Dr. Caiati, plaintiff had minimum limitations in his ability to reach, push and pull because of shoulder pain; a minimum limitation in his ability to bend because of back pain; a minimum limitation in his ability to climb because of knee pain; and a minimum to mild limitation in his ability to lift because of shoulder, spine, and knee pain. *Id.*

Plaintiff's musculoskeletal system showed no scoliosis, kyphosis, or abnormality in the thoracic spine, and he enjoyed full range of motion of the elbows, forearms, and wrists, though his lumbar range of motion testing produced lower back pain. R. at 258. Strength in the lower and upper extremities was five out of five, and the exam revealed no evident subluxations, contractures, ankylosis, or thickening; plaintiff's joints were stable and nontender. *Id.* Dr. Caiati found that plaintiff was unrestricted in his ability to sit, stand, and walk. R. at 259.

2. Dr. Sanam Hafeez–Khan, Ph.D.

Dr. Hafeez–Khan also saw plaintiff just once, on April 17, 2008. R. at 261. He reported that while plaintiff did "not seem to have an actual plan or intent of suicide," he did have "active thoughts" about taking his own life. R. at 262. Plaintiff complained of anxiety but did not report any symptoms of it; nor did he report symptoms of mania or thought disorder. *Id.* Largely consistent with treating physician Dr. Garcia's findings, although plaintiff's thought process was coherent and goal-directed, oriented to person, place, and time, and without hallucinations, delusions, or paranoia, R. at 262–63, 281–82, plaintiff exhibited a "[d]epressed and hopeless" affect and a dysthymic mood, and his attention and concentration were mildly impaired because of his physical pain, R. at 262–63.

**\*5** Dr. Hafeez–Khan concluded that plaintiff was able to understand and perform simple directions, to maintain attention and concentration, and to make appropriate decisions. R. at 263. As a result of his pain and depression, however, Dr. Hafeez–Khan felt that plaintiff would not be able to maintain a regular schedule or perform complex tasks without supervision, and he would have difficulty dealing with stress and relating to others. R. at 263. In addition, Dr. HafeezKhan noted that plaintiff's psychiatric problems "may significantly interfere with [plaintiff's] ability to function on a daily basis." R. at 264.

3. L. Mesagno

Apparently based solely on a review of plaintiff's medical records, a disability examiner retained by the state named L. Mesagno, completed a Physical Residual Functional Capacity ("RFC") Assessment form on May 19, 2008. *See* R. at 268–72. Mesagno found plaintiff to have moderate exertional and postural limitations and no manipulative, visual, communicative, or environmental limitations. R. at 269–71. Mesagno concluded that although plaintiff was "partially credible in his allegations of pain and restriction," his pain and restrictions were not serious "to the extent he claim[ed]." R. at 272.

### 4. M. Graff

Similarly based solely on a review of plaintiff's medical records, a psychologist retained by the state named M. Graff, completed a Psychiatric Review Technique Form on June 23, 2008. [8] R. at 310. Graff concluded that plaintiff suffered from major depressive disorder, but that this impairment did not meet or equal in severity the listing for affective disorders in the Social Security regulations. R. at 313. Graff found that although plaintiff had a "mild" limitation in his ability to maintain social functioning and "moderate" limitations in activities of daily living and maintaining concentration, persistence, or pace, plaintiff had never experienced "repeated episodes of deterioration ." R. at 320. Graff also determined that plaintiff did not meet the "C Criteria" for listing 12.04 contained at 20 C.F.R. § 404, Subpart P, Appendix 1. [9] R. at 321. According to Graff, plaintiff's psychiatric symptoms were "no more than moderate" and his psychiatric treatment appeared to have been beneficial. R. at 325.

[8]    The Psychiatric Review Technique Form is a standard SSA document on which psychiatric experts, including non-examining consultative psychiatrists like Graff, record their conclusions about a claimant's mental impairments and limitations. *See Kohler v. Astrue,* 546 F.3d 260, 265–66 (2d Cir.2008) (citing 20 C.F.R. § 404.1520(e)(1)).

[9]    The ALJ considered plaintiff's depression under the rubric of a mood disorder, which is contained in the Social Security regulations at listing 12.04 in Subpart P of Appendix 1. Listing 12.04 contains three different sets of possible symptoms, known as paragraphs A, B, and C. Under the regulations, a mood disorder is considered to meet or equal in severity an impairment in the listings—thus

entitling the claimant to benefits—if it either (1) meets the criteria of both paragraph A and paragraph B of listing 12.04; or (2) meets the criteria of paragraph C in listing 12.04. 20 C.F.R. § 404, Subpart P, Appendix 1.

### D. Administrative Process

On January 8, 2008, plaintiff applied for SSI, alleging disabilities beginning on January 1, 1998. R. at 16, 120–22. Based on the above-summarized evidence, [10] on June 26, 2008, the SSA denied plaintiff's application for SSI benefits, R. at 55, 58, and on July 31, 2008, plaintiff filed a request for an administrative hearing, R. at 16, 70.

[10]    With the exception of Dr. Geris' January 18, 2010, report. *See supra* note 5.

### 1. Hearing

ALJ David Z. Nisnewitz conducted a hearing on October 14, 2009. R. at 27. Plaintiff, who appeared *pro se,* acknowledged—through a Spanish-language interpreter—that he understood his right to representation and was voluntarily waiving that right. R. at 29. The only other witnesses to testify at the hearing were David Festa, a vocational expert, and Leslie Fine, M.D., a psychiatrist maintained on a panel of experts by the Bureau of Hearings and Appeals who had reviewed plaintiff's medical records and was present during plaintiff's testimony. R. at 28, 49, 52. Neither Fine nor Festa had ever examined plaintiff. Neither of plaintiff's treating physicians was present at the hearing.

**\*6** Plaintiff testified that he had not taken his psychiatric medications "for years" and that he had seen his psychiatrist for the last time around November of 2008. R. at 41, 48. He also admitted to noncompliance with diabetes medication prior to 2007 because he had been "traumatized" when his mother's liver "exploded" while she was on the same medication. R. at 39. Plaintiff said he still felt depressed, but not suicidal, and that to help himself walk he used a cane, which was not prescribed by a doctor. R. at 42, 47. In response to the ALJ's questioning, plaintiff estimated he could lift and carry 20 pounds across the room and walk a total of six to eight blocks, stopping to rest for five to ten minutes between each block. R. at 46–47. Plaintiff described his daily activities as watching television and writing letters. R. at 43. He testified that he was able to clean the house and cook small things for himself, as well as go grocery shopping with his brother. R. at 43–44. [11]

11    A close reading of the record reveals several inconsistencies in plaintiff's statements to the ALJ and medical sources, including, but not limited to, the number of times plaintiff attempted suicide and whether his cane had been prescribed by a doctor. On remand, the ALJ may, of course, take such discrepancies into consideration when assessing plaintiff's credibility.

Citing plaintiff's positive response to his psychiatric treatment, and his decision to stop receiving mental health care, Dr. Fine, the non-examining psychiatric expert, testified that plaintiff did not "meet[ ] a listing" in the Social Security regulations. R. at 50. Dr. Fine rated plaintiff "moderately limited" in his activities of daily living, socialization, and ability to maintain concentration, persistence, and pace. *Id.* Dr. Fine testified that plaintiff could resume working but would be limited to simple, repetitive, low-stress jobs because of his mood disorder. R. at 51–52. Vocational expert Festa testified that plaintiff could do unskilled jobs requiring only a light exertional level, including working as a racker, electrode cleaner, or laundry worker. R. at 52–54.

### 2. ALJ's Decision

In a decision dated November 20, 2009, the ALJ determined that plaintiff's asthma, obesity, arthritis, depression, and diabetes with neuropathy qualified as "severe" medical impairments under 20 C.F.R. § 416.920(c), R. at 18, but concluded that these conditions did not meet or medically equal in severity one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1, as plaintiff had only moderate restrictions in the three functional categories—activities of daily living, social functioning, and ability to maintain concentration, persistence, or pace—and had experienced no episodes of decompensation. R. at 18–19. With selective reference to the records of Dr. Geris, Dr. Caiati, Dr. Garcia, Dr. Hafeez–Khan, and Dr. Fine, the ALJ then determined that plaintiff lacked the RFC to perform past relevant work as a construction worker, but had the RFC to perform simple, repetitive work. R. at 19–21. The ALJ adopted the vocational expert's opinion that plaintiff could take a job as a racker, electrode cleaner, or laundry worker. R. at 22–23. The ALJ, therefore, denied plaintiff's application for SSI benefits. R. at 23.

### 3. New Evidence and Review by the Appeals Council

**\*7** Following the ALJ's unfavorable decision, plaintiff filed a motion for review by the Appeals Council, which the SSA received on December 10, 2009. R. at 8–9. On May 8, 2010, plaintiff forwarded to the Appeals Council a copy of Dr. Geris' January 18, 2010 report. R. at 144–45, 336–40; *see supra,* Part I.B(1). When the Appeals Council denied plaintiff's request for review on July 27, 2010, [12] R. at 1, the ALJ's decision then became the final decision of the Commissioner. *See* 20 C.F.R. § 404.981.

12    Although framed as a declination, the Appeals Council's determination of whether to review an appeal necessarily requires examination of the record. Under the Social Security regulations, the Appeals Council will agree to review a case if "(1) There appears to be an abuse of discretion by the administrative law judge; (2)[t]here is an error of law; (3)[t]he action, findings or conclusions of the administrative law judge are not supported by substantial evidence; or (4)[t]here is a broad policy or procedural issue that may affect the general public interest." 20 C.F.R. § 404.970(a).

### E. Instant Matter

On September 17, 2010, plaintiff filed the present action, seeking reversal of the Commissioner's decision. [13] ECF Docket # 1, Complaint. On June 27, 2011, the Commissioner filed a motion for judgment on the pleadings pursuant to Rule 12(c). Def.'s Mem. at 1–2.

13    Plaintiff reapplied for SSI benefits on November 9, 2010, and was found disabled for a period beginning on that date. *See* Pl.'s Mem. at 2; ECF Docket # 15. The Commissioner's decision on that subsequent application is not before the Court for review.

## II. DISCUSSION

### A. Applicable Legal Standards

"Under Rule 12(c) ... a movant is entitled to judgment on the pleadings only if the movant establishes 'that no material issue of fact remains to be resolved and that [it] is entitled to judgment as a matter of law.' " *Guzman v. Astrue,* No. 09 Civ. 3928(PKC), 2011 WL 666194, at \*6 (S.D.N.Y. Feb.4, 2011) (Castel, J.) (quoting *Juster Assocs. v. City of Rutland, Vt.,* 901 F.2d 266, 269 (2d Cir.1990)). "Judgment on the pleadings

Rivera v. Astrue, Not Reported in F.Supp.2d (2012)

2012 WL 3614323, 181 Soc.Sec.Rep.Serv. 694

is appropriate where 'a judgment on the merits is possible merely by considering the contents of the pleadings.' " *Id.* (quoting *Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir.1988)).

The Social Security regulations consider an individual "disabled" if he or she is "[unable] to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify for benefits, an applicant's physical or mental impairments must be so severe that, "considering his age, education, and work experience," he or she can neither perform his or her past work nor "engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). The SSA has set forth a five-step procedure to determine whether an applicant is "disabled" within the meaning of the statute. 20 C.F.R. § 404.1520(a)(4). The Second Circuit has described that procedure as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work,

the [Commissioner] then determines whether there is other work which the claimant could perform.

**\*8** *Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir.1999) (internal citation omitted). Although it is the plaintiff's burden to establish disability at "step one" through "step four," this burden shifts to the ALJ at "step five." *Id.* (internal citation omitted).

In the instant case, the ALJ's findings at steps one, two, and four are not in dispute. That is, the parties agree that plaintiff was not engaged in substantial gainful activity at the time of his hearing, that plaintiff's impairments were severe, and that plaintiff lacked the RFC to perform his past work. Plaintiff, however, challenges the ALJ's determination that plaintiff did not meet or medically equal in severity a listed impairment at step three and the ALJ's step-five conclusion that, based on plaintiff's RFC, plaintiff was capable of performing simple, repetitive, low-stress work. *See* Pl.'s Mem. at 5–7.

An ALJ's disability determination, though generally entitled to deference, must be reversed or remanded if it is infected with legal error or not supported by "substantial evidence." *Rosa,* 168 F.3d at 77 (internal citation omitted). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue,* 569 F.3d 108, 112 (2d Cir.2009) (internal citation and quotation marks omitted). Where the ALJ misreads the substance of such evidence or confuses different components of the record before him, remand is appropriate. *See Genier v. Astrue,* 606 F.3d 46, 50 (2d Cir.2010) ( "Because the ALJ's adverse credibility finding, which was crucial to his rejection of [the claimant's] claim, was based on a misreading of the evidence, it did not comply with the ALJ's obligation to consider 'all of the relevant medical and other evidence,' 20 C.F.R. § 404.1545(a)(3), and cannot stand.").

Moreover, in order to accommodate "limited and meaningful" review by a district court, the ALJ must clearly state the legal rules he applies and the weight he accords the evidence considered. *Reyzina v. Apfel,* No. 98–CV–1288 (JG), 1999 WL 65995, at \*13 (E.D.N.Y. Feb.10, 1999) (Gleeson, J.) (internal citation and quotation marks omitted). Only then can the Court accurately determine whether the ALJ's opinion is supported by "substantial evidence" and free of legal error while still affording appropriate deference to

2012 WL 3614323, 181 Soc.Sec.Rep.Serv. 694

the administrative decision. Where the ALJ fails to provide an adequate roadmap of his reasoning, remand or reversal is appropriate. *See id.* at 13–14 (remanding case, in part, due to the district court's inability "to determine whether [the ALJ's] determination [wa]s supported by substantial evidence"); *Ferraris v. Heckler,* 728 F.2d 582, 587 (2d Cir.1984) ("[W]e do believe that the crucial factors in any determination must be set forth with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.").

**\*9** The ALJ's opinion in this case is marred by errors, both legal and factual. In short, the ALJ (1) failed to weigh the evidence properly and misapplied the "treating physician rule"; (2) failed to provide an adequate explanation for finding that the severity of plaintiff's conditions—both physical and mental—did not meet or medically equal in a severity a disability listing; and (3) failed to develop fully the record on plaintiff's physical and mental limitations, his RFC in particular. As a result, the Court is unable to determine whether the ALJ's decision is supported by "substantial evidence," and remand is appropriate. Furthermore, while the ALJ did arguably apply the correct legal standards required for determining the credibility of a plaintiff's subjective claims of pain, in doing so the ALJ (4) misconstrued, and thus misapplied, the underlying evidence in this case. The ALJ's credibility determination is not supported by "substantial evidence," and for this additional reason, the case is also remanded.

B. Legal Errors Prevent the Court from Determining Whether the ALJ's Decision Is Supported by "Substantial Evidence"

1. Failure to Weigh the Evidence Properly

"A treating physician's opinion is entitled to controlling weight with respect to the nature and severity of a claimed impairment if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.' " *Carvey v. Astrue,* 380 F. App'x 50, 51 (2d Cir.2010) (quoting 20 C.F.R. § 404 .1527(d)(2)). Affording the opinions of treating physicians controlling weight reflects the reasoned judgment that treating sources "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such

as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2).

The ALJ is not bound to give treating physicians' opinions controlling weight. If the ALJ gives the treating physicians' opinions less than controlling weight, however, he must specify "good reasons," *Halloran v. Barnhart,* 362 F.3d 28, 32 (2d Cir.2004) (quoting 20 C.F.R. § 404.1527(d)(2)), and must justify the alternate weight with reference to four factors listed in the Social Security regulations: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist," *Brickhouse v. Astrue,* 331 F. App'x 875, 877 (2d Cir.2009) (internal citation and quotation marks omitted) (finding ALJ erred by crediting findings of non-examining state disability adjudicator, who was not a physician, because treating physicians' opinions were entitled to controlling weight in light of the four factors). Failure to provide "good reasons" for discrediting the opinion of a plaintiff's treating physician or failure to justify the affording of less than controlling weight with reference to the Social Security regulations is a ground for remand. *Snell v. Apfel,* 177 F.3d 128, 133 (2d Cir.1999).

**\*10** The ALJ in this case declined to afford *any* weight —controlling or otherwise—to the opinions of either of plaintiff's treating physicians, Drs. Geris and Garcia. Indeed, the ALJ did not so much as note that Drs. Geris and Garcia were treating physicians in his opinion, [14] let alone explain why he was declining to afford their opinions controlling weight. The ALJ did not make any reference to Dr. Geris's or Dr. Garcia's findings in reaching his conclusion that plaintiff's impairments did not meet or medically equal a disability listing at step three. Moreover, notwithstanding the ALJ's assertion that his determination of plaintiff's RFC was "supported by ... the reports of treating sources," R. at 21, the Court has searched the ALJ's opinion in vain for an explanation of how the treating physicians' reports substantiate his step-five conclusion that plaintiff could continue to perform light work. This absence is unsurprising given that the only opinion from a treating physician to address plaintiff's RFC is found in Dr. Geris's supplemental report submitted to the Appeals Council *after* the ALJ rendered his decision. [15]

14      The only acknowledgment of Drs. Geris and Garcia's status as treating physicians was the ALJ's

statements, in passing, that plaintiff "has been treated" by those doctors. R. at 19, 20.

15    *See infra,* Part II(B)(3) for a discussion of the ALJ's duty—and failure in this case—to develop the record by requesting treating physicians' opinions on plaintiff's RFC.

In lieu of affording *any* weight to the treating physicians, the ALJ attributed "significant weight" to "the opinions of the medical expert and the consultative examining sources," R. at 21, but he did not specify which of the numerous outside experts and/or consultative sources—Graff, Mesagno, Dr. Fine, Dr. Hafeez–Khan, or Dr. Caiati—he was referring to. Relying on consultative or non-examining physicians at the exclusion of treating physicians may be permissible, but only if those sources directly contradict the treating physicians' conclusions or the ALJ provides other "good reasons" for doing so. *See Schaal v. Apfel,* 134 F.3d 496, 503–05 (2d Cir.1998) (remanding case, in part, for ALJ's failure to explain less than controlling weight given to plaintiff's treating physician). Yet just as the ALJ failed to give any explanation for declining to afford plaintiff's treating physicians controlling weight—sufficient in itself for remand—the ALJ also did not explain why he was giving these other unspecified sources controlling weight. Moreover, it appears that the ALJ gave too much weight to the opinion of Dr. Fine, who failed at the hearing to explain how—if at all—he considered the opinions of plaintiff's treating physicians regarding plaintiff's RFC. *See* 20 C.F.R. § 404.1527(c)(3) ("[B]ecause nonexamining sources have no examining or treating relationship with [the claimant], the weight we will give their opinions will depend on the *degree to which they provide supporting explanations for their opinions.* We will evaluate the degree to which these opinions consider all of the pertinent evidence in [the claimant's] claim, *including opinions of treating and other examining sources.")* (emphasis added).

An ALJ must be clear and transparent when weighing the evidence. Where, as here, no such calculation appears in the record, the district court is unable to determine whether the ALJ's decision should be affirmed. The ALJ did not give any weight to the treating physicians' opinions and did not explain why he declined to do so. Moreover, the absence of any explanation for the ALJ's reliance on non-treating sources makes it impossible to assess whether Dr. Geris's and Dr. Garcia's opinions were properly rejected, or alternatively whether other sources were properly accepted. For these reasons, the case must be remanded.

### 2. Failure to Set Forth "Specific Rationale" for Adverse Step Three Finding

**\*11** At step three, the ALJ must decide whether a claimant's impairments "meet[ ] or equal[ ]" in severity an impairment listed in Appendix 1 of Subpart P of the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). When the ALJ makes an adverse finding at step three, the ALJ must justify this determination with more than a brief, conclusory statement that the plaintiff's conditions do not "meet[ ] or equal[ ] one of [the] listings in appendix 1 to subpart P of part 404." 20 C.F.R. § 416.920(a)(4)(iii). Instead, the ALJ must "set forth a specific rationale in support of the ... conclusion." *Berry v. Schweiker,* 675 F.2d 464, 468 (2d Cir.1982). Absent such a specific rationale, a court is unable, on review, to determine whether the ALJ's opinion is supported by "substantial evidence."

Failure to set forth a "specific rationale" does not in all cases dictate remand, as where the ALJ's disability determination is supported by "substantial evidence" contained elsewhere in the ALJ's opinion. *Id.* In *Berry,* for example, although the ALJ did not provide a "specific rationale" for his step-three decision—instead reciting boilerplate language—the Second Circuit still affirmed because it could "reasonably infer" from the balance of evidence in the record that the plaintiff was not disabled. *Id.* at 468–69; *see also Salmini v. Comm'r of Soc. Sec.,* 371 F. App'x 109, 112–13 (2d Cir.2010) (affirming in absence of specific rationale because "other portions of the ALJ's detailed decision, along with plaintiff's own testimony, demonstrate[d] that substantial evidence support[ed] this part of the ALJ's determination."). The *Berry* court cautioned, however, that there would be cases in which a court "would be unable to fathom the ALJ's rationale in relation to evidence in the record, especially where credibility determinations and inference drawing is required of the ALJ." 675 F.2d at 469. In such cases, the Second Circuit "would not hesitate to remand the case for further findings or a clearer explanation for the decision." *Id.* (internal citations omitted). This is such a case.

First, the ALJ failed to support his step-three conclusions with a "specific rationale." *Id.* at 468. As to plaintiff's physical impairments, the ALJ indicated that he had given "special consideration" to the listings for musculoskeletal, respiratory, endocrine system, neurological, and mental disorders, but without further discussion or analysis, he summarily concluded that plaintiff's "condition [did] not meet or medically equal the criteria of these, or indeed, any of the impairments listed in Appendix 1." R. at 18; *see Berry,* 675 F.2d at 467–68 (rejecting near-identical language

2012 WL 3614323, 181 Soc.Sec.Rep.Serv. 694

in ALJ opinion: " 'This [ALJ] has reviewed all of the material medical evidence and the claimant's testimony and concludes that this claimant's conditions were not attended by clinical findings that meet or equal in severity the requirements of Appendix 1 (of the relevant regulations)." '). As to plaintiff's mental health impairments, although the ALJ in this case was more detailed in his explanation of the applicable statutory standards, he likewise failed to apply these standards to plaintiff's particular impairments with any degree of specificity. R. at 18–19.

*12 Second, unlike in *Berry* or *Salmini,* the balance of the evidence in the record does not permit the Court to "glean the rationale of [the] ALJ's decision," *Salmini,* 371 F. App'x at 113, especially considering the "credibility determinations and inference drawing" required of the ALJ in this case, *Berry,* 675 F.2d at 469. The ALJ's opinion contains a lengthy—if selective—recitation of plaintiff's medical history. It is not clear, however, which pieces of medical evidence purportedly justify the conclusion that plaintiff's impairments do not "meet or equal" those in the listings. Nor at any point during his recitation of the evidence did the ALJ attempt to link any given piece of evidence to the disability listings. In addition, as described *supra,* Part II.B(1), the ALJ failed entirely to clarify or justify his weight determinations and, as will be described *infra,* Part II.C, failed to make appropriate credibility determinations. The balance of the record thus does not cure the ALJ's failure to include a "specific rationale" for his step-three conclusion and the court is, therefore, unable to determine whether this conclusion is supported by "substantial evidence."

On remand, the ALJ must justify—if possible—his reasons for finding that the severity of plaintiff's impairments does not entitle plaintiff to benefits and must do so with sufficient specificity to allow a reviewing court to review such justification.

### 3. Failure to Develop the Record

Given the "essentially non-adversarial nature of a benefits proceeding," the ALJ is under an affirmative duty to develop fully a claimant's medical history where "deficiencies" exist in the record. *Rosa,* 168 F.3d at 79 (internal citations and quotation marks omitted). This duty exists even where a claimant is represented by counsel, *id.,* but takes on increased importance in the case of a *pro se* plaintiff, *Lopez v. Sec'y of Dep't of Health & Human Servs.,* 728 F.2d 148, 149–50 (2d Cir.1984) (internal citations omitted), especially one who, as here, is "unable to speak English well" or at all. *Cruz v.*

*Sullivan,* 912 F.2d 8, 11 (2d Cir.1990). In cases such as this one, the ALJ has a heightened "duty to make a searching investigation of the record," *Cruz,* 912 F.2d at 11 (internal citation and quotation marks omitted), and "to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts," *Echevarria v. Sec'y of Health & Human Servs.,* 685 F.2d 751, 755 (2d Cir.1982) (internal citations and quotation marks omitted). There are no more "relevant facts," *id.,* than medical records and opinions of treating physicians on dispositive questions such as the existence and severity of a claimed disability or a claimant's RFC. *See Peed v. Sullivan,* 778 F.Supp. 1241, 1246 (E.D.N.Y.1991) (Glasser, J.) ("[T]he duty to develop a full record and to assist a pro se plaintiff *compels* the ALJ to move beyond pro forma compliance with the treating physician rule and to obtain from the treating source expert opinions as to the nature and severity of the claimed disability.") (emphasis added). Failure to supplement the records of treating physicians, where deficient, constitutes grounds for reversal or remand. *Hankerson v. Harris,* 636 F.2d 893, 897 (2d Cir.1980).

*13 True, the record before the ALJ did contain extensive medical documentation from plaintiff's treating physicians. The record, however, was devoid of an opinion from either Dr. Geris or Dr. Garcia concerning plaintiff's RFC—the degree to which plaintiff's physical and mental impairments would prevent him from working. *See Connor v. Barnhart,* No. 02 Civ. 2156(DC), 2003 WL 21976404, at *5 (S.D.N.Y. Aug.18, 2003) (Chin, J.) ("In keeping with this heightened obligation [to a *pro se* claimant], the ALJ must obtain the treating physician's opinion regarding the claimant's alleged disability; raw data or even complete medical records *are insufficient by themselves to fulfill the ALJ's duty.*") (internal citations and quotation marks omitted) (emphasis added). The only such evidence in the record before the ALJ— including (1) conclusions about plaintiff's ability to sit, stand, walk, reach, push, pull, bend, climb, and lift; and (2) an opinion about the effect of plaintiff's mental limitations on his ability to work—came from consultative internist Dr. Caiati, non-examining psychologist M. Graff, and non-examining "disability examiner" L. Mesagno. *See* R. at 256–60, 268–73, 310–25. Mesagno's report even made clear that no "treating or examining source statement(s) regarding the claimant's physical [RFC was] in [the] file." R. at 272. The ALJ thus determined plaintiff's RFC without the aid of arguably the most consequential opinions of all: those of Drs. Geris and Garcia. The ALJ's failure to request such treating physician opinions undercut his ability to adequately evaluate plaintiff's impairments.

Dr. Geris's 2010 report submitted to the Appeals Council two months after the ALJ issued his opinion illustrates well the significance of this failure by the ALJ. In his report, Dr. Geris reached dramatically different conclusions from those of Dr. Caiati and L. Mesagno—on which the ALJ exclusively relied —regarding plaintiff's physical RFC, including plaintiff's range of motion and ability to sit, stand, walk, lift, carry, bend, squat, climb, and reach. *Compare* R. at 258–59, 269–271; *with* 338–39. In addition, on the PHQ–9 [16] depression screening test, Dr. Geris assigned plaintiff a score of 24, R. at 336, which corresponds to severe depression, *see* R. at 201, while Graff found plaintiff's psychiatric symptoms to be "no more than moderate." R. at 325. It is unclear whether and how the inclusion of Dr. Geris's report, or any other information from treating physicians on plaintiff's RFC, would have affected the ultimate outcome of plaintiff's claim for benefits. This uncertainty, however, requires remand.

[16]     Dr. Geris appears have written in his notes that plaintiff scored a 24 on the "PHQ–2" test. While the PHQ–2, like the PHQ–9, is a depression screener, it consists of only two questions and is scored on a six-point scale. See Patient Health Questionnaire, *American Psychological Association,* http://www.apa.org/ pi/about/ publications/caregivers/practice-settings/ assessment/tools/patient-health.aspx (last visited Aug. 1, 2012). The Court, therefore, assumes that Dr. Geris simply committed a recording error in his January 2010 report. Consistent with his duty to develop the record, the ALJ should clarify this matter on remand.

On remand, the ALJ must elicit Dr. Geris' and Dr. Garcia's views on plaintiff's RFC in light of the physical and mental limitations during the period for which benefits are claimed, consistent with the ALJ's affirmative duty to develop the record. The ALJ should afford these opinions due weight under the "treating physician rule" when making his final determination of plaintiff's RFC. [17]

[17]     To the extent the ALJ determines that the 2010 Geris report submitted to the Appeals Council covers the period "on or before the ALJ's decision," or provides otherwise relevant evidence, the ALJ should also consider it, consistent with the "treating physician rule." *Perez,* 77 F.3d at 45.

## C. The ALJ's Credibility Determination on Plaintiff's Subjective Claims of Pain Relied on Factual Errors

**\*14** When assessing eligibility for Social Security benefits, an ALJ must take into account the claimant's subjective claims of "pain and other limitations," but he need not take them at face value if he has reason to doubt the claimant's credibility. *Genier,* 606 F.3d at 49 (internal citations omitted). In making such a credibility determination, the ALJ must first inquire into whether "the claimant suffers from a medically determinable impairment[ ] that could reasonably be expected to produce the pain alleged." *Meadors v. Astrue,* 370 F. App'x 179, 183 (2d Cir.2010) (quoting 20 C.F.R. § 404.1529(c)(1)) (internal quotation marks omitted). If so, the ALJ then must determine whether the objective medical evidence substantiates the claimant's allegations regarding the "intensity and persistence" of the pain. *Id.* at 183. Finally, where the ALJ finds that the medical evidence does not substantiate the claimant's allegations, the ALJ must assess the claimant's credibility by considering seven factors enumerated in the Social Security regulations. [18] *Id.* at 183– 84 & n. 1.

[18]     The seven factors are "(1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; (5) any treatment, other than medication, that the claimant has received; (6) any other measures that the claimant employs to relieve the pain; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain." *Id.* at 184 n. 1 (quoting 20 C.F.R. § 404.1529(c) (3)(i)(vii)).

An ALJ who finds that a claimant is not credible must do so "explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his determination is supported by substantial evidence." *Taub v. Astrue,* No. 10–CV–2526 (ARR), 2011 WL 6951228, at *8 (E.D.N.Y. Dec.30, 2011) (Ross, J.) (internal citation and quotation marks omitted). The "substantial evidence" the ALJ cites in support of his credibility determination must, of necessity, be accurate. *See Genier,* 606 F.3d at 50 (remanding, in part, because ALJ relied on fact that claimant was able to care for his dogs, vacuum, do dishes, cook, and do laundry while, in fact, claimant had indicated only that he *tried* to do such activities but required the assistance of a parent); *Taub,* 2011 WL 6951228,

at *8 (remanding where ALJ found claimant not credible because cognitive impairment did not affect ability to carry out activities of daily living, while claimant had actually stated that his cognitive impairment made it harder for him to function *in a work environment).*

In this case, the ALJ appears to have followed the procedure for assessing the credibility of subjective claims of pain with reasonable fidelity. *See* R. at 19–21. In the process of applying the correct legal standard, however, the ALJ relied on several factual inaccuracies. For this reason, remand is required.

The Court will refrain from listing all of the inaccuracies contained in the ALJ's opinion, but two particularly egregious ones warrant mention. First, in concluding that plaintiff was not credible regarding *mental* "pain," the ALJ relied upon the fact that plaintiff "no longer has suicidal thoughts" and that plaintiff "stated that he does not feel suicidal anymore." R. at 21. Even a superficial reading of the record indicates that this characterization of plaintiff's mental state is at least incomplete, if not misleading. While plaintiff's testimony and notes from Dr. Garcia and assistant Gloria Mendoza indicate that plaintiff no longer entertained *active* suicidal thoughts, *see, e.g.,* R. at 42, 279, he frequently reported experiencing *passive* suicidal ideation, *see, e.g.,* R. at 300, 302. Even Dr. Hafeez–Khan, a consultative psychological expert, reported that plaintiff "has active thoughts about [suicide]," even if he "does not seem to have an actual plan or intent" to take his own life. R. at 262. Dr. Hafeez–Khan also observed that plaintiff's psychiatric problems "may significantly interfere with the claimant's ability to function on a daily basis." R. at 264. The ALJ seems to have ignored this conclusion altogether in making his credibility determination.

 *15  Second, in concluding that plaintiff was not credible regarding his subjective claims of *physical* pain, the ALJ noted that plaintiff had enjoyed a "good response to treatment with medications" for neuropathy and arthritis. R. at 21. Nothing in the record supports this conclusion. Beginning in the late fall of 2007, plaintiff reported to his treating psychiatrist, Dr. Garcia and assistant, Gloria Mendoza, that only his *psychiatric* symptoms had improved somewhat, although he still often felt discouraged and depressed. *See, e.g.,* R. at 297, 300. But from the fall of 2007 through the summer of 2008, Dr. Garcia and Mendoza reported that plaintiff continued to experience a significant degree of physical pain resulting from neuropathy, R. at 297; that the pain was getting worse, R. at 298–99; that his primary care physician had told him there was no treatment for the pain,

R. at 299; that the pain was keeping him up at night, R. at 299; that his inability to work, which resulted from his pain, was causing him to feel more depressed, *see* R. at 300; that his pain was not controlled, *see* R. at 303; and that the medication he had been prescribed for his pain did not help much, R. at 304. As for Dr. Geris, there is no indication in the record that he changed his opinion at any time regarding the severity of plaintiff's physical pain, which he observed and noted throughout his course of treatment. *See generally* R. at 216–255.

Although generally bound to defer to an ALJ's credibility determination, that restriction does not apply to the Court when the ALJ's conclusion is not supported by "substantial evidence." *Cf. Aponte v. Sec'y, Dep't of Health & Human Servs.,* 728 F.2d 588, 591–92 (2d Cir.1984) (affirming ALJ's decision that claimant was not credible regarding physical pain where examining physicians' reports, as well as testimony from plaintiff's daughter-in-law, contradicted plaintiff's subjective complaints of pain). Here, because the ALJ's credibility determination is not supported by "substantial evidence," this Court need not—and does not—accept the ALJ's conclusion. On remand, the ALJ must conduct a more thorough and complete evaluation of the record, giving special consideration to plaintiff's continuing passive suicidal ideation and continued neuropathic pain. If, after doing so, the ALJ still believes plaintiff's subjective complaints of pain are not credible, he must explain his conclusion with greater specificity and with proper and accurate reference to evidence in the record.

### III. CONCLUSION

For the reasons stated above, the Commissioner's motion for judgment on the pleadings is denied, and the case is remanded to the ALJ for further proceedings consistent with this Order.

On remand, the ALJ must (1) articulate specific reasons, if still justified, for rejecting the opinions of plaintiff's treating physicians and/or affording more weight to non-examining and consultative sources; (2) explain in specific detail the basis for a determination—if one is warranted—that plaintiff's impairments are insufficiently severe to entitle plaintiff to benefits at step three; (3) elicit the opinions of Drs. Geris and Garcia regarding plaintiff's RFC—including considering the 2010 Geris report, if appropriate—and afford them the weight they are due under the "treating physician rule"; and (4) evaluate plaintiff's credibility based on an accurate reading of

2012 WL 3614323, 181 Soc.Sec.Rep.Serv. 694

the medical evidence, including plaintiff's continued passive suicidal ideation and the lack of any suggestion in the record that plaintiff's physical pain was ever responsive to treatment.

**\*16** SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 3614323, 181 Soc.Sec.Rep.Serv. 694

---

**End of Document**
© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Blinkovitch v. Commissioner of Social Security, Not Reported in Fed. Supp. (2017)

2017 WL 782979

2017 WL 782979
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ronald BLINKOVITCH, Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY, Defendant.

3:15-CV-1196 (GTS/WBC)
|
Signed 01/23/2017

**Attorneys and Law Firms**

LACHMAN, GORTON LAW FIRM, OF COUNSEL: PETER A. GORTON, ESQ., P.O. Box 89, 1500 East Main St., Endicott, NY 13761-0089, Counsel for Plaintiff.

U.S. SOCIAL SECURITY ADMIN., OFFICE OF REG'L GEN. COUNSEL—REGION II, OF COUNSEL: EMILY M. FISHMAN, ESQ., 26 Federal Plaza—Room 3904, New York, NY 10278, Counsel for Defendant.

**REPORT and RECOMMENDATION**

William B. Mitchell Carted, U.S. Magistrate Judge

**\*1** This matter was referred for report and recommendation by the Honorable Judge Suddaby, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). (Dkt. No. 15.) This case has proceeded in accordance with General Order 18.

Currently before the Court, in this Social Security action filed by Ronald Blinkovitch ("Plaintiff") against the Commissioner of Social Security ("Defendant" or "the Commissioner") pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), are the parties' cross-motions for judgment on the pleadings. (Dkt. Nos. 11, 14.) For the reasons set forth below, it is recommended that Plaintiff's motion be granted, in the extent it seeks remand under Sentence Four of 42 U.S.C. § 405(g), and Defendant's motion be denied.

**I. RELEVANT BACKGROUND**

**A. Factual Background**

Plaintiff was 32 at the time of the hearing. (T. 47.) He completed high school. (Id.) Generally, Plaintiff's alleged disability consists of cervical spine injury, posterior lumbar fusion, degenerative disc disease, leg pain, dorsal osteophytes with attendant radiculopathy, lateral recess foraminal stenosis, anxiety, and depression. (T. 194.) His alleged disability onset date is April 18, 2012. (T. 189.) His date last insured is December 31, 2017. (Id.) He previously worked as an auto mechanic. (T. 21.)

**B. Procedural History**

On August 17, 2012, Plaintiff applied for a period of Disability Insurance Benefits ("SSD") under Title II of the Social Security Act. (T. 189.) Plaintiff's application was initially denied, after which he timely requested a hearing before an Administrative Law Judge ("the ALJ"). On January 2, 2012 and again on May 15, 2014, Plaintiff appeared before the ALJ, Marie Greener. (T. 27-42, 43-65.) On July 8, 2014, ALJ Greener issued a written decision finding Plaintiff not disabled under the Social Security Act. (T. 10-26.) On September 10, 2015, the Appeals Council ("AC") denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (T. 1-6.) Thereafter, Plaintiff timely sought judicial review in this Court.

**C. The ALJ's Decision**

Generally, in her decision, the ALJ made the following five findings of fact and conclusions of law. (T. 15-22.) First, the ALJ found that Plaintiff met the insured status requirements through December 31, 2017 and Plaintiff had not engaged in substantial gainful activity since April 18, 2012. (T. 15.) Second, the ALJ found that Plaintiff had the severe impairments of lumbar spine residuals from fusion and an adjustment disorder. (Id.) Third, the ALJ found that Plaintiff did not have an impairment that meets or medically equals one of the listed impairments located in 20 C.F.R. Part 404, Subpart P, Appendix. 1. (T. 16-18.) Fourth, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work. (T. 18.) [1] Specifically, the ALJ concluded that Plaintiff could: lift 20 pounds occasionally and ten pounds frequently; sit for a total of six hours in an eight-hour workday, and stand or walk for a total of six hours in an eight-hour work day. (Id.) The ALJ determined that Plaintiff needed to alternate sitting and standing, with sitting limited to one hour at a time. (Id.) The ALJ determined that Plaintiff needed to stand for five minute "or so" but he did not have to leave the workstation or area during the change of position. (Id.) The ALJ determined that Plaintiff could stand or walk for an hour at a time, but would then need to sit for five minutes "or so" before standing or walking again. (Id.) The ALJ limited

2017 WL 782979

Plaintiff to unskilled work. (*Id.*) Fifth, the ALJ determined that Plaintiff was incapable of performing his past relevant work; however, there were jobs that existed in significant numbers in the national economy Plaintiff could perform. (T. 21-22.)

1      Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time. 20 C.F.R. § 404.1567(b).

## II. THE PARTIES' BRIEFINGS ON PLAINTIFF'S MOTION

### A. Plaintiff's Arguments

**\*2**  Plaintiff makes five separate arguments in support of his motion for judgment on the pleadings. First, Plaintiff argues that the ALJ's finding that Plaintiff could stand or walk for most of the day as required by a light job was contrary to the medical evidence in the record. (Dkt. No. 11 at 10-14 [Pl.'s Mem. of Law].) Second, Plaintiff argues that he cannot do the sitting required by the ALJ's RFC or sedentary work. (*Id.* at 14-15.) Third, Plaintiff argues that the ALJ's credibility determination was insufficient and erroneous. (*Id.* at 15-21.) Fourth, Plaintiff argues that the ALJ did not properly evaluate treating physician opinions. (*Id.* at 21-24.) Fifth, and lastly, Plaintiff argues that the ALJ erred in her step five determination. (*Id.* at 24-25.)

### B. Defendant's Arguments

In response, Defendant makes four arguments. First, Defendant argues that the ALJ's RFC finding was supported by substantial evidence. (Dkt. No. 14 at 5-12 [Def.'s Mem. of Law].) Second, Defendant argues that the ALJ properly weighed the medical source opinion. (*Id.* at 12-16.) Third, Defendant argues that the ALJ properly found Plaintiff's complaints not fully credible. (*Id.* at 16-21.) Fourth, and lastly, Defendant argues that substantial evidence supported the ALJ's step five finding. (*Id.* at 21.)

## III. RELEVANT LEGAL STANDARD

### A. Standard of Review

A court reviewing a denial of disability benefits may not determine de novo whether an individual is disabled. *See* 42 U.S.C. §§ 405(g), 1383c(3); *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); *Grey v. Heckler*, 721 F.2d 41, 46 (2d Cir. 1983); *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979).

"Substantial evidence" is evidence that amounts to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *See Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).

If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984).

Case 6:21-cv-01316-BKS-TWD    Document 38    Filed 01/30/23    Page 51 of 124
Blinkovitch v. Commissioner of Social Security, Not Reported in Fed. Supp. (2017)

2017 WL 782979

**B. Standard to Determine Disability**

The Commissioner has established a five-step evaluation process to determine whether an individual is disabled as defined by the Social Security Act. *See* 20 C.F.R. § 404.1520. The Supreme Court has recognized the validity of this sequential evaluation process. *See Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287 (1987). The five-step process is as follows:

> **\*3** (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a 'residual functional capacity' assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014).

**IV. ANALYSIS**

For ease of analysis, Plaintiff arguments will be addressed out of order and in a consolidated fashion.

**A. The ALJ's RFC Determination**

Plaintiff's RFC is the most he can still do despite his limitations. 20 C.F.R. § 404.1545(a)(1). In making an RFC determination, the ALJ will base her determination on an assessment of all the relevant evidence in the case record. *See id.* Further, Plaintiff's RFC is his maximum remaining ability to do sustained work activities in an ordinary setting on a regular and continuing basis. *See id.* at § 404.1545(b)-(c). "A regular and continuing basis means eight hours a day, for five days a week, or an equivalent work schedule." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 210 (N.D.N.Y. 2009).

In formulating an RFC the ALJ will afford weight to the medical opinion evidence in the record. The relevant factors considered in determining what weight to afford an opinion include the length, nature and extent of the treatment relationship, relevant evidence which supports the opinion, the consistency of the opinion with the record as a whole, and the specialization (if any) of the opinion's source. 20 C.F.R. § 404.1527(c)(1)-(6).

The opinion of a treating source will be given controlling weight if it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2).

The following factors must be considered by the ALJ when deciding how much weight the treating source opinion should receive, even if it is not given controlling weight: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." 20 C.F.R. § 404.1527(c)(2)(i)-(iv). The ALJ is required to set forth her reasons for the weight she assigns to the treating physician's opinion. *Id.*, *see also* SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000) (quoting *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998)).

In making her physical RFC determination, the ALJ relied primarily on the medical examination and source opinion of consultative examiner, Shannon Gearhart, M.D. and to a lesser extent the medical opinions provided by Plaintiff's treating providers, David Kammerman, M.D. and Cori Pane, F.N.P. (T. 19-20.)

On October 31, 2012, Dr. Gearhart conducted an internal medicine examination of Plaintiff and provided a medical source statement. (T. 376-380.) On examination, Dr. Gearhart observed that Plaintiff was in no acute distress, his gait was slightly antalgic, he declined to walk on heels and toes, his squat was 10% of full, his stance was normal, he needed no help changing for the exam or getting on and off the exam table, and he was able to rise from a chair without difficulty. (T. 378.) Dr. Gearhart observed that Plaintiff's lumbar spine range of motion was limited due to pain and because Plaintiff

2017 WL 782979

declined to remove his back brace. (T. 379.) Dr. Gearhart noted that Plaintiff declined to do a lumbar spinal rotation. (*Id.*) Dr. Gearhart observed positive straight leg raise on the right, sitting only. (*Id.*) Plaintiff had full strength in his upper and lower extremities and no sensory deficits. (*Id.*)

**\*4** In a medical source statement, Dr. Gearhart stated that Plaintiff had "marked restriction for heavy lifting, carrying, pushing, and pulling." (T. 380.) She further opined that Plaintiff had "moderate to marked restrictions for prolonged walking and standing." (*Id.*) Lastly, she opined that Plaintiff had "moderate restrictions for squatting, kneeling, climbing, going up and down stairs, and prolonged sitting." (*Id.*)

On October 1, 2013, Nurse Pane completed a "Questionnaire." (T. 482-483.) Nurse Pane was a nurse practitioner with Comprehensive Pain Relief. (T. 442.) In the questionnaire, Nurse Pane indicated that Plaintiff could sit for approximately four hours out of an eight hour workday. (T. 483.) She opined that Plaintiff could stand/walk for approximately four hours out of an eight hour workday. (*Id.*) She indicated that Plaintiff should change positions approximately every 30 minutes. (*Id.*)

On November 8, 2013, Dr. Kammerman, also with Comprehensive Pain Relief, completed a "Questionnaire." (T.493-494.) Dr. Kammerman opined that Plaintiff could sit for approximately two hours out of an eight hour workday. (T. 494.) He opined that Plaintiff could stand/walk for approximately two hours out of an eight hour workday. (*Id.*) He indicated that Plaintiff should change positions approximately every hour. (*Id.*)

Plaintiff testified at the hearing that he could sit for about forty minutes and stand for about thirty minutes. (T. 51.) In his disability report, Plaintiff indicated that he could stand "no more than 20 minutes" and sit "no more than thirty minutes." (T. 216-217.)

Plaintiff argues that the ALJ erred in her evaluation of treating source opinions because the ALJ failed to acknowledge that both providers were specialist and had an extensive treatment relationship with Plaintiff, and because both sources provided uncontradicted opinions. (Dkt. No. 11 at 21-24 [Pl.'s Mem. of Law].)

Where an ALJ's reasoning and adherence to the Regulations is clear, she is not required to explicitly go through each and every factor of the Regulation. *Atwater v. Astrue*, 512

Fed.Appx. 67, 70 (2d Cir. 2013) (plaintiff challenged ALJ's failure to review explicitly each factor provided for in 20 C.F.R. § 404.1527(c), the Court held that "no such slavish recitation of each and every factor [was required] where the ALJ's reasoning and adherence to the regulation [was] clear"). Here, the ALJ's reasoning and adherence to the Regulations was clear. Although the ALJ did not specifically refer to Dr. Kammerman or Nurse Pane as "treating providers," or specifically note how often they treated Plaintiff, her decision cites to the numerous treatment records and medical source statements provided by both providers. Further, in assessing the opinions of Dr. Kammerman and Nurse Pane, the ALJ provided specific reasoning for the weight she afforded their opinions. (T. 20.) Therefore, the ALJ did not commit legal error in failing to explicitly acknowledge that Dr. Kammerman or Nurse Pane were treating sources or their length of treatment because her reasoning and adherence to the Regulations was clear.

Plaintiff argues that the ALJ's RFC determination, that Plaintiff could stand/walk for six hours and sit for six hours in a workday, was not supported by medical evidence in the record. (Dkt. No. 11 at 13-15 [Pl.'s Mem. of Law].)

Light work requires "a good deal of walking or standing." 20 C.F.R. § 404.1567(b); *see also* SSR 83-10 (S.S.A. 1983) ("the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday"); *see also* SSR 83-12 (S.S.A. 1983) (most light work requires "prolonged standing or walking"). Here, substantial evidence did not support the ALJ's RFC determination that Plaintiff could stand or walk, for an hour at a time, six hours in an eight hour work day. (T. 18.) Further, the ALJ's decision failed to provide an adequate analysis of how the evidence in the record supported her determination that Plaintiff could stand or walk for six hours with a limitation of one hour at a time.

**\*5** The medical opinions in the record indicated that Plaintiff had greater restriction on his ability to stand and walk than provided for in the RFC. Dr. Gearhart opined that Plaintiff had "moderate to marked restrictions for prolonged walking and standing." (T. 380.) To be sure, a "moderate" limitation would not necessarily preclude the ability to perform the walking and standing requirements of light work; however, a "moderate to marked" limitation does not support the determination that Plaintiff can perform the requirements.

Case 6:21-cv-01316-BKS-TWD   Document 38   Filed 01/30/23   Page 53 of 124

Blinkovitch v. Commissioner of Social Security, Not Reported in Fed. Supp. (2017)

2017 WL 782979

Further, the opinions of Plaintiff's treating providers do not support the contention that Plaintiff could perform the walking or standing requirements of light work. Dr. Kammerman opined Plaintiff could stand or walk for approximately two hours out of an eight hour work day. (T. 494.) Nurse Pane opined Plaintiff could stand or walk for approximately four hours in an eight hour day. (T. 483.) Plaintiff testified that he could not stand more than "about half an hour" and could not "really walk too far without having to take a rest." (T. 51.) Plaintiff stated in his Function Report that he could stand for 20 minutes and walk ten to 20 minutes. (T. 216.) Therefore, neither the medical evidence in the record, not Plaintiff's testimony, supported the conclusion that Plaintiff could stand or walk for "prolonged" periods.

The ALJ's determination failed to provide an analysis of how the record supported the determination that Plaintiff could stand/walk for six hours in a workday. *See Otts v. Colvin,* No. 15-CV-6731, 2016 WL 6677192, at *4 (W.D.N.Y. Nov. 14, 2016) (remanding where ALJ failed to explain how consultative examiner's "moderate to marked" restriction for lifting, carry, pushing, and pulling supported an RFC to perform light work). Therefore, remand is recommended for a proper analysis of Plaintiff's ability to stand and walk.

The ALJ also determined that Plaintiff could sit, for one hour increments, for a total of six hours in an eight hour workday. (T. 18.) Substantial evidence did not support this conclusion. Although Dr. Gearhart opined that Plaintiff had a "moderate" restriction for sitting, treating providers indicated Plaintiff could sit for two or four hours in a work day. (T. 483, 494.) Plaintiff testified that he could sit for about forty minutes. (T. 51.) Elsewhere Plaintiff indicated he could sit for thirty minutes. (T. 217.) Again, the medical evidence indicated that Plaintiff had greater restriction in his ability to sit for prolonged periods than accounted for by the ALJ. In addition, the ALJ failed to explain how she arrived at the conclusion that Plaintiff could sit for six hours in a workday based on Dr. Gearhart's opinion that he had a moderate restriction for sitting.

To be sure, although an "ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in [her] decision, [she] was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole." *Matta v. Astrue,* 508 Fed.Appx. 53, 56 (2d Cir. 2013). Further, "it is not per se error for an ALJ to make the RFC determination absent a medical opinion ..., [and] remand is not necessary where

'the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity.' " *Lewis v. Colvin,* No. 13-CV-1072S, 2014 WL 6609637, at *6 (W.D.N.Y. Nov. 20, 2014) (quoting *Tankisi v. Comm'r of Soc. Sec.,* 521 Fed.Appx. 29, 34 (2d Cir. 2013)).

The "regulatory language provides ample flexibility for the ALJ to consider a broad array of evidence as 'medical opinions.' " *Sickles v. Colvin,* No. 12-CV-774, 2014 WL 795978, at *4 (N.D.N.Y. Feb. 27, 2014) (citation omitted). Plaintiff's testimony and the treatment notes may constitute "relevant evidence [that] a reasonable mind might accept as adequate to support" the RFC as determined by an ALJ. *Johnson v. Colvin,* No. 15-3483-CV, 2016 WL 5539890, at *2 (2d Cir. Sept. 29, 2016) (quoting *Richardson,* 402 U.S. at 401); *see also Scouten v. Colvin,* No. 15-CV-76S, 2016 WL 2640350, at *4 (W.D.N.Y. May 10, 2016) ("[t]here is no error where ... an ALJ bases his RFC on Plaintiff's own testimony" together with relevant medical evidence). Here, however, the record did not contain sufficient evidence to support the ALJ's conclusion that Plaintiff could stand or walk per the requirements of light work, or sit for six hours, even if such postures were limited to an hour at a time.

**\*6** Defendant argues that the ALJ's RFC determination accounted for Plaintiff's restrictions for standing, walking, and sitting because the RFC stated that Plaintiff could not perform a position for more than an hour at a time. (Dkt. No. 14 at 7 [Def.'s Mem. of Law].) This Court may not "create post-hoc rationalizations to explain the Commissioner's treatment of evidence when that treatment is not apparent from the Commissioner's decision itself." *Martinbeault v. Astrue,* 2009 WL 5030789, *5 (N.D.N.Y. Dec. 14, 2009) (citing *Grogan v. Barnhart,* 399 F.3d 1257, 1263 (10th Cir. 2005)); *see also Hall v. Colvin,* 37 F. Supp. 3d 614, 626 (W.D.N.Y. 2014) ("Even if accurate, this is a *post hoc* rationalization that is not apparent from the face of the ALJ's decision."); *see also Snell v. Apfel,* 177 F.3d 128, 134 (2d Cir. 1999) (a reviewing court may not accept appellate counsel's *post hoc* rationalizations for agency action); *see also Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir. 1999). Although the ALJ concluded that Plaintiff could stand, walk, and sit, for an hour at a time, it is not apparent from the ALJ's decision how she arrived at this conclusion.

In addition, the ALJ appears to have misread the objective medical evidence in the record. The ALJ relied on this misreading in weighing opinion evidence and formulating her RFC determination.

2017 WL 782979

To be sure, as indicated by the ALJ, the MRI performed on August 30, 2013 indicated "no disc herniation, central or foraminal narrowing at L1-L2 through L4-L4." (T. 463.) However, the ALJ either overlooked or ignored the MRI results indicating "mild abnormal hypointense T1 signal along the ventral aspect of the spinal canal which appear[ed] to abut the left more than right S1 nerve root" at L5-S1. (T. 463.) The results also indicated minimal hypointense T1 signal along the posterior aspect of the spinal canal that may represent "postoperative granulation tissue." (*Id.*) This oversite was not harmless, because Plaintiff's treating providers relied on these results in formulating treatment and medical opinions. Plaintiff's neurologist, Khalid Sethi, reviewed the MRI on October 16, 2013, and indicated that he was "not impressed with a robust incorporation" and Plaintiff's "symptoms may be partially referable to micromotion." (T. 495.) Both Dr. Kammerman and Nurse Pane indicated in their medical source statements that their diagnoses were supported by the MRI which showed granulation tissue abutting the S1 nerve root. (T. 482, 493.)

The ALJ reasoned that Dr. Kammerman's opinion, and Nurse Pane's opinion, were undermined by an MRI which showed "no disc herniation, central or foraminal narrowing." (T. 20.) The ALJ relied, in part, on the MRI findings as support for Dr. Gearhart's opinion. (T. 19.) The ALJ's reliance on a misreading of the MRI findings compounded her erroneous RFC determination.

In sum, the record did not contain sufficient evidence to support the ALJ's determination that Plaintiff could perform the standing or walking requirements of light work, or that Plaintiff could sit for six hours in a work day, even if Plaintiff was limited to those positions for an hour at a time. The ALJ's decision provided no analysis of how she reached the determination that Plaintiff could perform positional requirements of light work for an hour at a time. Further, the ALJ appears to have misread or misunderstood the objective medical evidence. Therefore, remand is recommended for a new physical RFC determination.

Plaintiff also argues that there was no adverse medical opinion to Dr. Kammerman's statement that Plaintiff would be off task 33% of the day and absent more than four days a month, and as such the ALJ was required to accept the limitations. (Dkt. No. 11 at 23-24 [Pl.'s Mem. of Law].) However, the ALJ's conclusion that Plaintiff could sustain attention and concentration for unskilled work was supported by the

medical opinion of consultative examiner, Cheyrl Loomis, Ph.D.

**\*7** Dr. Loomis concluded, based on her examination of Plaintiff, that he was capable of following, understanding, and performing simple tasks independently. (T. 373.) She concluded that Plaintiff could maintain attention and concentration, maintain a schedule, and learn new tasks. (*Id.*) She concluded that Plaintiff could make appropriate decision, relate adequately with others, and appropriately deal with stress. (T. 374.) Therefore, the ALJ's determination that Plaintiff retained the ability to perform unskilled work was supported by the opinion of Dr. Loomis.

**B. The ALJ's Credibility Determination**

A plaintiff's allegations of pain and functional limitations are "entitled to great weight where ... it is supported by objective medical evidence." *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 270 (N.D.N.Y. 2009) (quoting *Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 56 (2d Cir. 1992)). However, the ALJ "is not required to accept [a plaintiff's] subjective complaints without question; he may exercise discretion in weighing the credibility of the [plaintiff's] testimony in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979)). "When rejecting subjective complaints, an ALJ must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief." *Rockwood*, 614 F. Supp. 2d at 270.

The ALJ must employ a two-step analysis to evaluate the claimant's reported symptoms. *See* 20 C.F.R. § 404.1529. First, the ALJ must determine whether, based on the objective medical evidence, a plaintiff's medical impairments "could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(a). Second, if the medical evidence establishes the existence of such impairments, the ALJ must evaluate the intensity, persistence, and limiting effects of those symptoms to determine the extent to which the symptoms limit the claimant's ability to do work. *See id.*

At this second step, the ALJ must consider: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to relieve his pain or other symptoms; (5) other treatment the claimant receives or has received to relieve his pain or other symptoms; (6) any measures that

2017 WL 782979

the claimant takes or has taken to relieve his pain or other symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to his pain or other symptoms. 20 C.F.R. § 404.1529(c)(3)(i)-(vii).

Here, the ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms, but his statements concerning the intensity, persistence and limiting effects of his symptoms were not credible. (T. 19.) In making her credibility determination the ALJ first relied on Plaintiff's statement that he applied for benefits because he could not return to his past work as a mechanic. (T. 20.) Second, the ALJ stated that clinical findings and testing did not support his allegations. (*Id.*) Third, the ALJ stated that Plaintiff's statements were not fully credible because he claimed his back did not fully fuse; however, the record did not support that statement. (*Id.*) And lastly, the ALJ took into consideration that Plaintiff had previously filed for benefits and went back to work after he was denied. (*Id.*)

**\*8** Plaintiff argues that the ALJ erred in her credibility determination because the ALJ failed to discuss the relevant factors outlined in the Regulations and the reasons the ALJ relied on in making her determination had no bearing on credibility. (Dkt. No. 11 at 17-21 [Pl.'s Mem. of Law].) For the reasons stated herein, the ALJ's credibility determination was the product of legal error and not supported by substantial evidence.

To be sure, the ALJ is not required to make a "slavish" recitation of each and every factor in the Regulation where the ALJ's reasoning and adherence to the Regulations is clear. *See Halloran v. Barnhart,* 362 F.3d 28, 31-32 (2d Cir. 2004). However, in the instant case, the ALJ's reasoning and adherence to the Regulations is not clear. The ALJ's discussion makes no mention or reference to any factor outlined in 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii), 416.929(c)(3)(i)-(vii).

In her credibility determination the ALJ found Plaintiff to be less credible because he was not familiar with the legal standard of obtaining Social Security Disability benefits. (T. 20.) The ALJ relied on a notation made by a physical therapist in September of 2012. (T. 422.) The statement was not made by the Plaintiff at the hearing or in his application. Even if Plaintiff misunderstood the disability standard, that does not equate with Plaintiff's statements being less credible. Second,

as stated herein, the ALJ failed to acknowledge the MRI finding of nerve root abutment. Therefore, the ALJ erred in relying the MRI to undermine Plaintiff's credibility. Further, the ALJ's erroneously concluded that Plaintiff incorrectly stated that his back had not fully fused and was therefore not credible. (T. 20.) Plaintiff's treating source did indicate, as Plaintiff's alleged, his back had not fully fused. (T. 390-391.) The ALJ also selectively relied on one notation that Plaintiff's pain increase because he had been more active. (T. 20, *referring to* T. 524.) Outside of this one notation, the record indicated that Plaintiff complained his symptoms were aggravated by "daily activities." (*see generally* T. 346-370, T. 401-453.)

Because the ALJ made no mention of the factors outlined in the Regulations in making her credibility determination and the ALJ's adherence to the Regulations was not clear from her determination, remand is recommended for a proper credibility analysis.

### C. The ALJ's Step Five Determination

Because remand is recommended for a physical RFC determination and credibility determination, remand is recommended for a new analysis at step five.

**ACCORDINGLY**, based on the findings above, it is

**RECOMMENDED**, that the Plaintiff's motion for judgment on the pleadings be **GRANTED**, and the Commissioner's determination be **DENIED**, and the matter be **REMANDED** for further proceedings under sentence four of 42 U.S.C. § 405(g) and consistent with this report.

Pursuant to 28 U.S.C. § 636 (b)(1) and Local Rule 72.1(c), the parties have **FOURTEEN (14) DAYS** within which to file written objections to the foregoing report. Any objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636 (b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

### All Citations

Not Reported in Fed. Supp., 2017 WL 782979

2017 WL 782979

---

**End of Document**                                     © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:21-cv-01316-BKS-TWD   Document 38   Filed 01/30/23   Page 57 of 124
Blinkovitch v. Commissioner of Social Security, Not Reported in Fed. Supp. (2017)
2017 WL 782901

2017 WL 782901
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ronald BLINKOVITCH, Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY, Defendant.

3:15-CV-1196 (GTS/WBC)
|
Signed 02/28/2017

**Attorneys and Law Firms**

LACHMAN & GORTON, OF COUNSEL: PETER A. GORTON, ESQ., P.O. Box 89, 1500 East Main Street, Endicott, New York 13761, Counsel for Plaintiff.

SOCIAL SECURITY ADMINISTRATION, OFFICE OF REG'L GEN. COUNSEL–REGION II, OF COUNSEL: EMILY M. FISHMAN, ESQ., 26 Federal Plaza, Room 3904, New York, New York 10278, Counsel for Defendant.

### DECISION and ORDER

HON. GLENN T. SUDDABY, Chief United States District Judge

**\*1** Currently before the Court, in this Social Security action filed by Ronald Blinkovitch ("Plaintiff") against the Commissioner of Social Security ("Defendant" or "the Commissioner"), is the Report-Recommendation of United States Magistrate Judge William B. Mitchell Carter recommending that Plaintiff's motion for judgment on the pleadings be granted, Defendant's motion for judgment on the pleadings be denied, the Commissioner's decision denying Plaintiff Social Security benefits be reversed, and this matter be remanded to the Commissioner of Social Security for further proceedings under sentence four of 42 U.S.C. § 405(g). (Dkt. No. 16.) Objections to the Report-Recommendation have not been filed and the time in which to do so has expired. (*See generally* Docket Sheet.)

After carefully reviewing all of the papers in this action, including Magistrate Judge Carter's thorough Report-Recommendation, the Court can find no clear error in the Report-Recommendation. [1] Magistrate Judge Carter employed the proper legal standards, accurately recited the facts, and correctly applied the law to those facts. (Dkt. No. 16.) As a result, the Report-Recommendation is accepted and adopted in its entirety; Plaintiff's motion for judgment on the pleadings is granted; Defendant's motion for judgment on the pleadings is denied; the Commissioner's decision denying disability insurance benefits is reversed; and this matter is remanded to the Commissioner of Social Security for further proceedings under sentence four of 42 U.S.C. § 405(g).

[1]     When no objection is made to a report-recommendation, the Court subjects that report-recommendation to only a "clear error" review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a clear error review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.*; *see also Batista v. Walker*, 94-CV-2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks omitted).

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Carter's Report-Recommendation (Dkt. No. 16) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that Plaintiff's motion for judgment on the pleadings (Dkt. No. 11) is **GRANTED**, Defendant's motion for judgment on the pleadings (Dkt. No. 14) is **DENIED**, the Commissioner's decision denying Plaintiff Social Security benefits is **REVERSED**, and this matter is **REMANDED** to the Commissioner of Social Security for further proceedings under sentence four of 42 U.S.C. § 405(g).

**All Citations**

Not Reported in Fed. Supp., 2017 WL 782901

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 3455409, 256 Soc.Sec.Rep.Serv. 614

2018 WL 3455409
United States District Court, D. Connecticut.

Sobeida CLAUDIO, Plaintiff,
v.
Nancy A. BERRYHILL, Acting
Commissioner of Social Security, Defendant.

No. 3:17-cv-1228 (MPS)
|
Signed 07/18/2018

**Attorneys and Law Firms**

Olia Yelner, Pirro and Church, LLC, Norwalk, CT, for
Plaintiff.

Vernon Norwood, Social Security Administration—Office of
the General Counsel, New York, NY, for Defendant.

**RULING ON THE PLAINTIFF'S MOTION TO
REVERSE AND THE DEFENDANT'S MOTION TO
AFFIRM THE DECISION OF THE COMMISSIONER**

Michael P. Shea, U.S.D.J.

 **\*1**  This is an administrative appeal following the denial
of Sobeida Claudio's application for disability insurance
benefits. Ms. Claudio contends that the Administrative Law
Judge ("ALJ") erred in: (1) giving little weight to the
opinions of several physicians whose reports are contained
in the record; (2) failing to consider the effect of all of
her medically determinable impairments in formulating her
Residual Functional Capacity ("RFC"); and (3) concluding
that although her impairments prevent her performing her
past relevant work, others jobs exist in significant numbers
in the national economy which the claimant can perform.
I agree with Ms. Claudio that the ALJ improperly applied
the treating physician rule as to the opinions of one of her
treating physicians, and I am unable to conclude that this error
was harmless. The case is therefore REMANDED. I do not
reach Ms. Claudio's remaining arguments urging reversal or
remand.

**I. Background**
On May 23, 2011, Ms. Claudio filed an application for
disability benefits for an alleged disability. (ECF No. 19-2

at 2.)[1] A disability adjudicator in the Social Security
Administration ("SSA") denied her application and thereafter
denied her request for reconsideration on May 4, 2012.
(*Id.*) On July 30, 2013, Ms. Claudio appeared with counsel
before ALJ Deirdre R. Horton, who subsequently denied her
benefits. (*Id.* at 2-3.) In February 2015, however, the Appeals
Council for the SSA remanded the case back to the ALJ. (*Id.*
at 3.)

[1]      The parties did not submit a joint statement of facts.
         Instead, Ms. Claudio submitted her own statement
         of facts, which the Commissioner accepted "with
         the exception of any inferences, suggestions, or
         arguments contained therein...." (ECF No. 22-2 at
         1.) I therefore draw chiefly upon Ms. Claudio's
         statement of facts and the record in setting out the
         background to this case.

Ms. Claudio then appeared again with counsel before ALJ
Horton, who again denied her benefits. (*Id.*). The ALJ found
that Ms. Claudio had the severe impairments of sciatica,
mild degenerative joint disease causing right knee pain,
obesity, and depression. (ALJ Decision, Tr. at 39.) The ALJ
rejected the contention that Ms. Claudio suffered from severe
ailments relating to her feet, hearing, hips, symptoms of carpal
tunnel syndrome, or hypertension. (*Id.* at 40.) Next, the ALJ
determined that Ms. Claudio did not have an impairment or
combination of impairments that met or medically equaled
the severity of a listed impairment, and had the following
Residual Functional Capacity ("RFC"):

> to perform light work as defined
> in 20 CFR 404.1567(b) and
> 416.967(b) except she can sit
> for 6 hours; stand and walk 4
> hours; occasionally climb ramps
> and stairs; no climbing of ladders/
> ropes/scaffolds; occasional balancing;
> stooping; kneeling; crouching and
> crawling; she can perform short simply
> tasks and occasional detailed tasks;
> she can occasionally interact with the
> general public.

(*Id.* at 40, 42.) Finally, the ALJ determined that although Ms.
Claudio lacked the ability to perform any past relevant work,
there were jobs that "exist[ed] in significant numbers in the

2018 WL 3455409, 256 Soc.Sec.Rep.Serv. 614

national economy that [she] can perform...." (*Id.* at 46-47.) For these reasons, the ALJ concluded that Ms. Claudio was not disabled within the meaning of the Social Security Act. (*Id.* at 48.)

**\*2** On May 25, 2017, the appeals council denied Ms. Claudio's request for review of the ALJ's decision, thereby making the ALJ's decision the final decision of the Commissioner. (Tr. at 1.) This appeal followed. Specific facts and portions of the ALJ's decision will be discussed below as necessary.

## II. Standard

The Social Security Act establishes that benefits are payable to individuals who have a disability. 42 U.S.C. § 423(a)(1). "The term 'disability' means ... [an] inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ...." 42 U.S.C. § 423(d)(1). To determine whether a claimant is disabled within the meaning of the Social Security Act, the ALJ must follow a five-step evaluation process as promulgated by the Commissioner.

The five steps are as follows: (1) the Commissioner considers whether the claimant is currently engaged in substantial gainful activity; (2) if not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities; (3) if the claimant has a "severe impairment," the Commissioner must ask whether, based solely on the medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations. 20 C.F.R. § 416.920(a)(4). If the claimant has one of these enumerated impairments, the Commissioner will automatically consider that claimant disabled, without considering vocational factors such as age, education, and work experience. *Id.* (4) if the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has the residual functional capacity to perform his or her past work; and (5) if the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work the claimant could perform. *Id.* To be considered disabled, an individual's impairment must be "of such severity that he is not only unable to do his previous work but cannot ... engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). The Commissioner bears the burden of proof on the fifth step, while the claimant has the burden on the first four steps. 20 C.F.R. § 416.920(a)(4).

"A district court reviewing a final ... decision pursuant to ...42 U.S.C. § 405(g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Accordingly, a district court may not make a de novo determination of whether a plaintiff is disabled in reviewing a denial of disability benefits. *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the court's function is to ascertain whether the correct legal principles were applied in reaching the decision, and whether the decision is supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). If the Commissioner's decision is supported by substantial evidence, that decision will be sustained, even where there may also be substantial evidence to support the plaintiff's contrary position. *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982). The Second Circuit has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citation and quotation marks omitted). Substantial evidence must be "more than a mere scintilla or a touch of proof here and there in the record." *Id.*

## III. Discussion

### A. Treating Physician Rule
**\*3** Ms. Claudio contends that the ALJ erred in her application of the "treating physician rule" as to the opinions of Ms. Claudio's treating physicians, Drs. Martin Perlin and Tina Chieco. (ECF No. 19-2 at 14.) Under the treating physician rule, "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given controlling weight so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."[2] *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal citation and quotation marks omitted). "The regulations further provide that even if controlling weight is not given to the opinions of the treating physician, the ALJ may still assign some weight to those views, and must specifically explain the weight that is actually given to the opinion." *Schrack v. Astrue*, 608 F. Supp. 2d 297, 301 (D. Conn. 2009). The Second Circuit has made clear that:

Case 6:21-cv-01316-BKS-TWD    Document 38    Filed 01/30/23    Page 60 of 124

Claudio v. Berryhill, Not Reported in Fed. Supp. (2018)
2018 WL 3455409, 256 Soc.Sec.Rep.Serv. 614

To override the opinion of the treating physician ... the ALJ must explicitly consider, inter alia: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and, (4) whether the physician is a specialist. After considering the above factors, the ALJ must comprehensively set forth his reasons for the weight assigned to a treating physician's opinion.

*Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (internal citations, quotation marks, and alterations omitted). "The failure to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." *Id.*

2    Although the SSA recently adopted regulations effectively abolishing the treating physician rule, it did so only for claims filed on or after March 27, 2017. *See* 20 C.F.R. § 416.920c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) ..., including those from your medical sources.... [W]e will consider those medical opinions ... together using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate."). Since Ms. Claudio filed her claim before March 27, 2017, I apply the treating physician rule under the previously existing regulations. *See Tanya L., Plaintiff, v. Comm'r of Soc. Sec., Defendant.*, No. 2:17-CV-136, 2018 WL 2684106, at *4 n. 1 (D. Vt. June 5, 2018) ("Because Plaintiff filed her claims before March 2017, however, the Court applies the treating physician rule under the earlier regulations (20 C.F.R. § 416.927), and not under the more recent ones (20 C.F.R. § 416.920c).").

**i. Dr. Martin Perlin**

Ms. Claudio chiefly argues that the ALJ erred in her application of the treating physician rule to the opinions of Ms. Claudio's treating internist, Dr. Martin Perlin. (ECF No. 19-2 at 14-15.) The ALJ gave "little weight" to the following opinions from Dr. Perlin: (1) a March, 2012 opinion that Ms. Claudio suffered from osteoarthritis and depression (Tr. at 525-28); (2) an August, 2012 Medical Report for Incapacity noting that Ms. Claudio suffered from "↑ BP, migraine[s], depression, [and] sciatica" (*id.* at 898); (3) a February, 2013 Medical Report for Incapacity noting that Ms. Claudio suffered from sciatica, osteoarthritis, and migraine headaches (*id.* at 584); (4) a June, 2013 Physical Medical Source Statement noting that Ms. Claudio's maladies would cause her to be absent from work more than four days per month (*id.* at 648); and (5) letters from October, 2014 and November, 2015 opining that Ms. Claudio was "permanently disabled due to her chronic and severe conditions" including "hyperlipidemia, hypertension, sciatica, insomnia, depression/anxiety, osteoarthritis, headache/migraine, dysphagia, peripheral neuropathy and GERD" (*id.* at 694, 1167). (*See* ALJ Decision, Tr. at 45-46.)

 *4    The ALJ discounted Dr. Perlin's opinions because: (1) Dr. Perlin's treatment notes did not substantiate and were inconsistent with his findings (*see, e.g.*, ALJ Decision, Tr. at 45-46) ("Dr. Perlin's treatment notes do not substantiate any of his conclusory findings that the claimant is disabled and therefore, the undersigned gives these opinions little weight" and "[H]is treatment notes show all normal findings"); (2) Dr. Perlin's opinions contained in the record were "vague" (*see id.* at 45) (noting in relation to form completed by Dr. Perlin that he "provided no support for his findings and his 'check-off' style completion of the form was vague"); (3) one of the forms was not completed by Dr. Perlin (*id.* at 45-46 ("The August 2012 form is signed by Dr. Perlin, but it does not appear that he completed the form himself.") )[3]; and (4) Dr. Perlin's statements that Ms. Claudio was permanently disabled were "not medical opinions, but rather an administrative finding dispositive of a case ... reserved to the Commissioner" (*id.* at 46).

3    The ALJ does not specify how she reached this determination regarding the form's authorship or its significance to her determination to assign little weight to the opinions expressed therein. The form in question appears to have been stamped with Dr. Perlin's name and title, in addition to having been filled out by hand. (*See* Tr. at 901.) There does not

Case 6:21-cv-01316-BKS-TWD    Document 38    Filed 01/30/23    Page 61 of 124

Claudio v. Berryhill, Not Reported in Fed. Supp. (2018)
2018 WL 3455409, 256 Soc.Sec.Rep.Serv. 614

appear to be any indication, however, that Dr. Perlin did not complete the form.

In lieu of relying on the opinions mentioned above, the ALJ noted in her decision that she had "given great weight to the State agency opinion at Reconsideration, and ha[d] generally adopted [those] findings," with certain exceptions irrelevant to the case at hand. (ALJ Decision, Tr. at 46.) The State agency opinion at reconsideration, which was signed by Dr. Antonio Medina and Disability Adjudicator Gina Longo, concluded that Ms. Claudio was not disabled. (Tr. at 174.) It further noted that she was capable of occasionally lifting twenty pounds, frequently lifting ten pounds, standing or walking (with normal breaks) for a total of four hours, sitting (with normal breaks) for "[a]bout [six] hours in an [eight] hour workday," and pushing or pulling objects. (Tr. at 169-70.)

I conclude that the ALJ's decision not to give controlling weight to Dr. Perlin's opinions was supported by substantial evidence. An ALJ must only accord a treating physician's opinion controlling weight if it is "well-supported by medically acceptable ... techniques and ... not inconsistent with the other substantial evidence in [the record.]" *Lesterhuis v. Colvin*, 805 F.3d 83, 88 (2d Cir. 2015) (quoting 20 C.F.R. § 404.1527(c) ) (internal quotation marks omitted). The record contains substantial evidence that Dr. Perlin's opinions failed to meet this standard. First, as the ALJ noted in her decision, Dr. Perlin's opinions concerning the plaintiff's limitations are not supported by his treatment notes, or, for that matter, any explanation. For example, Dr. Perlin stated that the plaintiff suffered from severe sciatica and a variety of other physical ailments in two medical reports for incapacity that he filled out on behalf of the plaintiff; his treatment notes, however, uniformly note that the plaintiff's gait and strength were normal throughout his treatment of her. (*Contrast* Tr. at 578 (January, 2013 report from Dr. Perlin noting Ms. Claudio was incapable of working due to "severe sciatica), 694 (October, 2014 letter from Dr. Perlin noting that Ms. Claudio suffered from hyperlipidemia, hypertension, sciatica, insomnia, depression/ anxiety, osteoarthritis, headache/migraine, dysphagia, peripheral neuropathy, and gastroesophageal reflux disorder ("GERD") ) *with, e.g.,* Tr. at 438 (July, 2011 report from Dr. Perlin noting that the plaintiff's posture, gait, and muscle strength were normal), 488 (December, 2011 medical report from Dr. Perlin noting the same), 490-91 (January, 2012 medical report from Dr. Perlin noting the same), 539-40 (April, 2012 report from Dr. Perlin noting the same), 547-48 (June, 2012 report from Dr. Perlin noting the same), 555-56

(August, 2012 report from Dr. Perlin noting the same), 561-62 (November, 2012 report from Dr. Perlin noting the same), 568-69 (January, 2013 report from Dr. Perlin noting the same), 1118-19 (March, 2013 medical report from Dr. Perlin noting the same), 1101-02 (August, 2013 medical report from Dr. Perlin noting the same), 1095-96 (November, 2013 medical report from Dr. Perlin noting the same), 1092-93 (January, 2014 medical report from Dr. Perlin noting the same), 1084-85 (March, 2014 medical report from Dr. Perlin noting the same), 1080-81 (July, 2014 medical report from Dr. Perlin noting the same), 1067-68 (October, 2014 medical report from Dr. Perlin noting the same), 1063-64 (January, 2015 medical report from Dr. Perlin noting the same), 1059-60 (July, 2015 medical report from Dr. Perlin noting the same).)

**\*5** Second, Dr. Perlin's opinions in the record consist of a vast number of differing diagnoses that appear to have varied each visit. (*See, e.g.,* Tr. at 531 (July, 2011 report from Dr. Perlin noting Ms. Claudio suffered from edema and feeling of head fullness), 535 (December, 2011 report from Dr. Perlin noting Ms. Claudio suffered from hypertension and osteoarthritis in her lower legs), 538 (January, 2012 report from Dr. Perlin noting Ms. Claudio suffered from depressive disorder and hypertension), 540 (April, 2012 report from Dr. Perlin noting Ms. Claudio suffered from hypertension), 545 (May, 2012 report from Dr. Perlin noting Ms. Claudio suffered from sciatica and osteoarthritis), 548 (June, 2012 report from Dr. Perlin noting that Ms. Claudio suffered from osteoarthritis), 552 (July, 2012 report from Dr. Perlin noting that Ms. Claudio suffered from hypertension), 556 (August, 2012 report from Dr. Perlin noting that Ms. Claudio suffered from sciatica and migraine headaches), 559 (October, 2012 report from Dr. Perlin noting that Ms. Claudio suffered from sinusitis), 562 (November, 2012 report from Dr. Perlin noting that Ms. Claudio suffered from sciatica, osteoarthritis, and hypertension), 569 (January, 2013 report from Dr. Perlin noting that Ms. Claudio suffered from osteoarthritis).) As the ALJ noted in her opinion, none of these apparently inconsistent diagnoses appear to be supported with objective findings. These factors support the ALJ's decision to give Dr. Perlin's opinion less than controlling weight. *See Rusin v. Berryhill*, 726 Fed. App'x 837, 840 (2d Cir. 2018) (concluding ALJ did not err in declining to afford treating physician's opinions controlling weight in part because physician's opinion was inconsistent with his treatment notes and diagnostic observations).

Claudio v. Berryhill, Not Reported in Fed. Supp. (2018)
2018 WL 3455409, 256 Soc.Sec.Rep.Serv. 614

The analysis does not end here, however, as I must determine whether the ALJ provided adequate reasoning for according "little weight" to Dr. Perlin's opinions. *See Greek*, 802 F.3d at 375 ("[E]ven when a treating physician's opinion is not given controlling weight, SSA regulations require the ALJ to consider several factors *in determining how much weight the opinion should receive*." (emphasis added).). "In the Second Circuit, 'all of the factors cited in the regulations' must be considered to avoid legal error." *Twigg v. Comm'r of Soc. Sec.*, No. 3:16CV1500 (AWT), 2018 WL 855560, at *2 (D. Conn. Feb. 13, 2018) (quoting *Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998) ). For the reasons set forth below, I conclude that the ALJ properly considered all of the *Greek* factors in providing her weight assignment for Dr. Perlin's opinions.

As an initial matter, the ALJ considered the "frequen[c]y, length, nature, and extent of treatment" that Dr. Perlin provided to Ms. Claudio. *Greek*, 802 F.3d at 375. Indeed, the ALJ cited most of Dr. Perlin's treatment reports in her decision and set out the shortcomings therein in a comprehensive manner. (*See* ALJ Decision, Tr. at 44-46.) Second, the ALJ considered the full "amount of medical evidence supporting [Dr. Perlin's] opinion[s]." *Greek*, 802 F.3d at 375. As noted above, the ALJ cited most of this evidence in her decision—including the "longitudinal medical evidence" from Dr. Perlin's own treating notes—and walked the reader through Dr. Perlin's vague and conclusory opinions. (*See* ALJ Decision, Tr. at 43-46.) Third, the ALJ considered the consistency of Dr. Perlin's opinions with the remaining medical evidence. *Greek*, 802 F.3d at 375. As noted previously, the ALJ correctly concluded that Dr. Perlin's opinions were inconsistent with his own records, along with other evidence in the record. (*See* ALJ Decision, Tr. at 46 ("Dr. Perlin's inconsistent reports do not offer much probative value and are unsupported by his own records as well as the other evidence in the record.").) Finally, the ALJ also considered Dr. Perlin's specialty, which is internal medicine. (*See id.* at 43 (referring to the "treatment notes of the claimant's treating internist, Dr. Perlin").)

For these reasons, I conclude that the ALJ properly applied the treating physician rule in providing Dr. Perlin's opinions "little weight."

### ii. Dr. Tina Chieco

Ms. Claudio also objects to the ALJ's decision to not assign controlling weight to the opinions of her treating podiatrist, Dr. Tina Chieco of Footcare Associates. (*See* ECF No. 19-2 at 18-19.) Ms. Claudio contends that the ALJ erred in assigning "minimal weight" to a July, 2013 report from Dr. Chieco noting as follows:

> Ms. [Claudio] has been a patient of mine since 10/12/12. She presented with multiple health issues [and] much difficulty walking. She walks [with] a cane [and] a limp. She is in constant pain and we have exhausted most measures to try to treat her. [Ms. Claudio] suffers from osteoporosis, gouty arthritis, pinched nerves in her back, calcaneal spurs, and plantar fasciitis in her feet bilaterally. She had prev. [indecipherable] on her feet years ago which did not help. We have tried multiple injections which have not helped. She was sent for shoes, inserts, braces etc. no help [sic]. She is on multiple meds and is now very depressed since nothing has helped her. [Ms. Claudio] is a compliant patient. She keeps all her [appointments]. She does whatever treatment plan that's prescribed to the fullest. Her conditions and mental depression [are] making it extremely difficult to have a "quality of life." She is a lovely person and loving mother. Please consider her application for disability.

**\*6** (Tr. at 658.) The ALJ justified her decision to disregard Dr. Chieco's opinion on the ground that "Dr. Chieco only asked that the claimant's application for disability be 'considered' and did not offer a medical opinion on her standing or walking abilities." (ALJ Decision, Tr. at 46.) [4]

4
> Ms. Claudio also contends that the ALJ misapplied the treating physician rule in disregarding the opinion of Dr. Robert Schwartz, a physician from Dr. Chieco's office, that Ms. Claudio used a cane and could not walk without pain (*see* Tr. at 590) (prescription slip noting that "[Ms. Claudio cannot

Case 6:21-cv-01316-BKS-TWD   Document 38   Filed 01/30/23   Page 63 of 124

Claudio v. Berryhill, Not Reported in Fed. Supp. (2018)
2018 WL 3455409, 256 Soc.Sec.Rep.Serv. 614

walk [without] pain ... [and] uses [a] cane]"). (ECF No. 19-2 at 18). There is no indication in the record, however, that Ms. Claudio was a regular patient of Dr. Schwartz. Indeed, the only notation of his involvement with Ms. Claudio in the record are two prescription slips dated May 30, 2013. (*See* Tr. at 588, 590.) Further, the letter from Dr. Chieco in the record avers that Ms. Claudio is a patient of hers, not of Dr. Schwartz. (*See* ECF No. 19-2 at 8 (letter from Dr. Chieco noting that Ms. Claudio has been "[her] patient" for nearly nine months).) As such, Dr. Schwartz is not a "treating physician" within the meaning of the applicable regulations. *See Garcia v. Barnhart*, No. 01 CIV.8300 GEL, 2003 WL 68040, at *5 n. 4 (S.D.N.Y. Jan. 7, 2003) ("Doctors who see a patient only once do not have a chance to develop an ongoing relationship with the patient, and therefore are not generally considered treating physicians."); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (declining to treat doctor as treating physician because of lack of "clear evidence that [the doctor's] involvement with [the plaintiff] extended beyond [his] writing one letter" on the patient's behalf).

The ALJ erred in her weight assignment to Dr. Chieco's opinion. In particular, her conclusion that Dr. Chieco "did not offer a medical opinion on [Ms. Claudio's] standing or walking abilities" (ALJ Decision, Tr. at 46) is incorrect. As noted above, Dr. Chieco wrote that Ms. Claudio had "much difficulty walking" and "walks with a cane and a limp." (*See* Tr. at 658-59.) Dr. Chieco also provided a fairly comprehensive description of Ms. Claudio's difficulties, including foot ailments that fall squarely within a podiatrist's area of specialty, including calcaneal spurs (i.e., heel spurs) and plantar fasciitis. (*See id.*) Finally, Dr. Chieco also noted that her office had attempted to treat Ms. Claudio's ailments for some time, all to no avail. (*See id.*) The ALJ needed to provide a "good reason" for declining to credit her opinion. *See Burgess v. Astrue*, 537 F.3d 117, 130 (2d Cir. 2008). Given that her reason for discounting Dr. Chieco's opinion was demonstrably incorrect, she failed to do so. The ALJ also erred in failing to apply the *Greek* factors in determining what weight to provide to Dr. Chieco's opinions. In particular, she failed to consider the length of Dr. Chieco's treatment of Ms. Claudio, the evidence supporting Dr. Chieco's opinion, and Dr. Chieco's specialty in podiatry. The ALJ therefore misapplied the treating physician rule in her consideration of Dr. Chieco's opinions.

### iii. Whether Remand is Necessary

Although misapplication of the treating physician rule generally warrants remand, *see, e.g., Hidalgo v. Bowen*, 822 F.2d 294, 298 (2d Cir. 1987) (remanding case due to ALJ's failure to properly apply treating physician rule), "[r]emand is unnecessary ... '[w]here application of the correct legal standard could lead only to one conclusion' " *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (quoting *Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998) ). Here, however, I cannot comfortably conclude that the ALJ's correct application of the treating physician rule to Dr. Chieco's opinion could have led only to one conclusion. Remand is therefore required.

**\*7** The ALJ's opinion concerning the impact of Ms. Claudio's ailments likely would have differed had she properly considered Dr. Chieco's findings. The ALJ concluded that Ms. Claudio had the capacity to "stand and walk [four] hours[,] occasionally climb ramps and stairs" and "occasional[ly] balanc[e]." (ALJ Decision, Tr. at 42.) These conclusions supported her determination that Ms. Claudio was capable of performing "light work." (*Id.*) In contrast, Dr. Chieco reported Ms. Claudio had "much difficulty walking" and required a cane to ambulate. (Tr. at 658.) Even with these accommodations, Dr. Chieco noted, Ms. Claudio still walked with a "limp" and suffered from "constant pain." (*Id.*) Had the ALJ properly considered Dr. Chieco's opinion, she might have adopted it, which would likely have led to a different assessment of Ms. Claudio's capabilities.

To be sure, I cannot be certain that the ALJ's proper consideration of Dr. Chieco's opinion would require a different result on the merits. Complying with the treating physician rule does not necessarily mean according the physician's opinion controlling weight. Further, the vocational expert testified at Ms. Claudio's hearing that she should be able to perform the jobs the ALJ identified in her decision even "if she was required to use a cane to ambulate." (*See* Tr. at 91-92) (the vocational expert testified that Ms. Claudio could work as an "extrusion operator, assembler and ... production solderer" even if she required a cane to ambulate because "[t]hose are bench jobs that don't require waking as part of the job"). On the other side of the scale, I cannot be certain that Ms. Claudio's injuries are so limited. Ms. Claudio testified that she now required a wheelchair. (Tr. at 67.) The vocational expert testified that Ms. Claudio's use of a wheelchair could disqualify her from jobs

she could otherwise perform. (Tr. at 92.) Further, the ALJ did not conclude that Ms. Claudio would be able to perform the jobs set out in her opinion even if she required the use of a cane to ambulate. I therefore cannot presuppose what decision she would have made regarding Ms. Claudio's functional capacity had she properly applied the treating physician rule with respect to Dr. Chieco's opinion. Given these differing considerations on both sides of the ledger, I cannot conclude that application of the proper legal standard could have led only to one conclusion.

For these reasons, remand is required to allow the ALJ to assess properly the weight to be given to Dr. Chieco's opinions.

### B. Remaining Grounds

Ms. Claudio also contends that the ALJ erred in failing to consider the effect of all of her medically determinable impairments in formulating her RFC, among other things. I need not reach these issues as I have already determined that the case must be remanded for the reasons discussed above. I express no view on whether the ALJ should give controlling weight to Dr. Chieco's opinions or on any other issues except those expressly addressed by this ruling.

### IV. Conclusion

Ms. Claudio's motion for an order reversing or remanding the Commissioner's decision (ECF No. 19) is GRANTED, and the Commissioner's motion to affirm that decision (ECF No. 22) is DENIED. The case is hereby REMANDED.

IT IS SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2018 WL 3455409, 256 Soc.Sec.Rep.Serv. 614

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 551783

2016 WL 551783
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kim HUBBARD, Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY, Defendant.

6:14-CV-1401 (GTS/WBC)
|
Signed 01/14/2016

**Attorneys and Law Firms**

KIM HUBBARD, PRO SE, 270 Day Ave., Rome, NY 13440.

DANIEL R. JANES, ESQ., U.S. SOCIAL SECURITY ADMIN., OFFICE OF REG'L GEN. COUNSEL – REGION II, Counsel for Defendant, 26 Federal Plaza – Room 3904, New York, NY 10278.

### *REPORT and RECOMMENDATION*

William B. Mitchell Carter, U.S. Magistrate Judge

 **\*1** This matter was referred for report and recommendation by the Honorable Judge Suddaby, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). (Dkt. No. 19.) This case has proceeded in accordance with General Order 18.

Currently before the Court, in this Social Security action filed by Kim Hubbard ("Plaintiff") against the Commissioner of Social Security ("Defendant" or "the Commissioner") pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), is Defendant's unopposed motion for judgment on the pleadings. (Dkt. No. 17.) For the reasons set forth below, it is recommended that Defendant's motion be granted.

## I. RELEVANT BACKGROUND

### A. Factual Background

Plaintiff was born on July 20, 1982. (T. 88.) She completed four years of college. (T. 109.) Generally, Plaintiff's alleged disability consists of diabetes, attention deficit hyperactivity disorder ("ADHD"), back impairments, and anxiety. (T. 108.) Her alleged disability onset date is September 22, 2010. (T. 60.) Her date last insured is June 30, 2015. (*Id.*) She

previously worked as a customer service representative, medical records scanner, processor, waitress, and child care provider. (T. 109.)

### B. Procedural History

On February 25, 2012, Plaintiff applied for a period of Disability Insurance Benefits ("SSD") under Title II of the Social Security Act. (T. 60.) Plaintiff's application was initially denied, after which she timely requested a hearing before an Administrative Law Judge ("the ALJ"). On March 11, 2013, Plaintiff appeared, pro se, before the ALJ, David J. Begley. (T. 25–59.) The ALJ advised Plaintiff of her right to be counseled by an attorney or representative, but Plaintiff waived that right. (T. 28–29.) On June 5, 2013, ALJ Begley issued a written decision finding Plaintiff not disabled under the Social Security Act. (T. 7–24.) On September 22, 2014, the Appeals Council ("AC") denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (T. 1–4.) Thereafter, Plaintiff, again appearing pro se, timely sought judicial review in this Court. On November 19, 2014, the Court issued Plaintiff a copy of this Court's General Order 18, governing the procedural rules with respect to Social Security appeals. (Dkt. No. 3.) At that time the Court also issued Plaintiff a copy of the Pro Se Handbook and Notice. (Dkt. No. 4.)

Pursuant to General Order 18, plaintiffs are notified that "the failure to file a brief as required by this order will result in the consideration of this appeal without the benefit of plaintiff's arguments and may result in a decision heavily influenced by the commissioner's version of the facts and subsequent dismissal of your appeal." N.D.N.Y. General Order 18 at 4.

Plaintiff failed to file a brief by the April 27, 2015 deadline and because of her pro se status, the Court granted an extension to June 1, 2015. (Dkt. No. 14.) Plaintiff failed to file a brief by June 1, 2015 and the Court directed Defendant to file her brief. (Dkt. No. 15.) As of the date of this report and recommendation, Plaintiff has not filed a brief.

### C. The ALJ's Decision

 **\*2** Generally, in his decision, the ALJ made the following five findings of fact and conclusions of law. (T. 12–24.) First, the ALJ found that Plaintiff met the insured status requirements through June 30, 2015 and Plaintiff had not engaged in substantial gainful activity since September 22, 2010. (T. 12.) Second, the ALJ found that Plaintiff had the severe impairments of diabetes mellitus, hyperthyroidism,

2016 WL 551783

degenerative disc disease of the lumbar and cervical spine, left wrist tendinitis, left wrist carpal tunnel syndrome (status post release), right wrist capsulitis, panic disorder, and ADHD. (*Id*.) Third, the ALJ found that Plaintiff did not have an impairment that meets or medically equals one of the listed impairments located in 20 C.F.R. Part 404, Subpart P, Appendix. 1. (T. 12-13.) Fourth, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work, except Plaintiff:

> [could] not climb ladders, ropes, or scaffolds; could occasionally climb ramps/stairs, balance, stoop, kneel, crouch or crawl; work [was] limited to simple, routine, and repetitive tasks, involving only simple, work-related decisions, with few, if any, work-place changes, and only occasional interaction with coworkers and supervisors; [and] no regular interaction with the general public.

(T. 13–14.) [1] Fifth, the ALJ determined that Plaintiff was incapable of performing her past relevant work; however, there were jobs that existed in significant numbers in the national economy Plaintiff could perform. (T. 20–21.)

[1]    Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time. 20 C.F.R. § 404.1567(b).

## II. DEFENDANT'S BRIEFING ON HER MOTION FOR JUDGMENT ON THE PLEADINGS

In support of her motion for judgment on the pleadings, Defendant makes four arguments. First, Defendant argues Plaintiff knowingly and voluntarily waiver her right to representation. (Dkt. No. 17 at 11–12 [Def.'s Mem. of Law].) Second, Defendant argues the ALJ's RFC finding was supported by substantial evidence. (*Id*. at 12–14.) Third, Defendant argues the ALJ's step five finding was supported by substantial evidence. (*Id*. at 14.) Fourth, and lastly, Defendant argues Plaintiff failed to meet her burden. (*Id*. at 14–15.)

## III. RELEVANT LEGAL STANDARD

### A. Standard of Review

A court reviewing a denial of disability benefits may not determine de novo whether an individual is disabled. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir.1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. *See Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir.1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); *Grey v. Heckler,* 721 F.2d 41, 46 (2d Cir.1983); *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979).

**\*3**  "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *See Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982).

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen,* 859 F.2d 255, 258 (2d Cir.1988).

If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's

2016 WL 551783

independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan,* 805 F.Supp. 147, 153 (S.D.N.Y.1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Valente v. Sec'y of Health & Human Servs.,* 733 F.2d 1037, 1041 (2d Cir.1984).

### A. Standard to Determine Disability

The Commissioner has established a five-step evaluation process to determine whether an individual is disabled as defined by the Social Security Act. *See* 20 C.F.R. § 404.1520. The Supreme Court has recognized the validity of this sequential evaluation process. *See Bowen v. Yuckert,* 482 U.S. 137, 140–42, 107 S.Ct. 2287 (1987). The five-step process is as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant

is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform. Under the cases previously discussed, the claimant bears the burden of proof as to the first four steps, while the [Commissioner] must prove the final one.

*Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982).

## IV. ANALYSIS

In a civil case, the Court may dismiss an action where, as here, "the plaintiff fails to prosecute or to comply with [the Federal Rules of Civil Procedure] or a court order...." Fed.R.Civ.P. 41(b); *Storey v. O'Brien,* No. 10–3303, 2012 WL 1889408, at *1 (2d Cir. May 25, 2012). Further, other districts in the Second Circuit have dismissed Social Security appeals, sua sponte, due to a pro se plaintiff's failure to prosecute. *See Gonzalez v. Commissioner of Social Security,* No. 09–CV–10179, 2011 WL 2207574, at *2 (S.D.N.Y. June 2, 2011), *see also Winegard v. Barnhart,* No. 02–CV–6231, 2006 WL 1455479, at *9–10 (W.D.N.Y. Apr. 5, 2006). However, the Court declines to do so in this case.

**\*4** In this District, General Order No. 18 mandates a different course in Social Security cases. General Order 18 cautions plaintiffs that "Plaintiff's brief is the only opportunity for Plaintiff to set forth the errors Plaintiff contends were made by the Commissioner of Social Security that entitle Plaintiff to relief. The failure to file a brief as required by this Order will result in the consideration of this appeal without the benefit of Plaintiff's arguments and may result in a decision heavily influenced by the Commissioner's version of the facts and subsequent dismissal of your appeal." N.D.N.Y. General Order No. 18 at 4. General Order 18 thus states that the Court will "consider" the case notwithstanding a plaintiff's failure to file a brief, albeit in a way that might be "heavily influenced by the Commissioner's version of the facts." *Id.* In a case such as this, where Plaintiff is proceeding pro se, General Order No. 18's promise of a consideration of the merits complies with the special solicitude that the Second Circuit mandates for pro se litigants. Accordingly, the Court has, despite Plaintiff's failure to file a brief, examined the record to determine whether the ALJ applied the correct legal standards and reached a decision based on substantial

Case 6:21-cv-01316-BKS-TWD    Document 38    Filed 01/30/23    Page 68 of 124
Hubbard v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)
2016 WL 551783

evidence. See *Gregorka v. Comm'r of Soc. Sec.*, No. 6:13–CV–1408, 2015 WL 3915959, at \*4 (N.D.N.Y. June 25, 2015).

After a careful review of the administrative record on appeal, the Court recommends the Commissioner's determination be affirmed, for the reasons stated in Defendant's memorandum of law, that (1) the Plaintiff knowingly and voluntarily waived her right to representation, (2) the ALJ's RFC finding was supported by substantial evidence, (3) the ALJ's step five finding was supported by substantial evidence, and (4) Plaintiff failed to meet her burden. (Dkt. No. 17 at 11–15 [Def.'s Mem. of Law].)

### A. Plaintiff Knowingly and Voluntarily Waived Her Right to Representation

Although plaintiffs do not have a constitutional right to counsel at a Social Security hearings, they do have a statutory and regulatory right to be represented if they chose to obtain counsel. 42 U.S.C. § 406; 20 C.F.R. § 404.1705. Here, the Commissioner sent Plaintiff an acknowledgement letter explaining the hearing process and advising her of her right to representation, as well as the availability of free legal services. (T. 77–78.) At the hearing, the ALJ again reviewed with Plaintiff her right to have representation and Plaintiff knowingly waived that right. (T. 28–30.) Therefore, the Commissioner and ALJ complied with their obligations to inform Plaintiff of her right to counsel and Plaintiff knowingly and voluntarily waived her right.

### B. The ALJ's RFC Determination

A plaintiff's RFC is the most she can do despite her limitations. 20 C.F.R. § 404.1545(a). Here, the ALJ's RFC determination was supported by substantial evidence, specifically, the medical source opinions of consultative examiners Dennis Noia, M.D. and Pamela Tabb, M.D.

An ALJ "is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants," particularly where the consultant's opinion is supported by the weight of the evidence. *Garrison v. Comm'r of Soc. Sec.*, No. 08–CV–1005, 2010 WL 2776978 at \*4 (N.D.N.Y. June 7, 2010).

Dr. Noia performed a psychiatric consultative exam on April 30, 2012. At that time he observed Plaintiff was cooperative and her manner of relating, social skills, and overall presentation were adequate. (T. 205.) He further

observed her speech was normal, her thought process was normal, her mood was calm, and her affect was congruent. (T. 206.) Dr. Noia observed Plaintiff's attention and concentration were intact, her recent and remote memory skills were "mildly to moderately" impaired; and her intellectual functioning was average. (*Id.*) In a medical source statement, Dr. Noia opined Plaintiff was capable of understanding and following simple instructions and directions; capable of performing simple and some complex tasks; capable of maintaining attention and concentration; could regularly attend to a routine and maintain a schedule; capable of making appropriate decisions; able to relate to and interact moderately well with others; and Plaintiff had some difficulty dealing with stress. (T. 206–207.) [2]

[2]   Plaintiff did not undergo mental health treatment. In November of 2011, during an evaluation by her orthopedic provider, Plaintiff denied depression and anxiety. (T. 183.) In December of 2011, Plaintiff complained to her primary care provider of "slight depression." (T. 177.) A prescription history indicated Plaintiff was prescribed Alprazolam for her anxiety by Scott Brehaut, M.D. (T. 167.)

 **\*5** Dr. Tabb performed a physical consultative exam on April 30, 2012. At that time she observed Plaintiff appeared in no acute distress, had a normal gait, could walk on heels and toes, needed no help changing for exam or getting on and off the exam table, and was able to rise from a chair without difficulty. (T. 209.) Dr. Tabb observed Plaintiff's cervical spine and lumbar spine showed full flexion, extension, later flexion bilaterally and full rotary movement bilaterally. (T. 210.) Dr. Tabb observed Plaintiff had full range of motion in her shoulders, elbows, forearms, and wrists bilaterally. (*Id.*) Dr. Tabb observed Plaintiff had mild tenderness in the medial aspect of her left wrist. (*Id.*) In a medical source statement Dr. Tabb opined Plaintiff had mild restrictions for performing activities involving repetitive movement of the left wrist. (T. 211.) [3]

[3]   In June of 20120, subsequent to Plaintiff's examination by Dr. Tabb, she underwent CTS release surgery. (T. 255.)

In making his physical RFC determination, the ALJ also relied on objective medical imagining from March of 2012 which indicated "very minimal" degenerative change and "mild" disc space narrowing in the mid thoracic spine. (T. 200.) Medical imaging from March of 2012

2016 WL 551783

indicated degenerative disc disease with "mild" multilevel bulging in the lumbar spine. (T. 201.) Medical imaging of Plaintiff's cervical spine revealed "mild" disc desiccation with "minimal" disc bulging at multiple levels.

The ALJ thoroughly discussed all the medical evidence in the record and his RFC determination was supported primarily by the consultative examiners, Drs. Noia and Tabb. In addition to Dr. Tabb's opinion, the ALJ's physical RFC determination was supported by Plaintiff's treating physicians who reported Plaintiff had normal gait and stance, appeared in no acute distress, ambulated well, and had negative straight leg raises. (T. 182–185, 192–197.)

Plaintiff's orthopedic surgeon, Gregory Shankman, M.D., completed a medical source statement in August of 2007, which the ALJ discussed in his opinion but ultimately rejected. Dr. Shankman opined Plaintiff's pain was "too severe for her to work" and she was "totally and permanently disabled." (T. 161.) Dr. Shankman further opined Plaintiff could not walk for more than five minutes without pain, could not sit for more than five minutes without severe pain, and could not sleep for more than a few hours without pain. (*Id.*) He opined Plaintiff could not lift or carry more than ten pounds. (*Id.*) The ALJ properly assigned Dr. Shankman's opinion "limited weight" because there were no records to support his opinion, Plaintiff's own allegations of limitations were not as restrictive as Dr. Shankman's, and the opinion predated Plaintiff's alleged onset date by over three years. Therefore, for the reasons stated herein, and for the reasons provided in Defendant's brief, the ALJ's RFC determination was supported by substantial evidence.

### C. The ALJ's Credibility Determination
A plaintiff's allegations of pain and functional limitations are "entitled to great weight where ... it is supported by objective medical evidence." *Rockwood v. Astrue,* 614 F.Supp.2d 252, 270 (N.D.N.Y.2009) (quoting *Simmons v. U.S. R.R. Ret. Bd.,* 982 F.2d 49, 56 (2d Cir.1992)). However, the ALJ "is not required to accept [a plaintiff's] subjective complaints without question; he may exercise discretion in weighing the credibility of the [plaintiff's] testimony in light of the other evidence in the record." *Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir.2010) (citing *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979)). "When rejecting subjective complaints, an ALJ must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief." *Rockwood,* 614 F.Supp.2d at 270.

**\*6** "The ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record. First, the ALJ must determine whether the claimant has medically determinable impairments, which could reasonably be expected to produce the pain or other symptoms alleged." *Id.,* at 271.

> Second, if medically determinable impairments are shown, then the ALJ must evaluate the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limit the claimant's capacity to work. Because an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, an ALJ will consider the following factors in assessing a claimant's credibility: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms.

*Id.,* see 20 C.F.R. § 416.929(c)(3)(i)-(vii). Further, "[i]t is the role of the Commissioner, not the reviewing court, "to resolve evidentiary conflicts and to appraise the credibility of witnesses," including with respect to the severity of a claimant's symptoms." *Cichocki v. Astrue,* 534 F. App'x 71, 75 (2d Cir.2013) (citing *Carroll v. Sec'y of Health & Human Servs.,* 705 F.2d 638, 642 (2d Cir.1983)).

Here, the ALJ properly applied the Regulations in his credibility analysis. The ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, Plaintiff's statements concerning the intensity, persistence, and limiting

2016 WL 551783

effects of these symptoms were not entirely credible. (T. 15.) The ALJ provided an accurate synopsis of Plaintiff's testimony. (T. *Id.*) The ALJ discussed objective medical evidence and opinion evidence which he found to be inconsistent with Plaintiff's statements. (T. 15–18.) The ALJ discussed Plaintiff's activities of daily living, treatment she received for her impairments including medication, and aggravating factors. (T. 15.) Therefore, for the reasons stated herein, the ALJ properly adhered to the Regulations in making his credibility determination and substantial evidence supports the ALJ's credibility determination.

### D. The ALJ's Step Five Determination

At step five of the sequential process, the ALJ considered Plaintiff's age, education, and RFC, to determine whether there were a significant number of jobs in the national economy which Plaintiff could perform. 20 C.F.R. § 404.1569. In making his determination, the ALJ relied on the testimony of a vocational expert ("VE"). (T. 5658.) At the hearing the VE testified that based on a hypothetical individual with Plaintiff's age, education, and RFC, there were jobs that existed in significant numbers in the national economy which she could perform. (T. 56–57.) Because we find no error in the ALJ's RFC assessment, we likewise conclude that the ALJ did not err in posing a hypothetical question to the vocational expert that was based on that assessment. *See Dumas v. Schweiker,* 712 F.2d 1545, 1553–54 (2d Cir.1983) (approving a hypothetical question to a vocational expert that was based on substantial evidence in the record). **ACCORDINGLY**, based on the findings above, it is

**\*7 RECOMMENDED**, that the Commissioner's decision be **AFFIRMED**, and the Plaintiff's complaint **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have **FOURTEEN (14) DAYS** within which to file written objections to the foregoing report. Any objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health* and Human Services, 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

### All Citations

Not Reported in Fed. Supp., 2016 WL 551783

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 3915959
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Leo GREGORKA; and Eve Gregorka, Plaintiffs,
v.
COMMISSIONER OF SOCIAL SECURITY, Defendant.

No. 6:13–CV–1408 (GTS/TWD).
|
Signed June 25, 2015.

**Attorneys and Law Firms**

Leo Gregorka and Eve Gregorka, Little Falls, NY, pro se.

Hon. Richard S. Hartunian, United States Attorney for the Northern District of New York, Albany, NY, Office of General Counsel, Social Security Administration, Emily M. Fishman, Esq., of Counsel, New York, NY, for Defendant.

### *DECISION and ORDER*

GLENN T. SUDDABY, District Judge.

**\*1** The above matter comes to this Court following a Report–Recommendation by United States Magistrate Judge Thérèse Wiley Dancks, filed on May 28, 2015, recommending that the Commissioner's decision denying benefits be affirmed with regard to Social Security income benefits ("SSI") but reversed with regard to disability insurance benefits ("DIB"). (Dkt. No. 14.) No objections to the Report–Recommendation have been filed and the time in which to do so has expired. After carefully reviewing all of the papers herein, including Magistrate Judge Dancks' thorough Report–Recommendation, the Court can find no error in the Report–Recommendation, clear or otherwise. As a result, the Report–Recommendation is accepted and adopted in its entirety; and the case is remanded to the Commissioner of Social Security for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Dancks' Report–Recommendation (Dkt. No. 20) is ***ACCEPTED*** and ***ADOPTED*** in its entirety; and it is further

**ORDERED** that the Commissioner's decision is ***AFFIRMED*** with regard to the denial of SSI benefits but ***REVERSED*** with regard to the denial of DIB benefits; and it is further

**ORDERED** that this matter is ***REMANDED*** to the Commissioner for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

### *REPORT AND RECOMMENDATION*

THÈRÈSE WILEY DANCKS, United States Magistrate Judge.

This matter was referred to the undersigned for report and recommendation by the Honorable Glenn T. Suddaby, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Northern District of New York Local Rule 72.3. This case has proceeded in accordance with General Order 18 of this Court which sets forth the procedures to be followed when appealing a denial of Social Security benefits. Oral argument was not heard. For the reasons discussed below, it is recommended that the Court affirm the Commissioner's finding that Plaintiffs are not entitled to supplemental security income ("SSI") benefits but remand the disability insurance benefits ("DIB") claim to the Commissioner for further proceedings.

### I. BACKGROUND AND PROCEDURAL HISTORY

On June 9, 2011, Thomas Leo Gregorka ("Mr.Gregorka") submitted applications for SSI and DIB. (Dkt. No. 15–2 at 21.) The applications were denied on December 13, 2011. *Id.* On January 19, 2012, Mr. Gregorka filed a request for a hearing before an Administrative Law Judge ("ALJ"). *Id.* Mr. Gregorka died on April 1, 2012. *Id.* Mr. Gregorka was fifty-eight years old when he died. *Id.* at 30.

Plaintiffs Leo and Eve Gregorka, the parents of Mr. Gregorka, filed a substitution of party to proceed with the hearing requested by their son. (Dkt. No. 15–2 at 21.) They did not, however, wish to appear at the hearing in person. *Id.* Thus, the ALJ based his decision on the record alone. *Id.*

**\*2** On June 19, 2012, the ALJ issued a decision finding that Mr. Gregorka was not disabled. (Dkt. No. 15–2 at 21–31.) Plaintiffs filed a request for review by the Appeals Council (Dkt. No. 15–2 at 16) and submitted additional evidence (Dkt.

No. 15–2 at 5.) On September 5, 2013, the Appeals Council issued separate decisions on Mr. Gregorka's SSI claim and his DIB claim. (Dkt. No. 15–2 at 1–4, 8 .) The Appeals Council dismissed the request for review of the SSI claim, finding that Plaintiffs were not proper parties pursuant to Social Security regulations. (Dkt. No. 15–2 at 8.) The Appeals Council denied the request for review of the DIB claim, finding that there was no basis for changing the ALJ's decision. (Dkt. No. 15–2 at 2, 3.)

Plaintiffs commenced this action on November 12, 2013. (Dkt. No. 1.)

## II. APPLICABLE LAW

### A. Standard for Benefits

To be considered disabled, a claimant seeking disability insurance benefits or SSI disability benefits must establish that he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A) (2006). In addition, the claimant's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

§ 1382c(a)(3)(B).

Acting pursuant to its statutory rulemaking authority (42 U.S.C. § 405(a)), the Social Security Administration ("SSA") promulgated regulations establishing a five-step sequential evaluation process to determine disability. 20 C.F.R. § 416.920(a)(4) (2015). Under that five-step sequential evaluation process, the decision-maker determines:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

McIntyre v. Colvin, 758 F.3d 146, 150 (2d Cir.2014.) "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further." Barnhart v. Thomas, 540 U.S. 20, 24, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003).

**\*3** The claimant bears the burden of proof regarding the first four steps. Kohler v. As true, 546 F.3d 260, 265 (2d Cir.2008) (quoting Perez v. Chater, 77 F.3d 41, 46 (2d Cir.1996)). If the claimant meets his or her burden of proof, the burden shifts to the Commissioner at the fifth step to prove that the claimant is capable of working. Id.

### B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. Featherly v. Astrue, 793 F.Supp.2d 627, 630 (W.D.N.Y.2011) (citations omitted); Rosado v. Sullivan, 805 F.Supp. 147, 153 (S.D.N.Y.1992) (citing Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir.1987)). A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. Johnson, 817 F.2d at 986.

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g) (2012); *Rivera v. Sullivan,* 923 F.2d 964, 967 (2d Cir.1991). An ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Roat v. Barnhart,* 717 F.Supp.2d 241, 248 (N.D.N.Y.2010);[1] *Ferraris v. Heckler,* 728 F.2d 582, 587 (2d Cir.1984). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Williams ex rel. Williams v. Bowen,* 859 F.2d 255, 258 (2d Cir.1988) (citations omitted). It must be "more than a mere scintilla" of evidence scattered throughout the administrative record. *Featherly,* 793 F.Supp.2d at 630; *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams,* 859 F.2d at 258 (citations omitted). However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir.1972); *see also Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982).

[1] On Lexis, this published opinion is separated into two documents. The first is titled *Roat v. Barnhart,* 717 F.Supp.2d 241, 2010 U.S. Dist. LEXIS 55442, 2010 WL 2326142 (N.D.N.Y. June 7, 2010). It includes only the district court judge's short decision adopting the magistrate judge's report and recommendation. The second is titled *Roat v. Comm'r of Soc. Sec.,* 717 F.Supp.2d 241, 2010 U.S. Dist. LEXIS 55442, 2010 WL 2326142 (N.D.N.Y. June 7, 2010). It includes only the magistrate judge's report and recommendation. Westlaw includes both the district court judge's decision and the magistrate judge's report and recommendation in one document, titled *Ross v. Barnhart,* 717 F.Supp.2d 241 (N.D.N.Y.2010). The Court has used the title listed by Westlaw.

### III. THE ALJ'S DECISION

Here, the ALJ found at step one that Mr. Gregorka was not engaged in any substantial gainful activity from September 27, 2008, to April 1, 2012. (Dkt. No. 15–2 at 23.) At step two, the ALJ found that Mr. Gregorka suffered from the severe conditions of hypertensive and arthroscopic cardiovascular disease, chronic obstructive pulmonary disease, degenerative disc disease of the cervical and lumbar spine, and physical residuals from chronic alcohol abuse, including seizures, near syncope, and tremor. *Id.* at 23–24. The ALJ found that Mr. Gregorka did not have any severe mental impairment, granting "great weight" to the medical opinion of a non-examining agency medical consultant and "little weight" to the opinion of consultative psychologist Dennis Noia, Ph .D. *Id.* at 25. At step three, the ALJ found that none of Mr. Gregorka's impairments met or medically equaled a listed impairment. *Id.* at 25–26. At step four, the ALJ found that Mr. Gregorka had the RFC to perform medium work, except that he needed to avoid climbing ladders or scaffolds and should avoid working at heights or around dangerous machinery. *Id.* at 26. Based on that RFC, the ALJ found that Mr. Gregorka was not able to perform any past relevant work. *Id.* at 29. At step five, however, the ALJ found that Mr. Gregorka could perform jobs that exist in significant numbers in the national economy. *Id.* at 30. Accordingly, the ALJ found that Mr. Gregorka was not disabled. *Id.* at 30–31.

### IV. PLAINTIFFS' FAILURE TO FILE A BRIEF

**\*4** This Court's General Order 18 sets forth the briefing schedule in Social Security cases. After Plaintiffs failed to comply with General Order 18, the undersigned issued an order of June 9, 2014, which directed Plaintiffs to file their brief within forty-five days after service of Defendant's brief. (Dkt. No. 17.) Despite this, Plaintiffs filed neither papers opposing Defendant's motion nor a request to enlarge the time within which to oppose Defendant's motion.

In the usual civil case, a plaintiff's failure to comply with court orders would subject the complaint to dismissal under Federal Rule of Civil Procedure 41(b). In addition, other Districts in the Second Circuit have held that where a Social Security plaintiff files a complaint but fails to file a brief on the merits, the complaint is conclusory and insufficient to defeat a motion for judgment on the pleadings. *Winegard v. Barnhart,* No. 02–CV–6231 CJS, 2006 U.S. Dist. LEXIS 31973, at *27– 28, 2006 WL 1455479, at *9–10 (W.D.N.Y. Apr.5, 2006); *Feliciano v. Barnhart,* Civ. No. 04–9554 KMW AJP, 2005 U.S. Dist. LEXIS 14578, at *34–36, 2005 WL 1693835, at

*10 (S.D.N.Y. July 21, 2005); *Reyes v. Barnhart,* Civ. No. 01–4059 LTS JCF, 2004 U.S. Dist. LEXIS 3689, at *6–7, 2004 WL 439495, at *3 (S.D.N.Y. Mar.9, 2004).

In this District, however, General Order No. 18 mandates a different course in Social Security cases. General Order 18 cautions plaintiffs that "Plaintiff's brief is the only opportunity for Plaintiff to set forth the errors Plaintiff contends were made by the Commissioner of Social Security that entitle Plaintiff to relief. The failure to file a brief as required by this Order will result in the consideration of this appeal without the benefit of Plaintiff's arguments and may result in a decision heavily influenced by the Commissioner's version of the facts and subsequent dismissal of your appeal." (General Order No. 18 at 4.) General Order 18 thus states that the Court will "consider" the case notwithstanding a plaintiff's failure to file a brief, albeit in a way that might be "heavily influenced by the Commissioner's version of the facts." *Id.* In a case such as this, where the plaintiff is proceeding pro se, General Order No. 18's promise of a consideration of the merits complies with the special solicitude that the Second Circuit mandates for pro se litigants. Accordingly, the Court has, despite Plaintiffs' failure to file a brief, examined the record to determine whether the ALJ applied the correct legal standards and reached a decision based on substantial evidence.

## V. DISCUSSION

### A. SSI Claim

The ALJ denied Mr. Gregorka's claim for both SSI and DIB on the merits. (Dkt. No. 15–2 at 21–31.) The Appeals Council dismissed Plaintiffs' request for review of the ALJ's decision regarding SSI on the grounds that Plaintiffs were not eligible survivors for underpayment of SSI under the agency's regulations. *Id.* at 8. In their complaint, Plaintiffs explicitly challenge the denial of "Title II benefits (Social Security Disability)." (Dkt. No. 1 at 1.) The complaint does not explicitly challenge the denial of SSI benefits under Title XVI. Defendant argues that to the extent that the complaint can be construed as asserting an SSI claim, that claim is moot and was properly dismissed by the Appeals Council. (Dkt. No. 18 at 8–10.) Defendant is correct.

**\*5** Agency regulations drastically limit the categories of individuals who can recover benefit underpayments on behalf of a deceased individual. 20 C.F.R. § 416.542(b)(4). Surviving parents can recover only if the deceased underpaid recipient was a disabled or blind child when the

underpayment occurred. 20 C.F.R. § 416.542(b)(2)-(3). A "child" is an individual under the age of eighteen or an unmarried individual under the age of twenty-two who is attending school. 20 C.F.R. § 416.1856. Here, Mr. Gregorka was fifty-seven years old when he applied for SSI. (Dkt. No. 15–2 at 21, 30.) Accordingly, Plaintiffs are not the surviving parents of a disabled child pursuant to agency regulations. Therefore, it is recommended that the Court affirm the Commissioner's finding that Plaintiffs are not entitled to recover SSI benefits.

### B. DIB Claim

Defendant concedes that remand is appropriate regarding Plaintiffs' DIB claim. (Dkt. No. 18 at 10–14.) Specifically, remand is appropriate because it is not clear from the Appeals Council's decision whether it considered four medical assessments by Mr. Gregorka's treating physician that were submitted as new evidence. (Dkt. No. 15–2 at 5; Dkt. No. 15–9 at 59–66.) Those assessments related to the period on or before the ALJ's decision and contradicted the ALJ's RFC finding. (Dkt. No. 15–9 at 59–66.) The Appeals Council was thus required to consider it. 20 C.F.R. § 404.970(b). Accordingly, it is recommended that the Court remand this matter to the Commissioner for further proceedings regarding Plaintiff's DIB claim.

**WHEREFORE,** it is hereby

**RECOMMENDED,** that this matter be remanded to the Commissioner, pursuant to sentence four of 42 U.S.C. § 405(g),[2] for further proceedings consistent with the above.

[2]    Sentence four reads "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 87 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs. .,* 892 F.2d 15, 16 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72.

2015 WL 3915959

Dated: May 28, 2015.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 3915959

---

**End of Document**                                      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by DuBois v. Commissioner of Social Security, S.D.N.Y., March 21, 2022

2012 WL 7784156
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kenneth Ray HENDRICKSON, Plaintiff,

v.

Michael J. ASTRUE, Commissioner of the
Social Security Administration, Defendant.

Civil Action No. 5:11–927.
|
Dec. 11, 2012.

### REPORT AND RECOMMENDATION

EARL S. HINES, United States Magistrate Judge.

**\*1** Plaintiff Kenneth Ray Hendrickson ("Hendrickson") brings this action under 42 U.S.C. § 405(g) for review of a decision denying his application for disability-based benefits under the Social Security Act. Complying with General Order # 18, the parties join issues through competing briefs.[1]

[1] General Order # 18 is dated September 23, 2003 (superseding January 24, 2002 and September 19, 2001 general orders). (Dkt. No. 3).

### I. Background

Hendrickson applied for disability insurance ("DIB") and supplemental security income ("SSI") benefits claiming disability due to *depression* and *anxiety.* (T. 106–13, 136).[2] His applications, filed on June 25, 2007, alleged that disability commenced on April 28, 2007. *Id.* After being denied benefits initially (T. 66–67), Hendrickson requested a hearing before an administrative law judge ("ALJ"). (T. 76).

[2] "T." followed by a number refers to the page of the administrative

ALJ Thomas John S. Pope ("ALJ Pope") conducted a video evidentiary hearing on September 10, 2009. (T. 19, 29–65). Hendrickson was represented by counsel, Jason Mintz, Esq., at the hearing. (T. 19, 29, 31). Hendrickson and an impartial vocational expert gave testimony.[3] ALJ Pope received additional evidence consisting of Hendrickson's medical records, a psychiatric evaluation of a state agency psychiatric consultative examiner, Kristen Barry, Ph.D., and a psychiatric review report and mental residual functional capacity assessment of a state agency psychology medical consultant, E. Kamin, Ph.D.

[3] ALJ Pope presided over the hearing from Chicago, Illinois. Hendrickson appeared and testified through interactive video in Syracuse, New York. The impartial vocational expert, Edward Pagella, appeared by telephone. (T. 19).

When ALJ Pope denied Hendrickson's applications (T. 19–28), Hendrickson appealed to the Appeals Council of the Social Security Administration's Office of Hearings and Appeals. (T. 13–14). On June 28, 2011, the Appeals Council denied Hendrickson's request to review. (T. 3–5). This rendered ALJ Pope's opinion the final decision. *See Sims v. Apfel,* 530 U.S. 103, 107 (2000).

Represented by new counsel, Howard D. Olinsky, Esq., Hendrickson timely instituted this case on August 4, 2011. (Dkt. No. 1).

### II. Preliminary Discussion

An initial discussion of the Social Security benefit programs at issue and the administrative decision-making process (including certain terms of art) will aid comprehension of Hendrickson's underlying claim, ALJ Pope's decision and Hendrickson's challenges thereto.

### A. Eligibility for Benefits

*Disability Insurance benefits,* authorized by Title II of the Social Security Act and funded by social security taxes, provide income to insured individuals forced into involuntary, premature retirement by reason of disability. *Supplemental Security Income* benefits, authorized by Title XVI of the Social Security Act and funded by general tax revenues, provide an additional resource to assure that disabled individuals' income does not fall below the poverty line.

Maximum benefits available under SSI are considerably less than under DIB. Here, ALJ Pope found that Hendrickson meets the insurance requirements of the DIB program. The practical effect of that finding makes Hendrickson's SSI application superfluous since Hendrickson, if found to be disabled, obviously would elect the higher benefit available under DIB.

**\*2** The Social Security Act defines disability as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3).

*B. Sequential Evaluation Procedure*
The law requires *individualized* determinations. *See Heckler v. Campbell,* 461 U.S. 458, 467 (1983). Hence, Commissioner Astrue generally must make both medical and vocational assessments in every case. To satisfy this requirement, the Commissioner utilizes a five-step, sequential evaluation procedure for adjudicating disability-based claims. *See* 20 C.F.R. §§ 404.1520(a), 416.920.[4] This model is "sequential" in the sense that when a decision can be made at an early step, remaining steps are not considered. *See* 20 C.F.R. §§ 404.1520, 416.920. It enjoys judicial approval as a fair and just way for determining disability applications in conformity with the Social Security Act. *See Bowen v. Yuckert,* 482 U.S. 137, 153 (1987) (citing *Heckler,* 461 U.S. at 461) (use of the sequential evaluation process "contribute[s] to the uniformity and efficiency of disability determinations")).

[4]    In this circuit, the Commissioner's five-step sequential procedure is described as follows:
   1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.
   2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.
   3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment [that meets or equals a] listed [impairment] in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the

Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.
   4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.
   5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform.
*Shaw v. Chater,* 221 F.3d 126, 132 (2d Cir.2000) (citing *DeChirico v. Callahan,* 134 F.3d 1177, 1179–80 (2d Cir.1998) (citing 20 C.F.R. §§ 404.1520, 416.920)).

Claimants bear the burden to prove their disability under the first four steps. *DeChirico v. Callahan,* 134 F.3d 1177, 1179–80 (2d Cir.1998). When they do, a *prima facie* case of disability has been proven. *See Mimms v. Heckler,* 750 F.2d 180, 185 (2d Cir.1984). The burden then shifts to the Commissioner in Step 5 to show "that there is work in the national economy that the claimant can do." *Poupore v. Astrue,* 566 F.3d 303, 306 (2d Cir.2009); *see also DeChirico,* 134 F.3d at 1180; *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982); 20 C.F.R. § 416.966.

Specialized rules—some imposed externally by courts—govern the Commissioner's applications of these five steps. Those particularly pertinent to Hendrickson's case are described in the remainder of this section:

   1. *Step 2 Severity Determination*
In the Commissioner's view, "[a] 'severe' impairment is one that significantly limits an individual's physical or mental ability to do 'basic work activities.' " *Meadors v. Astrue,* 370 Fed. App'x 179, 182 (2d Cir.2010) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)); *Green–Younger v. Barnhart,* 335 F.3d 99, 106 (2d Cir.2003); *see also* 20 C.F.R. § 416.921(b) ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities"). The phrase "significantly limits," however, is not tantamount to an ultimate determination of disability. In this circuit, a Step 2 severity inquiry serves only to "screen out *de minimis* claims." *Dixon v. Shalala,* 54 F.3d 1019, 1030 (2d Cir.1995). Consequently, "[a] finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' ...

Case 6:21-cv-01316-BKS-TWD    Document 38    Filed 01/30/23    Page 78 of 124

[with] ...'no more than a minimal effect on an individual's ability to work.' " *Rosario v. Apfel,* No. 97 CV 5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (quoting *Bowen,* 482 U.S. at 154 n. 12).

**\*3** When mental impairments are present, determining severity thereof is a complex undertaking. The Commissioner has promulgated additional regulations that require application of a "special technique" at the second (and third) steps of the five-step framework. *Kohler v. Astrue,* 546 F.3d 260, 265 (2d Cir.2008) (citing 20 C.F.R. § 404.1520a). This technique requires an initial determination of whether the claimant has a "medically determinable mental impairment." 20 C.F.R. § 404.1520a(b)(1). If so, the reviewing authority must then rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c), § 404.1520a(b)(2), which specifies four broad functional areas: (1) activities of daily living; (2) social functioning; (3) *concentration, persistence, or pace* (underscored because of relevance to instant case); and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). When the degree of limitation in each of the first three areas is rated "mild" or better, and no episodes of decompensation are identified, the claimant's mental impairment is not "severe." 20 C.F.R. § 404.1520a(d)(1).[5] Conversely, when a mental impairment is severe, evaluation proceeds to Step 3 to determine whether the impairment meets or is equivalent in severity to any listed mental disorder. 20 C.F.R. § 404.1520a(d)(2)(3).

[5]    "[A] pplication of the special technique [must] be documented." *Petrie v. Astrue,* 412 Fed. App'x 401, 408 (2d Cir.2011) (citing 20 C.F.R. § 404.1520a(e)). "Generally, a medical or psychological consultant will complete a standard document, known as a 'Psychiatric Review Technique Form' ("PRTF")." *Id.* "Pursuant to the regulations, the ALJ's written decision must 'reflect application of the technique, and ... "include a specific finding as to the degree of limitation in each of the [four] functional areas." ' " *Id.* (quoting 20 C.F.R. § 404.1520a(e)(2)).

2. *Step 4 Residual Functional Capacity Determination*
When making a Step 4 finding (as to whether a severely impaired claimant can perform past relevant work), an ALJ must first assess and articulate that claimant's "residual functional capacity" ("RFC"), *i.e.,* what that claimant can still do in a work setting (8 hours a day, 5 days a week,

or equivalent scheduled) despite physical and/or mental limitations caused by impairments and any related symptoms, such as pain. *See* 20 C.F.R. § 404.1545, 416.945(a); *see also Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999) (defining RFC). Administrative law judges thus decide whether applicants, notwithstanding their impairments, have physical and mental abilities to perform activities generally required by competitive, remunerative work on a regular and continuing basis. *See* SSR 96–p, TITLE II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, 61 Fed.Reg. 34474, 1996 WL 374184, at *4 (SSA July 2, 1996).

When *physical* impairments are at issue, the Commissioner's regulation and an internal policy ruling (a) identify various ordinary physical functions to be considered in context of an ordinary work schedule, (b) require function-by function assessments of those activities, and (c) dictate that the ultimate RFC determination account for limitations imposed by both severe and non-severe impairments. *See* 20 C.F.R. §§ 404.1545(a)(2), 404.1545(b), 416.945(a)(2), 416.945(b); SSR 96–8p, 1996 WL 374184, at * *5, 7.

When *mental* impairments are in the picture, the RFC assessment ("mental RFC") involves an even more detailed analyses of claimants' functional limitations than were undertaken at Step 2. Mental RFC consists of four broad categories (*i.e.,* understanding and memory; sustained concentration and persistence; social interaction; and adaptation) with a total of twenty subparts that are each reviewed and rated (*i.e.,* "not significantly limited"; "moderately limited"; "markedly limited"; "no evidence of limitation in this category"; and "not ratable on available evidence"). (T. 389–391). Ultimately, "[a]ny impairment-related limitations created by an individual's response to demands of work ... must be reflected in the RFC assessment." SSR 85–15, THE MEDICAL–VOCATIONAL RULES AS A FRAMEWORK FOR EVALUATING SOLELY NONEXERTIONAL IMPAIRMENTS, 1985 WL 56857, at *5–6 (SSA 1985).

3. *Step 5 Evidentiary Burden When Nonexertional Impairments Exist*
**\*4** At Step 5, the Commissioner can satisfy his burden to show that a claimant can still do work existing in the national economy by eliciting or consulting several extrinsic sources of relevant evidence.[6] In limited circumstances, moreover, the Commissioner may take administrative notice

of disability *vel non* by adopting findings published in *"Medical–Vocational Guidelines,"* commonly called *"the grids."* See *Roma v. Astrue,* 468 Fed. App'x 16, 20–21 (2d Cir.2012); *Bapp v. Bowen,* 802 F.2d 601, 604 (2d Cir.1986); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 2. When only exertional impairments [7] are in play, and when an ALJ's findings of residual functional capacity, age, education, and previous work experience coincide with grids parameters, the Commissioner may directly apply the grids to determine whether work exists in the national economy which claimants can perform. *See Martin v. Astrue,* 337 Fed. App'x 87, 91 (2d Cir.2009); *see also* 20 C.F.R. Part 404, Subpart P, Appendix 2; *see also Thompson v. Barnhart,* 75 Fed. App'x 842, 844 (2d Cir.2003) (Commissioner can meet Step 5 burden "by resorting to the applicable medical-vocational guidelines (the grids)"). [8]

[6]    Generally, the Commissioner elicits or consults two principal sources of evidence relevant to whether claimants can perform alternative, available work. First, witnesses qualified as "Vocational Experts" may testify as to whether jobs exist for a person with the claimant's precise abilities. *See* 20 C.F.R. §§ 404.1566(e), 416. 966(e); *see also* SSR 00–4p, POLICY INTERPRETATION RULING: TITLES II AND XVI: USE OF VOCATIONAL EXPERT AND VOCATIONAL SPECIALIST EVIDENCE, AND OTHER RELIABLE OCCUPATIONAL INFORMATION IN DISABILITY DECISIONS, 2000 WL 1898704, at *1–2 (SSA Dec. 4, 2000). Second, a United States Department of Labor publication titled *Dictionary of Occupational Titles* ("DOT") can assist in determining when a claimant's residual work skills can be used in other work and the specific occupations in which they can be used. *See* 20 C.F.R. §§ 404.1560(d)(1), 416.966(d)(1); *see also* SSR 00–4p, 2000 WL 1898704, at *1–2.

[7]    "An exertional impairment is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only a claimant's ability to meet ... strength demands of jobs (*i.e.,* sitting, standing, walking, lifting, carrying, pushing, and pulling)." *Bogardus–Fry v. Astrue,* No. 7:11–CV–883 (MAD), 2012 WL 3779132, at *15 n.14 (N.D.N.Y. Aug. 31, 2012) (citing 20 C.F.R. §§ 404.1569a(b), 416.969a(b); *Rodriguez v. Apfel,* No. 96 Civ. 8330(JGK), 1998

WL 150981, at *10, n.12 (S.D.N.Y. Mar. 31, 1998)).

[8]    The grids are a matrix of general findings— established by rule—as to whether work exists in the national economy that a person can perform. "The grids take into account a claimant's RFC, as well as [his] age, education, and work experience." *Calabrese v. Astrue,* 358 Fed. App'x 274, 276 & n.1 (2d Cir.2009) (citing *Rosa v. Callahan,* 168 F.3d 72, 78 (2d Cir.1999)). Ultimately, the grids yield a decision of "disabled" or "not disabled." *Zorilla v. Chater,* 915 F.Supp. 662, 667 & n.2 (S.D.N.Y.1996) (citing 20 C.F.R. § 404.1567(a)).

But, when claimants also suffer from nonexertional impairments, [9] direct application of the grids to determine disability is not permitted. The Commissioner nonetheless permits administrative law judges to consult them as a "framework for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that would be contraindicated by ... nonexertional limitations." 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e)(2). SSR 85–15 addresses this "framework" analysis, and directs that when evaluating nonexertional impairments, an administrative law judge should first consult the grids, along with consideration of the claimant's RFC and vocational factors, to determine the extent of impairment caused by *exertional* limitations. *See* SSR 85–15, 1985 WL 56857, at *3. The administrative judge should next determine how much that claimant's "occupational base," (the entire exertional span from sedentary work through heavy work), is *further reduced* by effects of *nonexertional* impairments. *See id.*

[9]    "Nonexertional limitations" are "limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect [ing] only your ability to meet ... demands of jobs other than ... strength demands...." *See* 20 C.F .R. §§ 404.1569a(c)(1), 416.969a(c)(1). A nonexertional limitation is an impairment-caused limitation affecting such capacities as mental abilities, vision, hearing, speech, climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, fingering, and feeling. Environmental restrictions (*e.g.,* difficulty tolerating some physical features of certain work settings, such as dust and fumes) are also considered to be nonexertional limitations. *See*

Case 6:21-cv-01316-BKS-TWD   Document 38   Filed 01/30/23   Page 80 of 124
Hendrickson v. Astrue, Not Reported in F.Supp.2d (2012)
2012 WL 7784156

20 C.F.R. §§ 404.1569a (c)(1) (v), 416.969a (c)(1) (v).

The net effect is that when both exertional and nonexertional impairments are present, an administrative law judge theoretically can find a claimant *disabled* when the grids direct such a finding solely on the basis of severity of exertional impairments. But, when exertional impairments alone generate a grids finding of *not disabled,* an administrative judge then must determine (usually from other evidence) how much nonexertional impairments further diminish that claimant's occupational base. Only when a meaningful occupational base remains can an administrative judge then deny a claim using the grids as a framework. *See Pratts v. Chater,* 94 F.3d 34, 39 (2d Cir.1996) (a claimant's work capacity is "significantly diminished" if there is an additional loss of work capacity that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity).

### III. The Commissioner's Decision

**\*5** ALJ Pope utilized the sequential evaluation procedure described earlier. (T. 19—28). Findings generally favorable to Hendrickson at the first four steps established a *prima facie* case of disability. At Step 5, however, ALJ Pope concluded that Hendrickson "has not been under a disability" and his claim was denied. (T. 27–28).

ALJ Pope's complete findings and conclusions appear on pages 21—27 of the administrative transcript contained in the record before the court. (Dkt. No. 9). For present purposes, however, it is necessary to identify and then amplify certain findings at sequential Steps 2, 4 and 5:

| | |
|---|---|
| Step 2 | Hendrickson has severe impairments consisting of depression, anxiety, and substance abuse. (T. 21–23). |
| Step 4 | (a) Hendrickson has *physical capacity* to perform a full range of work at all exertional levels; (b) his *mental capacity* for work at all levels is diminished by depression, anxiety and substance abuse; and, consequently, (c) his overall *residual functional capacity* is limited to unskilled work that does not involve working closely with others. (T. 23–26). |
| Step 5 | (a) The grids (Medical–Vocational Rule 204.00) indicate "not disabled" with reference to Hendrickson's exertional impairments (none); (b) Hendrickson's nonexertional limitations, however, erode the occupational base of unskilled work at all exertional levels by 70%; but (c) many remaining jobs exist in the national economy for individuals with Hendrickson's residual functional capacity. (T. 27). |

*A. Step 4 Residual Functional Capacity Assessment*

When making his Step 4 findings summarized above, ALJ Pope gave "great weight" to the opinions and analyses of the two state agency experts identified earlier. Dr. Barry examined Hendrickson. Dr. Kamin conducted an "extensive review of [Hendrickson's] medical records and objective tests from all the claimant's treatment providers." (T. 27). Their respective evaluations relating to concentration, persistence and pace chronicled that Hendrickson:

• has a difficult time handling stress and making appropriate decisions (T. 373, 391);

• has a "guarded" prognosis (T. 374);

• is moderately limited in ability to perform activities with a schedule, maintain regular attendance and be punctual within customary tolerances (T. 389);

• is moderately limited in ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (T. 390);

• is moderately limited in ability to respond appropriately to changes in the work setting (T. 390);

• is moderately limited in ability to work in coordination with or proximity to others without being distracted by them (T. 390); and

• is moderately limited in his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (T. 390).

**\*6** Dr. Kamin also concluded from his overall review of Hendrickson's medical records that Hendrickson has mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, mild difficulties in concentration, persistence or pace, and one or two repeated episodes of deterioration (each of extended duration). (T. 385).

In ALJ Pope's view, this information indicates that Hendrickson's capacity for work-related activity is limited to performing unskilled work and only when not required to work closely with others. ALJ Pope explained:

"[T]he residual functional capacity finding by the undersigned accommodates some difficulties in the claimant's ability to concentrate and focus and his anxiety by providing for unskilled work which does not require working closely with other people. *The unskilled work will allow for a lower level of concentration and focus, and the limited contact with others should lessen the claimant's anxiety level and accordingly reduce the risk of panic attacks.*"

(T. 25) (emphasis added).

### B. Step 5 Finding Regarding Ability to Perform Alternative Work

Hendrickson cannot perform his past relevant work under the RFC rating ascribed to him above. Consequently, the sequential analysis proceeded to Step 5 where the burden rests with the Commissioner to show that Hendrickson can still perform alternative, available work. There, ALJ Pope could not apply the grids (Medical–Vocational Guidelines) directly because Hendrickson has nonexertional impairments. Consequently, ALJ Pope properly elicited extrinsic evidence from an impartial vocational expert, Edward Pagella, CRC, LCPC ("VE Pagella"). (T. 58–64, 101).

As is customary in these type proceedings, VE Pagella provided expert opinions in response to hypothetical questions. (T. 58–64). ALJ Pope asked VE Pagella to assume

that a person of Hendrickson's age, education and experience has limitations requiring that he engage only in unskilled work that does not require working closely with others. (T. 59–60). Based on those assumptions, VE Pagella opined that such a person's occupational base will be reduced by 70%. (T. 60–61). VE Pagella also opined that thousands of jobs in the light and sedentary categories exist in the remaining 30% of the occupational base. *Id.* He identified several representative occupations within this remaining occupational base. *Id.*

In sum, VE Pagella provided testimony concerning (a) extent of erosion of Hendrickson's occupational base caused by limitations posed in the hypothetical question posed and (b) availability of a meaningful remaining occupational base for a person with such limitations. Given this evidence, ALJ Pope concluded that Hendrickson is not disabled because there are jobs that he can perform despite his limitations. (T. 27).

### IV. Alleged Errors

Hendrickson claims that ALJ Pope committed multiple errors in his application of sequential Steps 4 and 5. Specifically, Hendrickson contends:

**\*7** • The ALJ failed to develop the record by failing to obtain opinions from Plaintiff's treating physicians.

• The ALJ failed to obtain opinions from Plaintiff's social workers, nurse, and counselors.

• The ALJ's residual functional capacity finding is not supported by substantial evidence and is the product of legal error.

• The ALJ failed to apply appropriate legal standards in assessing Plaintiff's credibility.

• The ALJ's Step 5 determination is unsupported by substantial evidence and is the product of legal error.

(Dkt. No. 12, pp. 1, 8–24).

In response, the Commissioner maintains that ALJ Pope properly evaluated his RFC assessment with substantial evidence at Step 4, sufficiently developed the record of Hendrickson's impairments, and correctly found that Hendrickson could perform other work existing in significant numbers in the national economy at Step 5. (Dkt. No. 14, pp. 15–25).

## V. Judicial Review

The court's limited role is to determine whether (a) the Commissioner applied proper legal standards and (b) the decision is supported by substantial evidence. *See Lamay v. Commissioner of Soc. Sec.,* 562 F.3d 503, 507 (2d Cir.2009), *cert. denied,* ––– U.S. ––––, 130 S.Ct. 1503 (2010); *Berry,* 675 F.2d at 467; *see also* 42 U.S.C. § 405(g). When proper principles of law are applied, and when the Commissioner's decision is supported by substantial evidence, [10] the Commissioner's findings are conclusive and must be affirmed. *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *see also* 42 U.S.C. § 405(g); *Halloran v. Barnhart,* 362 F.3d 28, 31 (2d Cir.2004).

[10]    "Substantial evidence" is a term of art. It means less than a "preponderance" (usual standard in civil cases), but "more than a mere scintilla," or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Moran v. Astrue,* 569 F.3d 108, 112 (2d Cir.2009); *Halloran v. Barnhart,* 362 F.3d 28, 31 (2d Cir.2004). Stated another way, to be "substantial," evidence need only be "enough to justify, if the trial were submitted to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *National Labor Relations Bd. v. Columbian Enameling & Stamping Co.,* 306 U.S. 262, 299–300 (1939), *cited in* Harvey L. McCormick, Social Security Claims and Procedures § 672 (4th ed.1991).

## VI. Discussion and Analysis

Hendrickson's proffered errors regarding inadequate development of the record and a flawed credibility determination need not be addressed on their merits because a necessary and proper disposition reveals itself by focusing initially on points arguing that (a) correct principles of law were not applied to the Step 4 RFC finding and (b) substantial evidence does not support the Step 5 finding that Hendrickson can still perform alternative, available work. These two points, while analytically distinct, are closely entwined.

*A. Failure to Apply Correct Principles of Law at Step 4*

A legally-correct RFC determination must account for all of a claimant's limitations imposed by both severe and non-severe impairments. *See* discussion in Section II.*B*.2, *supra.* ALJ Pope, giving great weight to the state agency experts' findings and opinions, found Hendrickson's capacity to perform a full range of work at all exertional levels to be limited only to the extent that such work must be (a) unskilled and (b) not involve working closely with others. (T. 23, 26). This RFC assessment clearly accounts for the state agency experts' determinations that Hendrickson has moderate limitations in working in coordination with or proximity to others, and getting along with coworkers or peers without distracting them or exhibiting behavioral extremes. (T. 25–26). It does not, however, reckon the remaining limitations found by Dr. Barry and Dr. Kamin unless those limitations are subsumed in a generic, catch-all limitation for "unskilled work."

**\*8** ALJ Pope's written decision is thoughtful, considerate and generally meticulous. [11] Hendrickson undisputably has long-standing and severe mental limitations, [12] and ALJ Pope obviously intended to factor them into his residual functional capacity analysis. His unskilled-work limitation is problematic, however, if he intended it to account for all of Hendrickson's other mental impairments.

[11]    ALJ Pope acknowledged that SSR 96–8p requires that the mental residual functional capacity assessment used at steps 4 and 5 requires a more detailed assessment by itemizing the various functions contained in the broad categories found in paragraph B and paragraph C of the adult mental disorders listing in 12.00 of the Listing impairments. (T. 22–23).

[12]    Treatment notes and a multitude of Global Assessment of Functioning ("GAF") scores document Hendrickson's serious mental limitations. "The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.' " *Kohler,* 546 F.3d at 262 n.1 (citing *Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed.2000)). GAF "ranks psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *Pollard v. Halter,* 377 F.3d 183, 186 (2d Cir.2004).

Hendrickson has been diagnosed with several GAF ratings, ranging in June 2007 from 20 (GAF score 11–20 indicates an individual is in "[s]ome danger of hurting self or others ... or occasionally fails to maintain minimal personal hygeine ... or gross impairment in communication") (T. 251–52) to a GAF of 35 (GAF score 31–40 indicates an individual has "[s]ome impairment in reality testing or communication ... or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood") (T. 233). *See Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV–TR")* 34 (4th ed.2000). In July 2007, he was diagnosed with a GAF of 30 (T. 278, 299, 300). *See id.* In January 2008, his GAF was rated at 37 (T. 397) and, later, at 42 (GAF score 41–50 indicates an individual has "[s]erious symptoms ... or any serious impairment in social, occupational, or school functioning") (T. 402). *See id.* In August 2009, Hendrickson's GAF was scored at 50. *See id.*

Treatment notes also reflect that Hendrickson's episodes are triggered by major stresses. (T. 427).

First, it is not *self-evident* that a person with limited ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances will function more acceptably when assigned only unskilled tasks. Second, the Commissioner's *official definition* of unskilled work does not support such premise, nor does it indicate that unskilled work ameliorates stress, or better enables a worker to complete a normal workday and workweek without interruptions from psychologically-based symptoms, or to work at a consistent pace, or to respond appropriately to changes in the work setting. [13] Third, no *extrinsic evidence* presented to ALJ Pope shows that unskilled work appropriately addresses these additional limitations, and, finally, the Commissioner's brief cites no *other authoritative sources* supporting that supposition.

[13]   The basic demands of unskilled work include abilities (on a sustained basis) to understand, carry out and remember simple instructions; make simple work-related decisions; respond appropriately to supervision, coworkers, and usual work situations; and deal with changes in a routine work setting. SSR 96–9, POLICY INTERPRETATION RULING TITLES II AND XVI: DETERMINING CAPABILITY TO DO OTHER WORK–IMPLICATIONS OF A RESIDUAL FUNCTIONAL CAPACITY FOR LESS THAN A FULL RANGE OF SEDENTARY WORK, 1996 WL 374185, at \*9 (SSA July 2, 1996).

Intuitively, one might suppose that unskilled work probably involves less stress. In an interpretive Ruling, however, the Commissioner cautions against making such broad assumptions. In SSR 85–15, the Commissioner states unequivocally that "*[a] claimant's condition [due to stress and mental illness] may make performance of an unskilled job as difficult as an objectively more demanding job.*" The Ruling elucidates that mentally impaired individuals' reactions to demands of work stress are highly individualized, and that in some cases, they have difficulty meeting requirements of even low stress jobs. And, of special relevance here, the Ruling emphasizes that "*the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job.*" *Id.* Accordingly the Ruling directs that (a) ALJs make particularized findings about the nature of a claimant's stress, the circumstances that trigger it, and how those factors affect his ability to work, and (b) every impairment-related limitation created by an individual's response to demands of work be reflected in the RFC assessment. *Id.*

Finally, interpretive jurisprudence generally rejects the idea that a broad limitation of "unskilled work" suffices as a detailed assessment of the type required by SSR 96–8p, 1996 WL 374184, at \*4. Thus, an administrative judge may not avoid conducting such a detailed assessment by merely indicating that the claimant can perform simple, unskilled work. *See, e.g., Thompson v. Astrue,* No. 10–CV–6576 CJS, 2012 WL 2175781, at \*13 (W.D.N.Y. May 30, 2012) (when making findings about a claimant's RFC, an ALJ may not avoid conducting such a detailed assessment by merely indicating that the claimant can perform simple, unskilled work); *Sweat v. Astrue,* No. 08–CV–1108 (FJS/ VEB), 2011 WL 2532932, at \*6 (N.D.N.Y. May 23, 2011) (on remand ALJ admonished to address the consultative examiners' findings that claimant had difficulty dealing with stress during the relevant time period, as ALJ did not explain how he reconciled those findings with his RFC assessment).

**\*9** For all these reasons, a conclusion that ALJ Pope did not apply correct principles of law when making his RFC determination is warranted. He did not make particularized findings about the nature of Hendrickson's stress, the circumstances that trigger it, and how those factors affect

his ability to work. He did not—possibly could not under evidence before him—sufficiently connect the dots between all of Hendrickson's impairments and his RFC finding.

*B. Substantial Evidence Error at Step Five*
Given a legally-flawed RFC finding, a Step 5 error was sure to follow. ALJ Pope used his RFC as the basis for his hypothetical question to the vocational expert. Thus, his hypothetical question failed to include all of Hendrickson's nonexertional limitations. (T. 58–64). Specifically, ALJ Pope's hypothetical question to the vocational expert did not include limitations related to Hendrickson's stress or three of the five other moderate impairments listed earlier. (T. 58–64, 373, 389–91).

For expert vocational opinion to constitute substantial evidence, the hypothetical question posed to the vocational expert must include all limitations supported by medical evidence in the record. *See Dumas v. Schweiker,* 712 F.2d 1545, 1553–54 (2d Cir.1983) (The Commissioner may rely on a vocational expert's testimony concerning the availability of jobs suited to a hypothetical person's capabilities so long as the hypothetical is based on substantial evidence.); *see also Burns v. Barnhart,* 312 F.3d 113, 123 (3d Cir.2002) ("A hypothetical question posed to a vocational expert must reflect all of a claimant's impairments.... Where there exists in the record medically undisputed evidence of specific impairments not included in a hypothetical question ..., the expert's response is not considered substantial evidence." (internal citations and quotation marks omitted)). The reason for this requirement is that it is important for the vocational expert to understand the full extent of the applicant's disability so that the expert does not declare an applicant capable of undertaking work in the national or local economy that the applicant cannot truly perform.

VE Pagella expressed opinions concerning the extent to which Hendrickson's job base is eroded by nonexertional limitations and also the existence and extent of jobs within the remaining occupational basis that Hendrickson can perform. Because the hypothetical question on which VE Pagella based these opinions failed to account for additional specific impairments that are medically undisputed, his testimony does not constitute substantial evidence.[14] ALJ Pope adduced no other evidence that Hendrickson is capable of performing jobs existing in significant numbers in the national economy. Thus, his conclusion that Hendrickson is

not disabled lacks substantial evidentiary support. In this circumstance, reversal and remand are warranted.

[14]    The Second Circuit has nor directly addressed the question of whether an ALJ's hypothetical question to a VE must specifically account for limitations in concentration, persistence, and pace. Other circuits, however, have addressed the issue and answer in the affirmative. *See, e.g., Winschel v. Commissioner of Soc. Sec.,* 631 F.3d 1176, 1180–81 (11th Cir.2011) (ALJ erred by failing to either "explicitly include[ ]" or "implicitly account for" moderate limitations in maintaining concentration, persistence, and pace in a hypothetical); *Stewart v. Astrue,* 561 F.3d 679, 685 (7th Cir.2009) (restricting hypothetical to ability to do "simple, routine tasks that do not require constant interactions with coworkers or the general public" does not accurately describe documented limitations in concentration, persistence, or pace); *Bowers v. Astrue,* 271 Fed. App'x 731, 733 (10th Cir.2008) (hypothetical including limitations for simple, repetitive, and routine work with a low stress level and only brief contact with the public did not account for impairment in concentration and attention); *Ramirez v. Barnhart,* 372 F.3d 546, 554 (3d Cir.2004) (hypothetical restriction to simple one or two-step tasks did not account for limitations in concentration); *Kasarsky v. Barnhart,* 335 F.3d 539, 544 (7th Cir.2003) (hypothetical about a person with borderline intelligence did not account for deficiencies in concentration); *Newton v. Chater,* 92 F.3d 688, 695 (8th Cir.1996) (hypothetical limiting claimant to performing only simple tasks did not account for deficiencies in concentration, persistence, or pace).

**VII. Recommendation**

1. The Commissioner's decision should be **REVERSED** and the case **REMANDED** pursuant to 42 U.S.C. § 405(g), sentence four, for further proceedings including reexamination of: (a) Hendrickson's difficulties in handling stress, including but not limited to his moderate limitations in the areas of ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; ability to complete a normal workday and

workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and ability to respond appropriately to changes in the work setting; and (b) the extent to which Hendrickson's occupational base is eroded by his difficulties handling stress and the moderate limitations listed above.

**\*10** 2. To guard against necessity for further actions seeking judicial review, the court also should request that, on remand, the Commissioner also reflect on *all* errors asserted in this action as set forth herein at Section IV.

### VIII. Objections

Parties have fourteen (14) days to file specific, written objections to the Report and Recommendation. Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THE REPORT, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Thomas v. Arn,* 474 U.S. 140, 155 (1985); *Graham v. City of New York,* 443 Fed. App'x 657, 658 (2d Cir.2011); *FDIC v. Hillcrest Assocs.,* 66 F.3d 566, 569 (2d Cir.1995); *see also* 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Signed on the *10* day of *December* 2012.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 7784156

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:21-cv-01316-BKS-TWD    Document 38    Filed 01/30/23    Page 86 of 124

Del Carmen Fernandez v. Berryhill, Not Reported in Fed. Supp. (2019)

2019 WL 667743

2019 WL 667743
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Nuris DEL CARMEN FERNANDEZ, Plaintiff,

v.

Nancy A. BERRYHILL, Acting
Commissioner of Social Security, Defendant.

18-CV-326 (JPO)
|
Signed 02/19/2019

**Attorneys and Law Firms**

Charles E. Binder, Varsha Rambali, New York, NY, for
Plaintiff.

Elizabeth Rothstein, Social Security Administration, Office
of The General Counse, New York, NY, for Defendant.

OPINION AND ORDER

J. PAUL OETKEN, United States District Judge

*1  Plaintiff Nuris Del Carmen Fernandez brings this
action pursuant to 42 U.S.C. § 405(g) challenging the
final decision of the Commissioner of Social Security
(the "Commissioner") denying her application for disability
insurance benefits. Fernandez and the Commissioner have
cross-moved for judgment on the pleadings. (Dkt. Nos. 9
& 13.) For the reasons that follow, Fernandez's motion is
granted and the Commissioner's motion is denied.

**I. Background**

**A. Factual Background and Medical History**
Plaintiff Nuris Del Carmen Fernandez was born in 1964 (Dkt.
No. 8 ("R.") 351), and she has an eleventh-grade education
(R. 370). She has been in the United States for over twenty
years and passed the U.S. citizenship test sometime in 2015 or
2016. (R. 257–58, 273.) As of August 1, 2014—the date she
stopped working due to disability—Fernandez was employed
as a home attendant/home health aide. (R. 275, 351, 369–70.)
She had also held prior jobs as a factory worker and hotel
housekeeper. (R. 370, 385.) Fernandez professes to suffer
from a number of medical conditions that limit her ability
to work, including diabetes, leg pain, and issues with her

heart. (R. 369.) However, the focus of this appeal is certain
impairments relating to her mental health and cognitive
functioning. (Dkt. No. 10 at 1 n.4.)

On December 19, 2013, Fernandez first sought mental health
treatment from Catherine Roche, Ph.D., a psychologist at
the New York Presbyterian Mental Health Clinic. (R. 407.)
Dr. Roche initially diagnosed Fernandez with depressive
disorder (id.), but in February 2014 revised her diagnosis to
depressive disorder and anxiety disorder (R. 404). Fernandez
was subsequently evaluated by a psychiatrist, Jose Genua,
M.D., on May 7, 2014. (Dkt. No. 10 at 2 n.5; R. 399.) Dr.
Genua also diagnosed depressive disorder, and prescribed
Escitalopram. (R. 400–01.)

Fernandez regularly consulted Dr. Roche from July 2014
until June 2015, during which time Dr. Roche consistently
listed her "diagnostic impression" of Fernandez as "major
depressive disorder." (R. 396–98, 570, 573, 579, 585, 589,
603–05, 610, 613, 619.)[1] During this period, Dr. Roche
began to note that Fernandez was experiencing issues
with memory and cognitive functioning, and added to her
diagnosis "cognitive disorder NOS."[2] (See, e.g., R. 603–05,
610.) On October 27, 2014, Dr. Roche wrote a letter stating
that Fernandez's "symptoms are significant that would impair
work functioning," specifying that her "cognitive disorder
functions consist of memory loss and disorganization." (R.
521.) In a subsequent letter on November 13, 2014, Dr. Roche
noted that Fernandez had scored in the "Mild Cognitive
Impairment" range on a mental health examination and
exhibited memory impairment and confusion. (R. 524.)

---

[1]    Fernandez also visited Giselle Rosado, a social
       worker at New York Presbyterian, for counseling
       during this period. (R. 540–41, 555–56, 571, 573–
       74, 589–90, 611–12.)

[2]    "NOS" means "not otherwise specified." (Dkt. No.
       14 at 3.)

During her treatment by Dr. Roche, Fernandez was also
a patient of Mencia Gomez De Vargas, M.D., a specialist
in psychosomatic medicine at Centro Medico Dominicano.
(Dkt. No. 10 at 4 & n.7.) Dr. Gomez De Vargas
began treating Fernandez on July 16, 2014, at which
time she diagnosed Fernandez with "persistent depressive
disorder" (or "dysthymia") and prescribed medication. (R.
668–70.) Dr. Gomez De Vargas saw Fernandez for follow-
up appointments in August, September, and October 2014,

over which time her diagnosis remained consistent (R. 671–76), though Fernandez occasionally denied having "any psychiatric problems or symptoms," (R. 673, 675).

**\*2** After a gap of a year, Fernandez returned to the Centro Medico Dominicano on November 17, 2015, with her treatment from this point forward consisting of therapy with Candida Cartegena, supervised by psychiatrist Fernando Taveras, M.D. (Dkt. No. 10 at 5 & n.10; R. 678–79.) At the initial therapy appointment, Fernandez was diagnosed as having dysthymic disorder with a global assessment of functioning (GAF)[3] score of 60. (R. 679.) Fernandez attended regular therapy visits at Centro Medico Dominicano from November 2015 to December 2016, during which Fernandez was consistently diagnosed as having dysthymic disorder and a GAF score of 60. (R. 679–707.)

[3]     A GAF score of 51 to 60 correlates to "moderate symptoms," or "moderate difficulty in social, occupational, or school functioning." (Dkt. No. 14 at 9 n.3.)

In a mental impairment questionnaire dated January 5, 2017, Dr. Taveras stated his diagnosis that Fernandez suffered from dysthymic disorder, with a GAF score of 60. (R. 710.) Dr. Taveras listed Fernandez's symptoms as including difficulty concentrating and memory problems, and indicated that she had "[m]oderate-to-marked" and "[m]arked" limitation in various activities related to "Understanding and Memory" and "Concentration and Persistence," and "[m]oderate" limitations in the category of "Social Interactions." (R. 711–13.)

In addition to her treating physicians, on October 22, 2014 Fernandez was evaluated by psychologist Lauren Feiden, Psy.D., at the direction of the Social Security Administration. (Dkt. No. 10 at 7; R. 509–13.) Dr. Feiden diagnosed Fernandez as having major depressive disorder, and noted that Fernandez was "markedly limited in her ability to maintain attention and concentration, learn new tasks, and perform complex tasks independently" as caused by "psychiatric symptoms and cognitive deficits." (R. 512.) Overall, Dr. Feiden concluded that the examination "appear[ed] to be consistent with psychiatric problems" which "may significantly interfere with the claimant's ability to function on a daily basis." (R. 512.) At the ALJ's direction, Dr. Feiden examined Fernandez again on October 10, 2016. (Dkt. No. 10 at 7; R. 647.) Dr. Feiden diagnosed unspecified depressive disorder and unspecified anxiety disorder, and

again noted moderate to marked limitations in various areas. (R. 650, 652–53.)

On November 13, 2014, the medical evidence that had been submitted in support of Fernandez's application of disability benefits to date was reviewed by V. Reddy, Ph.D., a state psychologist. (Dkt. No. 14 at 6; R. 288–91.) Dr. Reddy concluded that Fernandez ranged from "not significantly limited" to only "moderately limited" on all categories of a "mental residual functional capacity assessment." (R. 289–90.)

On August 14, 2017—after the ALJ denied her application—Fernandez was evaluated by psychologist Patricia Galiotos, Psy.D. (Dkt. No. 10 at 8; R. 115–18.) After reviewing medical records and conducting a mental status exam, Dr. Galiotos diagnosed Fernandez with severe persistent depressive disorder and unspecified major neurocognitive disorder. (R. 116–18.) In a mental impairment questionnaire dated September 5, 2017, Dr. Galiotos reported that Fernandez exhibited issues with memory and thinking or concentrating, as well as a loss of intellectual ability, and various limitations of mental activities. (R. 120, 122.)

### B. Procedural History

Fernandez filed an application for Social Security disability benefits on September 4, 2014, alleging disability beginning August 1, 2014. (R. 351.) Her application was denied on November 14, 2014. (R. 295.) Fernandez requested a hearing, and an administrative law judge ("ALJ") conducted a hearing on January 18, 2017. (R. 255, 301–02.)

**\*3** At the hearing before the ALJ, Fernandez testified with the aid of a Spanish interpreter. (R. 258.) Fernandez answered questions about her physical health problems and about her mental and emotional health. (R. 259–60, 268–72.) She described feeling "always depressed" and "always tired," and indicated having difficulty concentrating and remembering things. (R. 261–62.) Fernandez also answered questions about her habits and average daily activities. (R. 263–68, 273.)

A vocational expert, Melissa Fass-Karlin, also testified at the hearing. (R. 17, 275.) She opined that an individual capable of performing a medium level of physical exertion, limited to "simple, routine, repetitive type tasks," and without fluency in English could perform work as a cleaner, kitchen helper, or cook helper. (R. 276–77.) Karlin further testified that such jobs would allow only "[u]p to 5%" time off task, and one unscheduled absence per month. (R. 277.) In response

Case 6:21-cv-01316-BKS-TWD Document 38 Filed 01/30/23 Page 88 of 124

Del Carmen Fernandez v. Berryhill, Not Reported in Fed. Supp. (2019)

2019 WL 667743

to questioning, Karlin opined that an individual who was "unable to work in coordination with others" or had "marked limitation ... with the ability to respond appropriately to changes in the workplace" would not be able to maintain unskilled work. (R. 279.)

On February 16, 2017, the ALJ denied Fernandez's application, concluding that Fernandez is not disabled within the meaning of the Social Security Act ("SSA"). (R. 11, 17.) [4] The ALJ found that Fernandez has a number of severe impairments, including recurrent major depressive disorder, dysthymic disorder, and mild cognitive disorder. (R. 19.) However, the ALJ found that Fernandez retained the "residual functional capacity to perform medium work ... restricted to jobs involving simple, routine, repetitive type tasks and requiring only occasional contact with supervisors, coworkers and the public and also not requiring fluency in English." (R. 22.) Based on these findings, the ALJ concluded that Fernandez was unable to perform her past work as a home health aide (R. 28), but was capable of performing other work as a cleaner, kitchen helper, or cook helper (R. 29–30).

[4]     The ALJ followed the Social Security Administration's five-step process for determining whether an individual is disabled under the SSA. (R. 18–19.) Because only certain aspects of that process are at issue in this appeal —the determination of Fernandez's "residual functional capacity" and whether she is able to perform any other work in light of that capacity and relevant personal factors (R. 22–30)—the remaining portions of the ALJ's determination will not be discussed in detail here.

Fernandez requested review of the ALJ's decision, submitting new evidence in the form of Dr. Galiotos's report to support her application. (R. 346, 393–94.) The Social Security Appeals Council refused to consider the new evidence and denied the request for review on November 15, 2017. (R. 1– 2.) Fernandez filed this suit on January 12, 2018. (Dkt. No. 1.)

## II. Legal Standard

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g) ). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion.' " *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) ). A court may not substitute its judgment for the Commissioner's "even if it might justifiably have reached a different result upon *de novo* review." *Downes v. Colvin*, No. 14 Civ. 7147, 2015 WL 4481088, at *6 (S.D.N.Y. July 22, 2015) (quoting *DeJesus v. Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) ). Accordingly, this Court determines only whether the ALJ's decision was based on sufficient evidence and applied proper legal standards. The Court does not decide whether Fernandez is in fact disabled.

## III. Discussion

**\*4** Fernandez contends that the review of her application for disability benefits was flawed in three respects: (1) the ALJ failed to properly weigh medical opinion evidence; (2) the ALJ failed to properly evaluate Fernandez's testimony; (3) the Appeals Council impermissibly declined to consider new medical evidence. In support of its cross-motion for judgment on the pleadings, the Commissioner counters that the ALJ's decision was supported by substantial evidence and attempts to refute the three arguments raised by Fernandez. The Court addresses each argument in turn.

### A. Framework for Disability Claims

To establish a disability under the SSA, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The disability at issue must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Social Security Administration employs a five-step procedure to analyze disability determinations. The Commissioner considers whether: (1) the claimant is currently engaged in substantial gainful activity; (2) the claimant has a "severe" impairment as defined in Social Security Administration's regulations; (3) the claimant has an impairment listed in Appendix I of the regulations; (4) the claimant has a residual functional capacity to perform her past work; and (5) there is other work the claimant could perform. *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (Sotomayor, J.); *see also* 20 C.F.R. §§ 404.1520, 416.920.

Case 6:21-cv-01316-BKS-TWD Document 38 Filed 01/30/23 Page 89 of 124

Del Carmen Fernandez v. Berryhill, Not Reported in Fed. Supp. (2019)

2019 WL 667743

The claimant bears the burden of proof at the first four steps; the Commissioner bears the burden at the final step. *Rosa, 168 F.3d at 77.* In conducting its analysis, the ALJ has an affirmative duty to "develop the record." *Swiantek v. Comm'r of Soc. Sec.*, 588 F. App'x 82, 84 (2d Cir. 2015) (citing *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) ).

### B. Medical Opinion Evidence

Fernandez first argues that the ALJ erred by giving improper weight to certain medical opinion evidence in determining her residual functional capacity ("RFC"). (Dkt. No. 10 at 11–18.) Specifically, Fernandez challenges the ALJ's decision to afford "no weight" to the opinion of Dr. Taveras, only "moderate weight" to the opinion of Dr. Feiden, and "great weight" to the opinion of a "non-examining state agency psychologist"—Dr. Reddy. (Dkt. No. 10 at 12.)

### 1. Dr. Fernando Taveras

In providing an overview of the medical evidence in this case, the ALJ's determination summarized the treatment records from Fernandez's therapy with Candida Cartagena (supervised by Dr. Taveras), and Dr. Taveras's January 2017 assessment report. (R. 25.) The ALJ observed a "stark contrast between the findings in [Taveras's January 2017] assessment and his treatment notes detailed above." (R. 25.) Later in the determination, in explaining how much weight to afford the various medical opinions, the ALJ again noted "how [Taveras's] assessment"—that Fernandez exhibited "persistent depressed mood" and "difficulty thinking or concentrating"—"contrasted greatly with his treatment ... which showed only occasional depressive and anxiety symptoms." (R. 27.) The ALJ also noted how Dr. Taveras's "treatment notes showed a global assessment of function (GAF) of 60 (moderate symptoms) which is inconsistent with his medical source statement." (*Id.*) The ALJ thus concluded that Dr. Taveras's "opinion is given no weight." (*Id.*)

*5 Fernandez objects to this treatment of Dr. Taveras's medical opinion on two bases: (a) the failure to afford his opinion "controlling weight" due to inconsistencies between his medical opinion and his treatment notes; and (b) the failure to consider required factors in determining how much weight to afford the opinion.

#### a. Failure to Afford Opinion Controlling Weight

In support of her argument that the ALJ impermissibly disregarded the opinion of Dr. Taveras, Fernandez invokes the "treating physician rule," which binds ALJs in making disability benefit determinations. *Kessler v. Colvin*, No. 14 Civ. 8201, 2015 WL 6473011, at *4 (S.D.N.Y. Oct. 27, 2015). The rule mandates that "[t]he opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.' " *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (alteration in original) (quoting 20 C.F.R. § 404.1527(d)(2) ); *see also Green-Younger v. Barnhart*, 335 F.3d 99, 106–07 (2d Cir. 2003) (holding that an ALJ erred in not giving a treating physician's diagnosis of fibromyalgia controlling weight). "The reason for this rule is that treating physicians offer a 'unique perspective to the medical evidence' that cannot otherwise be obtained from the record." *Mancebo v. Comm'r of Soc. Sec.*, No. 16 Civ. 6400, 2017 WL 4339665, at *3 (S.D.N.Y. Sept. 29, 2017) (quoting 20 C.F.R. § 404.1527(c)(2) ).

The Commissioner contends that the ALJ "properly gave [Dr. Taveras'] opinion no weight, as it was inconsistent with the therapy notes from his own clinic ... and the treatment notes from Plaintiff's other providers." (Dkt. No. 14 at 18–19.) The Commissioner is incorrect, however, to the extent she characterizes the ALJ as relying on the latter of these two reasons. Although the ALJ's reasoning is not comprehensively presented, the ALJ apparently decided not to give Dr. Taveras's opinion controlling weight solely because his "assessment contrasted greatly with his treatment [notes]," and specifically that "his treatment notes showed" a GAF score "which is inconsistent with his medical source statement." (R. 27.) The ALJ did observe earlier in the determination that there was a "contrast between the findings in treatment notes from Centro Medico Dominican, which showed waxing and waning depressive and anxiety symptoms with no concentration deficits, and treatment notes from the [New York Presbyterian clinic], which showed persisting depressive symptoms and poor immediate memory." (R. 25.) But the ALJ did not opine that Dr. Taveras's ultimate *opinion* was inconsistent with the notes from the New York Presbyterian clinic. Indeed, the ALJ could not have done so, because the upshot of the ALJ's observations is that Dr. Taveras's opinion was arguably *more* consistent with the notes

Case 6:21-cv-01316-BKS-TWD   Document 38   Filed 01/30/23   Page 90 of 124

Del Carmen Fernandez v. Berryhill, Not Reported in Fed. Supp. (2019)

2019 WL 667743

from the New York Presbyterian clinic than his own treatment notes. [5]

[5]   The ALJ could have relied on any other inconsistencies between Dr. Taveras's opinion and the observations and opinions of other physicians to attempt a decision to support a decision to discount the weight of Dr. Taveras's opinion. *See Burgess,* 537 F.3d at 128 (noting that an ALJ need not give a treating physician opinion controlling weight where it is "inconsistent with the other substantial evidence in the case record" (brackets omitted) ). But the ALJ did not do so here, and the Court may not "affirm an administrative action on grounds different from those considered by the agency." *Estrella o/b/o M.R.E. v. Berryhill,* No. 15 Civ. 6966, 2017 WL 2693722, at *23 (S.D.N.Y. June 22, 2017) (quoting *Burgess,* 537 F. 3d at 128).

*6  The only reason the ALJ actually gave for discounting Dr. Taveras's opinion was its alleged inconsistency with Dr. Taveras's own treatment notes. (R. 27.) In making this observation, the ALJ was indicating that Dr. Taveras's opinion was "inconsistent with the other substantial evidence in [the] case record," *Burgess,* 537 F.3d at 128, the other "substantial evidence" being Dr. Taveras's own treatment notes.

However, such evidence is insufficient on its own to permit an ALJ to decline to give controlling weight the opinion of a treating physician. The Second Circuit has held that an ALJ "err[s] in rejecting the opinions of [treating] physicians solely on the basis that the opinions allegedly conflicted with the physicians' own clinical findings." *Balsamo v. Chater,* 142 F.3d 75, 80 (2d Cir. 1998). More recently, the Circuit reaffirmed in a summary order that "an ALJ may not reject a treating physician's disability opinion based 'solely' on internal conflicts in that physician's clinical findings." *Carvey v. Astrue,* 380 F. App'x 50, 52 (2d Cir. 2010) (quoting *Balsamo,* 142 F.3d at 80).

None of the cases cited by the Commissioner are to the contrary. (Dkt. No. 14 at 19.) Rather, they stand for the proposition that an ALJ may reject a treating physician's opinion where it is inconsistent with the physician's own notes *and* conflicts with other evidence in the record. *See Monroe v. Comm'r of Soc. Sec.,* 676 F. App'x 5, 8 (2d Cir. 2017) (rejecting physician's opinion because it was "contrary to his own treatment notes" and "refuted by" evidence of the claimant's "recreational activities"); *Legg v. Colvin,* 574

F. App'x 48, 49 (2d Cir. 2014) (citing inconsistencies with a doctor's "own treatment notes" as one factor—in addition to conflicts with "the objective medical evidence" and "the reports of other physicians"—that collectively justified discounting opinion of treating physician).

Here, the only reason given by the ALJ for declining to give Dr. Taveras's opinion controlling weight, as required by 20 C.F.R. § 404.1527(c)(2), is the opinion's inconsistency with Taveras's own findings in his treatment notes. (R. 27.) Because that is an inadequate basis for rejecting a treating physician's medical opinion, remand is required to correct this error. [6]

[6]   The bulk of the parties' arguments regarding the treating physician rule focus on whether the ALJ's finding—that Dr. Taveras's opinion was inconsistent with his treatment notes and GAF scores—is supported by substantial evidence, particularly given the nature of psychiatric diagnosis. (Dkt. No. 10 at 12–14; *see* Dkt. No. 14 at 19–21.) However, because the ALJ erred on a more fundamental basis, the Court need not address these arguments.

### b. Failure to Consider Required Factors in Determining Weight

Fernandez also contends that the ALJ failed to consider the required factors in deciding to afford Dr. Taveras's opinion no weight. (Dkt. No. 10 at 16–17.) If an ALJ decides not to give controlling weight to a treating physician's assessment, the ALJ must consider the following factors to determine how much weight to give the opinion:

> (1) the length of treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence in support of the opinion; (4) the opinion's consistency with the record as a whole; (5) whether the opinion is that of a specialist; and (6) any other relevant factors.

Case 6:21-cv-01316-BKS-TWD   Document 38   Filed 01/30/23   Page 91 of 124

Del Carmen Fernandez v. Berryhill, Not Reported in Fed. Supp. (2019)

2019 WL 667743

**\*7** *Monroe*, 676 F. App'x at 7 (citing 20 C.F.R. § 404.1527(c) ). After considering these factors, the ALJ must "comprehensively set forth [her] reasons for the weight assigned to a treating physician's opinion." *Id.* (quoting *Burgess*, 537 F.3d at 129). "Failure to provide such good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." *Byrne v. Berryhill*, No. 18-622, 2019 WL 495133, at \*1 (2d Cir. Feb. 8, 2019) (summary order) (quoting *Burgess*, 537 F.3d at 129–30).

Here, it is not clear that the ALJ considered the relevant factors, and he failed to comprehensively set forth good reasons for not crediting Dr. Taveras's opinion. The ALJ mentioned the length of treatment and the nature of the treatment relationship in giving a summary of medical evidence (R. 25), but he gave no indication why those important considerations did not affect his decision to give no weight to Dr. Taveras's opinion. Nor did the ALJ ever acknowledge the extent to which the opinion was consistent with the record as a whole, the significance of Dr. Taveras's status as a specialist, or the unique nature of psychiatric diagnosis. Instead, the ALJ's determination briefly notes an apparent internal inconsistency between Dr. Taveras's own treatment notes and his ultimate opinion, and concludes: "This opinion is given no weight." (R. 27.)

The Commissioner is correct that an "ALJ need not 'slavishly recite ... each and every factor where the ALJ's reasoning and adherence to the regulation are clear.' " *Batchelor v. Berryhill*, No. 18 Civ. 1424, 2019 WL 422527, at \*4 (S.D.N.Y. Feb. 4, 2019) (brackets omitted) (quoting *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) ). But in this instance, the "reasoning and adherence to the regulation" are not clear.

The Court thus concludes that the ALJ's apparent failure "to consider the statutory factors" and failure to "provide 'good reasons' for assigning" no weight to Dr. Taveras's opinion "contravene[ ] the regulations and requires remand." *Byrne*, 2019 WL 495133, at \*2.

## 2. Dr. V. Reddy

Next, Fernandez challenges the ALJ's reliance on the opinion of Dr. V. Reddy, a non-examining psychologist. (Dkt. No. 10 at 14–15.) Describing Dr. Reddy as a "state agency psychological consultant," the ALJ noted that Dr. Reddy "found that claimant has only moderate functional limitations

indicating claimant can do simple work." (R. 28.) The ALJ decided to give Dr. Reddy's assessment "great weight, as it is consistent with evidence of impaired attention, concentration and memory, as well as a lack of motivation to interact socially, but an inability to be cooperative and relate adequately, support a conclusion the claimant's ability to complete tasks and interact with others detailed above [*sic*]." (R. 28.) The ALJ gave Dr. Reddy's opinion greater weight than the opinion of any other physician. (R. 27–28.)

Fernandez contends that the ALJ's decision to rely on Dr. Reddy's assessment is contrary to relevant regulations and case law. (Dkt. No. 10 at 14.) The relevant regulations provide that ALJs generally "give more weight to the medical opinion of a source who has examined [the claimant] than to the medical opinion of a medical source who has not examined [the claimant]," and generally "give more weight to medical opinions from [ ] treating sources." 20 C.F.R. § 404.1527(c) (1)–(2). And courts in this Circuit routinely indicate that non-examining and non-treating physicians should be generally given less weight. *See, e.g., Byrne*, 2019 WL 495133, at \*1 ("[W]e have cautioned that 'ALJs should not rely heavily on the findings of consultative physicians after a single examination.' " (quoting *Selian v. Astrue*, 708 F.3d 409, 419 (2d Cir. 2013) ) ); *Brown v. Comm'r of Soc. Sec.*, No. 06 Civ. 3174, 2011 WL 1004696, at \*4 (E.D.N.Y. Mar. 18, 2011) ("The ALJ's heavy reliance on the SSA physician's testimony also contravened the clear guidance of SSA regulations, as [the physician] was a nonexamining source whose opinions are to be accorded less weight than those of examining sources and especially treating sources.").

**\*8** Fernandez further contends that reliance on Dr. Reddy's assessment was particularly inappropriate here, given that Dr. Reddy's opinion was based on review of a near-empty treatment record, and the nature of the psychiatric treatment and diagnoses make in-person examination uniquely valuable. (Dkt. No. 10 at 15–16.) The Commissioner responds that ALJ compensated for any gaps in Dr. Reddy's review by adequately considering the rest of the evidence in the record. (Dkt. No. 14 at 22.) But the ALJ himself did not offer this justification in relying on Dr. Reddy's opinion. As particularly relevant to Fernandez's argument here, the court notes the importance of the ALJ's "duty to adequately explain his reasoning in making the findings on which his ultimate decision rests." *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010). It is crucial "that a determination by the ALJ must contain a sufficient explanation of her reasoning to permit the reviewing court to

Case 6:21-cv-01316-BKS-TWD   Document 38   Filed 01/30/23   Page 92 of 124

Del Carmen Fernandez v. Berryhill, Not Reported in Fed. Supp. (2019)

2019 WL 667743

judge the adequacy of her conclusions." *Pacheco v. Barnhart*, No. 03 Civ. 3235, 2004 WL 1345030, at *4 (E.D.N.Y. June 14, 2004) (brackets and citation omitted).

In a similar case where the disability at issue involved mental health, Magistrate Judge Dolinger reviewed the determination of an ALJ that credited the opinion of a non-examining physician over that of treating physicians. *Rodriguez v. Astrue*, No. 07 Civ. 534, 2009 WL 637154, at *26 (S.D.N.Y. Mar. 9, 2009). Judge Dolinger concluded that the findings of the non-examining physician "should have been discounted or addressed with some s[k]epticism because they were largely inconsistent with the examining physicians' findings and did not account for the 'subjective nature of the patient's disease.' " *Id.* (citation omitted). But because the ALJ failed to do so, failed "to explain why the medical evidence dictated a different result," and "failed to give 'good reasons' for adopting the non-examiner's conclusions," *id.*, Judge Dolinger recommended remanding the case.

Similarly here, the ALJ did not adequately explain his decision to give "great weight" to the opinion of Dr. Reddy, particularly in light of several significant factors that counseled against significantly relying on that opinion, including: Reddy's status as a consultant who did not personally examine Fernandez, given the relevant regulations about the relative of such opinions; Reddy's review of only a small portion of the treatment record; the conflicts between Reddy's opinion and the opinions of treating physicians; and the importance of in-person examination in the assessment of mental health limitations. Given these countervailing considerations, the ALJ's statement that Dr. Reddy's assessment was "consistent" with uncited evidence in the record constitutes an insufficient explanation of the reasoning by which he gave the opinion "great weight." Accordingly, remand is warranted for the ALJ to revisit his decision to give the opinion of Dr. Reddy "great weight."

### 3. Dr. Lauren Feiden

Finally, Fernandez objects to the weight given by the ALJ to the opinions of Dr. Feiden. (Dkt. No. 10 at 17–19.) The ALJ acknowledged Dr. Feiden's opinion that Fernandez was "markedly limited in her ability to maintain attention and concentration, learn new tasks, and perform complex tasks independently," but observed that those findings of marked limitation "are contrary to reports that claimant was able to study for and pass her citizenship examination and that she

could verbalize and repeat key points in a conversation." (R. 27–28.) The ALJ ultimately gave Dr. Feiden's opinion "moderate weight." (R. 28.)

Fernandez contends that this treatment of Dr. Feiden's opinion was flawed in two respects. First, Fernandez asserts that the ALJ erred in rejecting Dr. Feiden's opinion regarding marked limitations based on Fernandez's citizenship test. (Dkt. No. 10 at 17.) Fernandez argues that the ALJ was incorrect in relying on the fact that Fernandez "was able to study for" the citizenship test, because she specifically testified that she "didn't study" for the test. (Dkt. No. 10 at 17; R. 275.) However, Fernandez also testified that she *did* study for the citizenship test. The relevant passages of the transcript provide:

**\*9** Q. ... Did you have to study for the citizenship test?

A. Well, how could I say? I studied some and some other things I knew from school.

...

ALJ. Your psychiatrist said you had problems concentrating, but you were able to concentrate enough to study for the exam and you had enough concentration to take the exam. Is that correct?

A. No. I didn't study. I studied but it was a coincidence. They questions they asked I knew....

(R. 273–75.) Given this somewhat confusing testimony, it was reasonable for the ALJ to rely on the fact that Fernandez did at least some studying for the test and passed. Fernandez also argues that the citizenship test is irrelevant to her ability to function in a work environment. (Dkt. No. 10 at 17.) But Fernandez offers no support for this proposition, and the ALJ could reasonably find that the ability to study for and pass a test is relevant to an individual's ability to maintain attention and concentration, and perform a complex task. Accordingly, the Court concludes that the ALJ did not err in partially discounting Dr. Feiden's testimony in this regard.

Second, Fernandez contends that the ALJ failed to properly consider other aspects of Dr. Feiden's opinion, specifically that Fernandez had moderate limitations in her ability to deal with stress, maintain a schedule, and make decisions. (Dkt. No. 10 at 17; R. 512, 650.) However, the ALJ specifically acknowledged these moderate limitations identified by Dr. Feiden in the determination. (R. 27.) And he later concluded that Dr. Feiden "noted moderate-to-marked limitations that do

Case 6:21-cv-01316-BKS-TWD    Document 38    Filed 01/30/23    Page 93 of 124

Del Carmen Fernandez v. Berryhill, Not Reported in Fed. Supp. (2019)

2019 WL 667743

not prevent simple work." (R. 28.) The Court agrees with the Commissioner that this discussion adequately took account of these aspects of Dr. Feiden's opinion, and that the ALJ reasonably concluded that these limitations were consistent with a capacity to perform medium exertion unskilled work. (*See* Dkt. No. 14 at 21.) Accordingly, the Court rejects Fernandez's challenges to the ALJ's consideration of Dr. Feiden's medical opinion based on the record before the ALJ in February 2017.

* * *

Overall, the ALJ erred by discounting the opinion of treating physician Dr. Taveras on an improper basis, failing to consider required factors in deciding to give Dr. Taveras's opinion no weight, and failing adequately explain the great weight given to Dr. Reddy's opinion. The Court does not hold that Fernandez is disabled or that she is entitled to disability insurance benefits. The Court holds only that the case should be remanded to the Commissioner for further proceedings that assign the proper weight to the various medical opinions of Fernandez's doctors and adequately explains the reasons for doing so.

### C. Claimant's Testimony

As an additional basis for remand, Fernandez contends that the ALJ failed to properly evaluate her testimony at the hearing. (Dkt. No. 10 at 18–20.)[7] In determining "whether a claimant who has a severe impairment nonetheless has the 'residual functional capacity' ('RFC') to perform work," an ALJ "is required to take the claimant's reports of pain and other limitations into account." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). The ALJ must "carefully consider" all the evidence presented by claimants regarding their symptoms, which fall into seven relevant factors including "daily activities" and the "location, duration, frequency, and intensity of [their] pain or other symptoms." 20 C.F.R. § 404.1529(c)(3); *see* Social Security Ruling (SSR) 16-3p, *Titles II and XVI: Evaluation of Symptoms in Disability Claims*, 81 FR 14166-01 at 14169–70 (Mar. 16, 2016).[8] But in considering this evidence, the ALJ "is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Barry v. Colvin*, 606 F. App'x 621, 622–23 (2d Cir. 2015) (quoting *Genier*, 606 F.3d at 49).

[7] The Court notes that Fernandez does not appear to have raised this particular objection in her request to the Appeals Council for review of the ALJ's determination. (R. 389–94.) However, whether a claimant has "fully exhaust[ed] his administrative remedies before obtaining judicial review," is a " 'waivable' — *i.e.*, prudential" element of "the right to appeal pursuant to § 405(g)." *Adelman v. Berryhill*, 742 F. App'x 566, 571 (2d Cir. 2018) (alteration in original) (quoting *Smith v. Schweiker*, 709 F.2d 777, 780 (2d Cir. 1983) ). Because the Commissioner did not object to the consideration of this argument on the grounds of administrative exhaustion, the Court deems any such objection to be waived.

[8] To the extent Fernandez argues that an ALJ commits reversible error by failing to expressly consider each of seven factors in determining whether to credit a claimant's testimony (Dkt. No. 10 at 20), the Court disagrees. Consistent with the relevant regulations, an ALJ need consider only those factors on which claimant has offered evidence. *See* 20 C.F.R. § 404.1529(c)(3) ("[W]e will carefully consider any other information you may submit about your symptoms."); SSR 16-3p, 81 FR 14166-01 at 14170 ("We will consider other evidence to evaluate only the factors that are relevant to assessing the intensity, persistence, and limiting effects of the individual's symptoms. If there is no information in the evidence of record regarding one of the factors, we will not discuss that specific factor in the determination or decision because it is not relevant to the case. We will discuss the factors pertinent to the evidence of record.").

**\*10** "The ALJ must explain the decision to reject a claimant's testimony 'with sufficient specificity to enable the [reviewing] Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether [the ALJ's] decision is supported by substantial evidence.' " *Rousey v. Comm'r of Soc. Sec.*, 285 F. Supp. 3d 723, 743 (S.D.N.Y. 2018) (alterations in original) (quoting *Calzada v. 753 F. Supp. 2d at 280*) (internal quotation marks omitted). The ALJ's determination regarding the claimant's credibility is entitled to deference. *See id.*

In addressing non-medical evidence of Fernandez's symptoms and limitations, the ALJ summarized her testimony

Case 6:21-cv-01316-BKS-TWD   Document 38   Filed 01/30/23   Page 94 of 124

Del Carmen Fernandez v. Berryhill, Not Reported in Fed. Supp. (2019)

2019 WL 667743

at the hearing along with other evidence from the record. (R. 26–27.) Regarding Fernandez's testimony at the hearing, the ALJ ultimately concluded that

> [C]laimant's statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision. Accordingly, these statements have been found to affect claimant's ability to work only to the extent they can reasonably be accepted as consistent with the objective medical and other evidence. (R. 27.)

Fernandez objects to the ALJ's treatment of her testimony on two grounds. First, she contends that the ALJ failed to adequately explain why her testimony was not supported by the record. (Dkt. No. 10 at 19–20.) The Commissioner responds that the ALJ properly found Fernandez's statements to be inconsistent with the record, and the finding was supported by substantial evidence. (Dkt. No. 14 at 23–24.)

Looking to the language of the determination, the Court agrees with the Commissioner. As the ALJ went through and summarized the relevant non-medical evidence bearing on Fernandez's symptoms, he repeatedly juxtaposed statements from Fernandez's testimony with references to other evidence in the record that was not wholly consistent with the testimony. (R. 26.) For example, the ALJ noted that Fernandez "testified that she does not read or listen to the radio," but she had earlier indicated to a doctor that "[s]he can sustain concentration for watching television, listening to the radio, and reading." (R. 26 (referencing R. 658).) Similarly, Fernandez testified that she "does not cook," but had indicated to doctors that she "spends her days cooking." (R. 26 (referencing R. 649); *see* R. 515.) The ALJ also highlighted various instances in which Fernandez's statements at the hearing regarding her daily activities and accomplishments were internally inconsistent. (R. 26–27.) And he contrasted Fernandez's statements about physical limitations and pain with medical evidence in the record that he had discussed earlier in the determination. (R. 26 (referencing discussion of musculoskeletal impairments on R. 23).)

Thus, when he concluded that "claimant's statements ... are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision" (R. 27), the ALJ was referring to the inconsistencies apparent in that paragraph and the preceding paragraph. The Court concludes that in highlighting those inconsistencies, often with citations to the record, the ALJ explained his decision to reject Fernandez's testimony "with sufficient specificity." *Rousey,* 285 F. Supp. 3d at 743. Furthermore, the Court concludes that the ALJ's decision not to fully credit those statements was an acceptable exercise of his discretion.

 **\*11** Second, Fernandez asserts that the ALJ erred by failing to explicitly weigh Fernandez's testimony regarding "her psychiatric symptoms" and "limited activities of daily living," which were the relevant factors raised by Fernandez to support the testimony about her symptoms and limitations. (Dkt. No. 10 at 20.) The Commissioner counters that the ALJ adequately assessed Fernandez testimony regarding her daily activities. (Dkt. No. 14 at 23–24.)

Again, the Court agrees with the Commissioner. As an initial matter, the "failure to specifically reference" a particular relevant factor "does not undermine the credibility assessment if there is substantial evidence supporting the ALJ's credibility determination." *Rousey,* 285 F. Supp. 3d at 744 (brackets omitted) (second quoting *Wavercak v. Astrue,* 420 F. App'x 91, 94 (2d Cir. 2011) ). Additionally, where it is "clear from the record that the ALJ was aware of" the factor because the ALJ "asked [claimant] about it at the hearing and relied on it in [the] disability determination," the failure to expressly weigh the factor separately is harmless. *Id.*

Here, the ALJ expressly acknowledged Fernandez's testimony about her psychiatric symptoms in the determination—noting that she testified to being "always depressed and tired" and reported "difficulty concentrating and focusing, remembering, and being around people." (R. 26.) The ALJ also noted Fernandez's testimony that "her psychiatric medications are sometimes helpful." (*Id.*) Additionally, the ALJ expressly discussed Fernandez's daily activities, including grooming, cooking, shopping, attending church, and visiting family. (R. 26–27.) And Fernandez identifies no other relevant evidence that she introduced but that the ALJ failed to assess in his determination. (*See* Dkt. No. 10 at 20.)

Case 6:21-cv-01316-BKS-TWD   Document 38   Filed 01/30/23   Page 95 of 124

Del Carmen Fernandez v. Berryhill, Not Reported in Fed. Supp. (2019)

2019 WL 667743

Ultimately, the Court concludes that the ALJ did not err in his assessment of Fernandez's testimony, and remand on this particular ground is not warranted.

### D. New Medical Evidence on Appeal

Finally, Fernandez contends that the Appeals Counsel erred in declining to consider new medical evidence submitted after the ALJ issued his determination. (Dkt. No. 10 at 20–22.) Under the relevant Social Security regulations, "[t]he Appeals Council is obligated to consider 'new and material' evidence that 'relates to the period on or before the date of the administrative law judge hearing decision.' " *Patterson v. Colvin*, 24 F. Supp. 3d 356, 372 (S.D.N.Y. 2014) (quoting 20 C.F.R. § 404.970(b) ); *accord Perez v. Chater*, 77 F.3d 41, 45 (2d Cir. 1996). To be "material," evidence must be "both relevant to the claimant's condition during the time period for which benefits were denied and probative," and there must be "a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide claimant's application differently." *Patterson*, 24 F. Supp. 3d at 372 (alternation in original) (quoting *Lisa v. Sec'y of Health & Human Servs.*, 940 F.2d 40, 43 (2d Cir. 1991) ).

In denying Fernandez's request for review of the ALJ decision, the Appeals Council declined to consider the new evidence submitted by Fernandez. (R. 2.) As to the report from Dr. Galiotos's August 14, 2017 examination of Fernandez (R. 115–18), the Appeals Counsel stated that it "does not relate to the period at issue" (R. 2). With respect to the mental impairment questionnaire from Dr. Galioto (R. 119–23), the Appeals Counsel concluded that it "does not show a reasonable probability that it would change the outcome of the decision" (R. 2).

*12  Fernandez contests the assertion that Dr. Galiotos's report "does not relate to the period at issue," noting that Dr. Galiotos reviewed Fernandez's medical history and wrote a report that was retrospective in nature. (Dkt. No. 10 at 21.) The Commissioner responds that Dr. Galiotos's report was written upon examining Fernandez for the first time "six months after the end of the relevant period," after review of "only some of Plaintiff's medical records," resulting in a report that is "contradicted by extensive evidence in the record during the relevant period." (Dkt. No. 14 at 24–25.) But because the report discusses Fernandez's medial history and offers a retrospective opinion, the Commissioner's concerns pertain to how much *weight* the doctor's opinion should ultimately receive, not whether the evidence satisfies the threshold requirement of pertaining to the relevant period.

*See Guile v. Barnhart*, No. 07 Civ. 259, 2010 WL 2516586, at *2 (N.D.N.Y. June 14, 2010) (holding that evidence is not relevant to the period of disability where it "provides only a snapshot of [claimant's] condition several months after the ALJ's decision, and does not ... offer any retrospective opinion as to [claimant's] condition during the relevant period").

On the question of whether there was a "reasonable probability" that Dr. Galiotos's evidence would change the outcome of the ALJ's decision, Fernandez asserts that the new evidence "may well lead to a different decision by the ALJ once the entire record is considered." (Dkt. No. 10 at 22.) The Court agrees.

The key question before the ALJ involved how to weigh various medical and non-medical evidence in determining Fernandez's RFC. The ALJ ultimately gave "no weight" to the opinion of a treating psychiatrist, Dr. Taveras, and "great weight" to a non-examining state psychologist. (R. 27–28.) In deciding how to weigh these respective opinions, and the remainder of the medical opinions offered, the ALJ was required to evaluate the opinions against the background of the record as a whole. *See, e.g., Monroe*, 676 F. App'x at 7 (requiring ALJ to consider "the evidence in support of the opinion" and "the opinion's consistency with the record as a whole" in determining the weight to give to a treating physician's opinion).

In this context, an additional expert report supporting the conclusions of Dr. Taveras could have reasonably caused the ALJ to credit his opinion, which would have likely affected the ultimate conclusion regarding Fernandez's functional capacity. And indeed, the report and mental impairment questionnaire completed by Dr. Galiotos are entirely consistent with Dr. Taveras's January 2017 assessment. (*Compare* R. 119–23, *with* R. 710–714.) Furthermore, Dr. Galiotos's evidence also supports the opinion of Dr. Feiden regarding Fernandez's marked limitations (*compare* R. 122, *with* R. 512), and contradicts aspects of Dr. Reddy's opinion (*compare* R. 122, with R. 289–90). Given that both Feiden and Reddy's opinions were key to the ALJ's findings regarding Fernandez's residual functional capacity (R. 27–28), additional supporting or detracting evidence could very well have also affected how much weight those experts' opinions received.

Viewing the proffered new evidence in light of the existing record, the Court concludes that there was a "a reasonable

Case 6:21-cv-01316-BKS-TWD    Document 38    Filed 01/30/23    Page 96 of 124
Del Carmen Fernandez v. Berryhill, Not Reported in Fed. Supp. (2019)
2019 WL 667743

possibility that the new evidence would have influenced the Commissioner to decide claimant's application differently." *Patterson,* 24 F. Supp. 3d at 372 (brackets omitted). The Appeals Council's failure to consider the new evidence thus provides an additional basis to remand this case to allow the Commissioner to consider this evidence in the first instance.

**IV. Conclusion**
For the foregoing reasons, Fernandez's motion for judgment on the pleadings is GRANTED, and the Commissioner's motion for judgment on the pleadings is DENIED. Pursuant to 42 U.S.C. § 405(g), the case is remanded to the Commissioner for further proceedings consistent with this Opinion and Order.

The Clerk of Court is directed to close the motions at Docket Numbers 9 and 13, and to close this case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 667743

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

Case 6:21-cv-01316-BKS-TWD   Document 38   Filed 01/30/23   Page 97 of 124

Leach ex rel. Murray v. Barnhart, Not Reported in F.Supp.2d (2004)

2004 WL 99935, 93 Soc.Sec.Rep.Serv. 298

2004 WL 99935
United States District Court,
S.D. New York.

Joy LEACH o/b/o Daniel Murray, Jr., Plaintiff,
v.
Jo Anne B. BARNHART, Commissioner
of Social Security, Defendant.

No. 02 Civ.3561 RWS.
|
Jan. 22, 2004.

**Synopsis**

**Background:** Parent, on behalf of minor son who had learning and behavioral problems, sought judicial review of final decision of the Commissioner of Social Security Administration, denying disability insurance benefits (DIB) and supplemental security income (SSI) benefits to son.

**Holdings:** On Commissioner's motion for judgment on the pleadings, the District Court, Sweet, J., held that:

[1] parent did not knowingly and voluntarily waive her right to representation at hearing before ALJ, but

[2] remand was not warranted, as ALJ fully developed record and based his finding that son did not have impairment that met or equaled listed impairment, or that was functionally equivalent to listed impairment, on substantial evidence.

Motion granted, and Commissioner's decision affirmed.

West Headnotes (2)

[1]    **Social Security** 🔑 Counsel or other representation

Parent, who was seeking Social Security disability insurance benefits (DIB) and supplemental security income (SSI) benefits on behalf of her minor son, did not knowingly and voluntarily waive her right to representation at hearing before ALJ, when she responded in the affirmative to ALJ's request that she confirm

that her showing up at hearing unaccompanied meant that she intended to represent herself, after her pre-hearing request to reschedule hearing in order to obtain lawyer was denied.

2 Cases that cite this headnote

[2]    **Social Security** 🔑 Disability benefits
      **Social Security** 🔑 Particular cases

Although parent did not knowingly and voluntarily waive her right to representation at hearing before ALJ to determine whether her minor son, who had learning and behavioral problems, was entitled to Social Security disability insurance benefits (DIB) and supplemental security income (SSI) benefits, remand was not warranted, given that ALJ fully developed record and based his finding that son did not have impairment that met or equaled listed impairment, or that was functionally equivalent to listed impairment, on substantial evidence, including opinions of psychiatrist, psychologist, and state agency review physician. 20 C.F.R. §§ 416.926a, 416.927(f).

147 Cases that cite this headnote

**Attorneys and Law Firms**

Disability Advocacy Project, Lsny/Manhattan, New York, NY, for Plaintiff, By: James P. Barton, of counsel.

Honorable David N. Kelley, United States Attorney for the Southern District of New York, New York, NY, for Defendant, By: Susan D. Baird, Assistant U.S. Attorney, of counsel.

*OPINION*

SWEET, J.

**\*1** Plaintiff Joy Leach ("Leach") brings this action on behalf of her son Daniel Murray, Jr. ("Daniel"), pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), to obtain judicial review of a final decision of defendant Jo Anne B. Barnhart, the Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's request for disability

insurance benefits and Supplemental Security Income ("SSI"). The Commissioner has moved for judgment on the pleadings, seeking an affirmance of the Commissioner's decision.

For the reasons discussed below, the Commissioner's motion is granted, and the Commissioner's decision is affirmed.

### Prior Proceedings

Leach filed an application for SSI benefits on Daniel's behalf on March 7, 2001. Leach reported in her son's application that Daniel had a speech impairment and a learning disability, and that he was in a special education class. The Social Security Administration employee who interviewed Leach at that time noted that Daniel had an earlier SSI case under which benefits were terminated in December 1997. Supplemental reports on Daniel were submitted following the application.

On June 5, 2001, Daniel's SSI application was denied. Leach filed a timely Request for Hearing by an Administrative Law Judge ("ALJ") on August 3, 2001, and subsequently received a Notice of Hearing on October 9, 2001. In response to this, Leach filed an Acknowledgment of Receipt of Notice of Hearing dated October 16, 2002, upon which she checked a box stating "I cannot be present at the time and place shown on the Notice of Hearing. I request that you reschedule my hearing because:", and Leach has written "I need to get legal representation. I've been trying to find a lawyer. Please reschedule."

Leach's request for an adjournment to seek legal representation was denied. The Acknowledgment of Receipt form bears a handwritten note which states "11/6/01—left message w/my # & told cl[ai]m[an]t has to come to hearing." The hearing went forward as originally scheduled on November 13, 2001. Based on the record as it existed at the time and the hearing testimony, the ALJ concluded on November 29, 2001 that Daniel was not disabled. The Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.

Leach filed a *pro se* complaint in this Court on April 10, 2002, and the Commissioner moved for a judgment on the pleadings on April 11, 2003. After obtaining the representation of counsel, Leach opposed the motion on August 29, 2003. The Commissioner did not file a reply brief, and the motion was deemed submitted on October 1, 2003.

### The Administrative Hearing

At the outset of the hearing, the ALJ did not make any reference to the denial of Leach's request to obtain legal representation. The ALJ stated,

> In the Notice of Hearing, you were again advised of your right to be represented by a lawyer or any other representative of your choice. It is not necessary to have such formal representation to proceed with this hearing. You may do so alone. Since you've appeared alone today, does that mean you wish to proceed without a representative?

**\*2** Transcript ("Tr.") 22. Leach answered "Yes," *id.,* and the hearing proceeded with no further reference to the denial of her written request. Daniel was not present at the hearing, and the ALJ made no inquiry regarding his absence.

Leach testified that Daniel wasn't saying any words when he was two and half or three years old, that he was very hyper, that he is behind in math, reading and spelling, that he gets counseling now, and still has speech and psychological therapy. Leach also testified that Daniel has a very bad temper. Leach reported that one of Daniel's doctors recommended that Daniel take medication for hyperactivity, but Leach stated that she wanted to work with Daniel herself before putting him on medication. Leach testified that despite Daniel's temper problems, he never injured others or damaged property, although he fights with his sister a lot. Leach also testified that Daniel did what he was told most of the time, obeyed safety rules, got to school on time and accepted criticism and correction.

Leach also testified that Daniel could read and understand stories in books and magazines. Leach also stated that Daniel could spell most 3 or 4 letter words, and could write a simple story. Leach reported that Daniel received speech therapy two days a week, and was able to communicate to be understood. Although Leach reported that Daniel did not catch on to things like other kids his age and had a hard time understanding, she also stated that Daniel could repeat stories he heard, tell jokes accurately, explain why he did something, and talk with both family and friends.

Case 6:21-cv-01316-BKS-TWD   Document 38   Filed 01/30/23   Page 99 of 124
Leach ex rel. Murray v. Barnhart, Not Reported in F.Supp.2d (2004)
2004 WL 99935, 93 Soc.Sec.Rep.Serv. 298

An educational evaluation was completed on September 15, 2000 by Lisa Siracuse ("Siracuse"). Daniel was cooperative, polite and well-motivated and focused on each task presented. His grade level equivalent reading score was 2.7. His overall instructional level in math computation and applied problem solving was estimated to be in the lower second grade. On the informal writing task, Daniel was able to write a simple sentence, but without proper punctuation. Siracuse concluded that Daniel was not performing at an age appropriate grade level and needed full-time educational support in a small group setting.

The record contains an Individualized Education Program ("IEP") report, dated September 22, 2000. Present at the IEP conference to discuss Daniel's situation were his Special Education teacher, the school Educational Evaluator, and the school Psychologist. The report noted that Daniel's ability to interpret the world is "generally within normal limits, however he can have difficulty recognizing all elements of social situations. This factor can interfere with his developing age appropriate peer relationships." Tr. 102. However, the report states that this behavior did not seriously interfere with instruction. Leach notes that the IEP report does not contain any report from the school Psychologist who recommended initiating weekly counseling for Daniel.

 *3  At the time of the IEP report, Daniel was reported as functioning on a mid-second grade level in reading. He reportedly had difficulty with literal and inferential comprehension, and was not confident with vowel sounds, vowel digraphs and diphthongs. Daniel could complete simple addition computation and simple multiplication examples, as well as verbal problems involving addition, subtraction and multiplication.

Daniel's special education teacher, Jennifer Burke ("Burke"), completed a report on May 2, 2001, stating that Daniel was in a "Modified Instructional Service" class consisting of eight students. Burke reported that Daniel was easily frustrated, but usually calmed down within ten minutes. Burke stated that Daniel did not exhibit sudden changes in his behavior, and had no difficulty performing age appropriate self-care activities, or completing tasks in a timely manner. Burke also stated that Daniel may become disappointed easily and will withdraw. On these occasions, he needed time to himself, or to talk it out with an adult in order to regain positive feelings.

Dr. Richard King ("Dr.King"), a psychiatrist, examined Daniel on March 28, 2001, when he was ten years old. He evaluated Daniel's functioning, and reported that Daniel was cooperative, and that his speech was relevant, coherent and age appropriate. There was no thought disorder. Dr. King opined that Daniel's affect was spontaneous, well modulated, friendly and appropriate.

Dr. King opined that Daniel was slightly beneath an age appropriate level in intellectual ability, noting that Daniel could spell the word sweater, but had difficulty multiplying 5 times 6. Dr. King concluded that although Daniel had a learning disorder, he demonstrated age appropriate behavior at home, with peers, and at school.

On March 28, 2001, Dr. Robin Bryant ("Dr.Bryant"), a school psychologist, evaluated Daniel's intellectual capacities using the Wechsler Intelligence Scale for Children III. Daniel was ten years old at the time. During the test, Daniel was able to establish and maintain eye contact, and did try to relate to the examiner, but was timid and shy. Dr. Bryant commented that Daniel was self-sufficient regarding personal and social competence, and noted that his attention and concentration were fair to good. Dr. Bryant reported that on testing, Daniel had a verbal I.Q. of 87, a performance I.Q. of 91, and a full scale I.Q. of 87, placing him in the low average range. Dr. Bryant concluded that Daniel's basic competence and intellectual, personal and social skills were mildly impaired. Dr. Bryant stated that although Daniel had mild speech and language delays, he would be able to handle "a number of age appropriate tasks in his school setting without difficulty." Tr. 82.

Daniel was also evaluated by a speech language pathologist, Donna Paul ("Paul"), when he was ten years old. Paul concluded that Daniel's receptive language scores indicated he functioned at an eight-year-old level, while his expressive language skills indicated that he functioned at a seven year, five month old level. His expressive language skills were characterized as "severely delayed." Articulation, voice, hearing and fluency appeared to be within normal limits.

 *4  Daniel's speech therapist, Jana Shapkorn ("Shapkorn"), completed a report concerning his speech on May 2, 2001. She stated that Daniel's speech was appropriate in pitch, loudness and quality. Shapkorn described Daniel's speech as age appropriate, although she stated that he demonstrated inconsistencies with some language concepts, such as verb tenses and idioms. Shapkorn stated that in a small group

Case 6:21-cv-01316-BKS-TWD Document 38 Filed 01/30/23 Page 100 of 124

Leach ex rel. Murray v. Barnhart, Not Reported in F.Supp.2d (2004)

2004 WL 99935, 93 Soc.Sec.Rep.Serv. 298

setting, Daniel was able to make inferences, predictions and outcomes more consistently.

Michelle Lieberman ("Lieberman"), a licensed speech pathologist, reviewed the evidence on May 3, 2001. Lieberman noted that Daniel was able to produce seven-word utterances, but that his vocabulary, grammar, and detailed, elaborate responses were reduced. Lieberman also considered that Daniel had a receptive delay in understanding, logic, inferences and idioms. Articulation and intelligibility were considered to be adequate. Lieberman concluded that Daniel's delays were mild to moderate, and that he had a less than marked limitation in speech and language development.

On June 4, 2001, Dr. Judith Belsky ("Dr.Belsky"), a state agency review physician, reviewed the record and assessed Daniel's condition. She opined that Daniel had a severe impairment in the area of speech and language delay, but that it did not meet or equal, either medically or functionally, the requirements of a listed impairment. Dr. Belsky specifically opined that Daniel did not have any limitations in the domains of: (1) moving about and manipulating objects; (2) caring for yourself; (3) health and physical well-being; and (4) attending and completing tasks. Noting that Daniel had speech and language delays and was timid and withdrawn at times, Dr. Belsky opined that Daniel had less than marked limitations in the domains of (1) acquiring and using information; and (2) interacting and relating with others.

*Discussion*

The Commissioner argues that there is substantial evidence in the record to support the Commissioner's decision that Daniel is not disabled as that term is defined in the Act. *See* 42 U.S.C. § 1382c(a)(3)(a). In opposition, Leach contends that she was denied the opportunity to be heard at a reasonable time and in a meaningful manner and that the defendant erred in collecting and weighing the evidence.

*Standard of Review*

The Act provides that the "findings of the Commission as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g); *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Perez v. Chater,* 77 F.3d 41, 47 (2d Cir.1996). Even if the "administrative record supports disparate findings," the reviewing court "must accept the ALJ's factual determinations." *Quinones v. Chater,* 117 F.3d 29, 36 (2d Cir.1997). If the Court finds that there is substantial evidence

supporting the Commissioner's determination, the decision must be upheld, even if there is also substantial evidence for the plaintiff's position. *Alston v. Sullivan,* 904 F.2d 122, 126 (2d Cir.1990); *see also DeChirico v. Callahan,* 134 F.3d 1177, 1182 (2d Cir.1998) (Commissioner's decision affirmed where there was also substantial evidence for claimant's position).

**\*5** A fact is supported by substantial evidence when the supporting evidence is such that "a reasonable mind might accept [it] as adequate to support a conclusion." *Quinones,* 117 F.3d at 33. "To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Snell v. Apfel,* 177 F.3d 128, 132 (2d Cir.1999) (*quoting Mongeur v. Heckler,* 722 F.2d 1033, 1038 (2d Cir.1983)). The role of the reviewing court is therefore "solely to determine whether the ALJ's decision is supported by substantial evidence and decided based on correct legal standards—not to determine whether it would have reached a different result if reviewing the case *de novo." Gonzalez v. Barnhart,* 02 Civ. 5813, 2003 WL 22383376, at \*4 (S.D.N.Y. Oct.16, 2003).

In order to qualify for SSI benefits, a child must be disabled within the meaning of the Act. A child under eighteen years of age is disabled if the child has "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(c)(i). A determination that a child is disabled requires a three-step analysis. *See* 20 C.F.R. § 416.924(a). First, the ALJ must consider whether the child is engaged in substantial gainful activity. *See* 20 C.F.R. § 416.924(b). If the child is so engaged, he or she will not be awarded SSI benefits. *See id.* Second, the ALJ must consider whether the child has a severe impairment. *See* 20 C.F.R. § 416.924(c). A severe impairment is an impairment that is more than a slight abnormality. *See id.* Third, if the impairment is severe, the ALJ must consider whether the impairment meets or is medically or functionally equal to a disability in the Listings. *See* 20 C.F.R. § 416.925. Only if the impairment is severe and meets or is medically or functionally equal [1] to a disability in the Listings will it constitute a disability within the meaning of the Act. *See* 20 C.F.R. § 416.924(d); *Salomon* 2000 WL 776924, at \*3.

Case 6:21-cv-01316-BKS-TWD    Document 38    Filed 01/30/23    Page 101 of 124

Leach ex rel. Murray v. Barnhart, Not Reported in F.Supp.2d (2004)

2004 WL 99935, 93 Soc.Sec.Rep.Serv. 298

1    If a child's impairment or combination of impairments does not meet or equal any impairment stated in the Listings, the Commissioner assesses all functional limitations caused by the child's impairment(s). *See* 20 C.F.R. § 416.926a(a). If the functional limitations caused by the impairment(s) are the same as the disabling functional limitations caused by an impairment stated in the Listings, the Commissioner will find that the impairment(s) is functionally equivalent in severity to an impairment in the Listings. *See id.*

In determining whether the child's limitations are functionally equivalent, the Commissioner evaluates the effects of the child's impairments in six broad domains of functioning. *See* 20 C.F.R. § 416.926a. The domains are: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and physical well-being. *See* 20 C.F.R. § 416.926a(b) (1)(i-vi). If a child has an extreme limitation in one domain of functioning, or a marked limitation in two domains of functioning, the Commissioner will find that the child's impairments are functionally equivalent in severity to a listed impairment. *See* 20 C.F.R. § 416.926a(a).

**\*6** A marked limitation is found when an impairment interferes seriously with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i). A marked limitation means a limitation that is more than moderate, and less than extreme. *Id.* An extreme limitation is found when an impairment interferes very seriously with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3)(i). An extreme limitation means a limitation that is more than marked. *Id.* A child's day-to-day functioning may be seriously or very seriously limited when the impairment limits only one activity or when the interactive and cumulative effects of the impairment limits several activities. 20 C.F.R. § 416.926a(e) (2)(i), (e)(3)(i).

In making a determination whether the claimant is disabled, the ALJ is required to consider "all of the relevant evidence in the record, including: (1) the objective medical facts; (2) the medical opinions of the examining or treating physicians; (3) the subjective evidence of the claimant's symptoms submitted by the claimant, [her] family, and others; and (4) the claimant's educational background, age, and ... experience." *Morales v. Barnhart,* 01 Civ. 4057, 2002 WL 3179256, at \*9 (S.D.N.Y. Dec. 5, 2002) (*quoting Tucker v. Massanari,* 99 Civ.

12037, 2001 WL 868031, at \*7 (S.D.N.Y. Aug.1, 2001); *see also Williams v. Bowen,* 859 F.2d 255, 259 (2d Cir.1988).

*Leach Did Not Knowingly and Voluntarily Waive Her Right to Representation*

**[1]** Leach argues that the denial of an adjournment to find a lawyer and the cursory interrogation of her decision to appear without counsel constitute an ineffective waiver of the right to representation at the hearing. The government did not respond to this argument.

"It is well established that an ALJ is charged with providing each claimant with an full and fair hearing." *Rocker v. Apfel,* No. 98 Civ. 9040, 2000 WL 1459846, at \*6 (S.D.N.Y. Sept.29, 2000) (*citing Cullinane v. Sec'y of Health and Human Servs.,* 728 F .3d 137, 137 (2d Cir.1984)). In order for the claimant to have a full and fair hearing, the ALJ must ensure that the claimant is aware of this right. *See id., Robinson v. Sec'y of Health and Human Servs.,* 733 F.2d 255, 257 (2d Cir.1984); *Rivera v. Apfel,* No. 98 Civ. 3393, 2000 WL 1201545, at \*2 (S.D.N.Y. Aug.22, 2000). Further, "the ALJ must ensure that if a claimant chooses to proceed pro se, waiver of the right to representation is knowing and voluntary." *Rose v. Barnhart,* No. 01 Civ. 1645, 2003 WL 1212866, at \*3 (S.D.N.Y. Mar.14, 2003) (*citing Taveras v. Apfel,* No. 97 Civ. 5639, 1998 WL 557587, at \*3 (Sept. 2, 1998)); *see also Thompson v. Sullivan,* 933 F.2d 581, 584 (7th Cir.1991); *Rocker,* 2000 WL 1459846, at \*6.

Leach's request for an adjournment in order to find a lawyer demonstrates her awareness that she could obtain representation to assist her with the hearing. The denial of the adjournment to do just that, combined with the assumption, which the ALJ asked Leach to confirm, that her showing up unaccompanied meant that she intended to represent herself, does not constitute a knowing waiver. *See Rocker,* 2000 WL 1459846, at \*1 (knowing waiver not found when ALJ asked "I assume you mean to represent yourself; is that right?"); *Frank v. Chater,* 924 F.Supp. 416, 427 (E.D.N.Y.1996) (ineffective waiver found given court's finding that ALJ should have adjourned hearing when claimant stated that "he had an appointment that very day with a legal services organization.").

**\*7** By contrast, courts have found effective waivers when the ALJ offered to adjourn the hearing in order for the claimant to obtain representation. *See Gonzalez,* 2003 WL 22383376, at \*4 ("On the advice of the ALJ, Gonzalez decided to adjourn in an effort to retain the assistance of an

Case 6:21-cv-01316-BKS-TWD   Document 38   Filed 01/30/23   Page 102 of 124

Leach ex rel. Murray v. Barnhart, Not Reported in F.Supp.2d (2004)
2004 WL 99935, 93 Soc.Sec.Rep.Serv. 298

attorney."); *Salomon v. Apfel,* 99 Civ. 4250, 2000 WL 776924, at *6 (S.D.N.Y. June 15, 2000) (ALJ told claimant: "If you wish, you could go home today, get a lawyer and come back and do this hearing another time.").

Because the ALJ made no attempt to determine whether Leach desired to adjourn the hearing after expressing a desire to obtain a lawyer, it is held that the waiver of counsel was not knowing and therefore was ineffective.

*The ALJ Did Not Err in Collecting and Weighing the Evidence*

 **[2]**    However, remand is not required despite the absence of a knowing and voluntary waiver "as long as the ALJ fully developed the record and based his decision on substantial evidence." *Id.* (*citing Santiago v. Apfel,* 98 Civ. 9042, 2000 WL 488467, at *5 (S.D.N.Y. Apr.25, 2000); *see also Alvarez v. Bowen,* 704 F.Supp. 49, 52–53 (S.D.N.Y.1989) ("Lack of counsel 'would not affect the validity of the hearing unless the claimant demonstrates prejudice or unfairness in the proceeding.") (*quoting Heisner v. Sec'y of Health, Education & Welfare,* 538 F.2d 1329, 1331 (8th Cir.1976)).

The standard for demonstrating prejudice as a result of an ineffective waiver of the right to representation, however, is no different in this Circuit from the standard imposed on ALJs in *pro se* cases generally: the hearing examiner must "scrupulously and conscientiously probe into, inquire of, and explore all the relevant facts surrounding the alleged right or privilege." *DeChirico,* 177 F.3d at 1183; *see also Frank,* 924 F.Supp. at 427 (declining to draw a distinction "between the types of prejudice that a claimant must establish depending on whether there was an effective or ineffective waiver."). In *Frank,* the Court argued that applying the same standard does not invalidate the importance of an adequate notification of the right to representation. In light of the frequency with which courts remand such cases, *see id.* at 428 (collecting cases), the Court observed that,

> Adequate notification may alleviate the pressure on ALJs and courts to protect a claimant's interests by encouraging claimants to pursue legal representation at an early stage of the administrative process.

*Id.*

Because benefit proceedings are non-adversarial in nature, the ALJ must affirmatively develop the record. *See Tejada v. Apfel,* 167 F.3d 770, 774 (2d Cir.1999). The ALJ has an even greater responsibility to develop the record when claimants proceed *pro se. See Lopez v. Sec'y of Dept. of Health and Human Services,* 728 F.2d 148, 149 (2d Cir.1984). The ALJ must attempt "to fill any clear gaps in the administrative record." *Rosa v. Callahan,* 168 F.3d 72, 79 (2d Cir.1999). If the clinical records are "inadequate," the ALJ has a duty to seek additional information. *Id.*

 ***8**    Leach argues that the ALJ did not discharge his heightened duty to a *pro se* claimant because he did not collect any evidence comparing Daniel to other children the same age who did not have impairments, and instead compared him only to other special education student. *See* 20 C.F.R. § 416.924a(b)(3)(i) ( "Information about what you can and cannot do, and how you function on a day-to-day basis at home, school, and in the community, allows us to compare your activities to the activities of children your age who do not have impairments."); *see also id.* § 416.924a(b)(7)(iv) ("[W]e will consider that good performance in a special education setting does not mean that you are functioning at the same level as other children your age who do not have impairments."); *Hudson v. Barnhart,* 345 F.3d 661, 666 (8th Cir.2003). As evidence for this failure, Leach points to school reports in the record which describe Daniel's performance in special education class, and make no reference to children outside the class.

While the school report does not make such a comparison, there are numerous references in the record that compare Daniel's functioning to children of his age or grade. Daniel's grade-equivalent in reading, writing and spelling is discussed in two educational evaluations dating from 2000. *See* Tr. 101, 110–111. The psychiatric evaluation by Dr. Richard King ("King"), also states that "[i]ntellectual functioning is slightly beneath age-appropriate level," and "[i]nsight and judgment was age appropriate." Tr. 78. Such comparisons are not made only among the other students in Daniel's special education class. While Leach has shown that there may have been other reports which could have completed the record, the ALJ did not fail to collect evidence demonstrating Daniel's functioning compared to other children without impairments because the existing record was sufficient to make a sustainable determination.

Leach also argues similarly that the ALJ failed to make the inquiries required by the regulations. In particular, Leach alleges that the ALJ failed to ask the following questions, which relate to the claimant's functioning and whether the claimant's

> activities are typical of other children your age who do not have impairments. (i) What activities are you not able to perform? (ii) Which of your activities are limited or restricted compared to other children your age who do not have impairments? ... (v) Do you have difficulty independently initiating, sustaining, or completing activities? (vi) What kind of help do you need to do your activities, how much help do you need, and how often do you need it?

20 C.F.R. § 416.926a(b)(2). *See also Marnell v. Barnhart,* 253 F.Supp.2d 1052, 1076–77 (N.D.Iowa 2003) (reviewing questions to be asked by ALJ).

Leach argues that the only school reports considered by the ALJ compared Daniel to the other students in his special education class. As with the allegations that the collection of evidence was insufficient, Leach restricts the record too narrowly to the school reports. The same evidence listed above was weighed by the ALJ in making his findings with regard to Daniel's functioning. The inquiries made by the ALJ are sufficient to answer the questions required by § 416.926a(b)(2).

### The Commissioner's Decision is Supported by Substantial Evidence

**\*9** The ALJ applied the sequential evaluation analysis set forth at 20 C.F.R. § 416.924(a)-(d). Based on the record before him, the ALJ found that Daniel had a learning disability and a speech and language development disorder, but that his impairments did not meet or equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ then evaluated Daniel's impairment to determine whether it was "functionally equivalent" to a listed impairment. The ALJ determined that Daniel had a less than marked limitation in the domains of: 1) acquiring and using

information, and 2) interacting and relating with others. The ALJ determined that Daniel had no limitation in the remaining broad areas of functioning.

The ALJ properly concluded that Daniel's limitations were not functionally equivalent to any listed impairment. The ALJ's conclusion is supported by the opinions of Dr. King, Dr. Belsky and Dr. Bryant. The ALJ's opinion is also supported by the opinions of Paul, Lieberman and Shapkorn, all of whom evaluated his impairments.

### Acquiring and Using Information

The evidence of record supports the ALJ's finding that Daniel had less than marked limitation in the domain of acquiring and using information. In this domain, the ALJ considers how well the child acquires and learns information and how well he uses the information he has learned. *See* 20 C.F.R. § 416.26a(g). The results of I.Q. testing placed Daniel in the low average range of intellectual functioning. Dr. Bryant concluded that despite his mild speech language delays, Daniel would be able to handle a number of age appropriate tasks in his school setting without difficulty. Dr. King concurred with Dr. Bryant, concluding that Daniel's functioning was only slightly beneath grade level.

Leach's testimony also lends support to the ALJ's decision. Leach testified that Daniel could add, subtract and make small purchases given the proper change. Leach also reported that Daniel could write a simple story. Therefore, although Daniel had some limitations, intellectually he was able to acquire and use information to independently initiate, sustain and complete tasks in an age appropriate manner. The evidence on the record from the speech pathologists and speech therapists who examined Daniel also supports the ALJ's findings. Further, Dr. Belsky, a state agency physician, opined that Daniel had a less than marked limitation in the domain of acquiring and using information. State agency physicians are qualified as experts in the evaluation of medical issues in disability claims. As such their opinions may constitute substantial evidence if they are consistent with the record as a whole. *See* 20 C.F.R. § 416.927(f); *Mongeur v. Heckler,* 722 F.2d 1033, 1039 (2d Cir.1983) (report of a consultative physician may constitute substantial evidence). Therefore, the ALJ reasonably concluded that Daniel was able to perform functional tasks within the domain of acquiring and using information.

### Interacting and Relating With Others

Case 6:21-cv-01316-BKS-TWD   Document 38   Filed 01/30/23   Page 104 of 124
Leach ex rel. Murray v. Barnhart, Not Reported in F.Supp.2d (2004)
2004 WL 99935, 93 Soc.Sec.Rep.Serv. 298

**\*10**  The evidence of record supports the ALJ's finding that Daniel had less than marked limitation in the domain of interacting and relating with others. In this domain the ALJ considers how well the child initiates and sustains emotional connections with others and develops and uses language in his community. *See* 20 C.F.R. § 416.926a(i). The ALJ considered the opinions of Dr. King, Dr. Bryant and Dr. Belsky, as well as statements made by Daniel's teacher and mother, and properly concluded that Daniel had a less than marked limitation in this domain.

Dr. King observed that Daniel was cooperative, that his speech was relevant, coherent and age appropriate. He concluded that although Daniel had a learning disability, he demonstrated age appropriate behavior at home, with peers and at school.

Following the examination of Daniel, Dr. Bryant concluded that Daniel was self-sufficient regarding personal and social competence and noted that his attention and concentration was fair to good. In addition, Dr. Belsky opined that Daniel had a less than marked limitation in this domain. Based on the assessments of Dr. King, Dr. Bryant and Dr. Belsky, the ALJ concluded that Daniel had the ability to follow instructions and relate to adults properly.

In her testimony to the ALJ, Leach indicated that while Daniel had a bad temper, he was able to establish peer relationships and understood safety rules. The record also shows that Daniel did not take medication to control his behavior and had never been suspended from school. Therefore, the ALJ properly concluded that Daniel had less than a marked impairment in the domain of interacting and relating with others.

### Attending and Completing Tasks

The evidence of record supports the ALJ's finding that Daniel had no limitation in the domain of attending and completing tasks. In this domain the ALJ considers how well the child is able to focus and maintain his attention, and how well he begins, carries through, and finishes his activities, including the pace at which he performs activities, and the ease with which he changes them. 20 C.F.R. § 416.926a(h).

Daniel's teacher indicated that he had no difficulty in the effective completion of tasks. Further, each of the consulting examiners opined that Daniel displayed appropriate test behaviors and had an adequate attention span. Dr. King indicated that Daniel was able to initiate and complete tasks. Dr. Belsky opined that Daniel had no limitations in this domain. Therefore, substantial evidence supports the ALJ's decision that Daniel had no limitation in the domain of attending and completing tasks.

### Other Domains

The ALJ also evaluated Daniel in three additional domains: (1) moving about and manipulating objects, (2) caring for yourself, and (3) health and physical well being. *See* 20 C.F.R. § 416.926a(b)(1)(i-vi). In the remaining domains the ALJ properly found that Daniel had no limitations. The record contains no evidence of physical impairment. Thus it was reasonable for the ALJ to conclude that Daniel had no difficulty moving or manipulating objects. Leach testified that Daniel enjoyed basketball and gym. Similarly, in the domains of caring for yourself and health and physical well being, no professional who evaluated Daniel indicated that he could not meet his personal needs in an age appropriate manner, or stated that Daniel experienced health problems affecting his functioning. Dr. Belsky specifically opined that Daniel did not have any limitations in these domains.

**\*11**  In sum, substantial evidence of record supports the ALJ's findings that Daniel did not have an impairment that met or equaled the requirements of a listed impairment, and did not have an impairment that functionally equaled the requirements of a listed impairment.

### Conclusion

Leach did not knowingly and voluntarily waive her right to legal representation. However, because the ALJ fully developed the record and supported his decision by substantial evidence, the Commissioner's motion is granted and the decision is affirmed.

It is so ordered.

### All Citations

Not Reported in F.Supp.2d, 2004 WL 99935, 93 Soc.Sec.Rep.Serv. 298

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 17721254
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

ELIZABETH B., Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY, Defendant.

8:21-cv-00100 (TWD)
|
Signed December 15, 2022

**Attorneys and Law Firms**

MARK A. SCHNEIDER, ESQ., SCHNEIDER & PALCSIK, Counsel for Plaintiff, 57 Court Street, Plattsburgh, NY 12901.

NATASHA OELTJEN, ESQ., SOCIAL SECURITY ADMINISTRATION, OFFICE OF THE GENERAL COUNSEL, Counsel for Defendant, 6401 Security Boulevard, Baltimore, MD 21235.

**MEMORANDUM-DECISION AND ORDER**

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

**\*1** Elizabeth B. ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her applications for supplemental security income ("SSI") and disability insurance benefits ("DIB"). (Dkt. No. 1.) Pursuant to 28 U.S.C. § 636(c), the parties consented to the disposition of this case by a Magistrate Judge. (Dkt. Nos. 4, 5.) Both parties filed briefs, which the Court treats as cross-motions for judgment on the pleadings under Federal Rule of Civil Procedure Rule 12(c) in accordance with General Order 18. (Dkt. Nos. 14, 22.) With permission from the Court, Plaintiff filed a reply brief. (Dkt. No. 25.) For the reasons discussed below, Plaintiff's motion is denied and Defendant's motion is granted. The Commissioner's decision is affirmed.

**I. BACKGROUND**
Plaintiff was born in 1984, has an associate's degree, and is a CNA. (Administrative Transcript at 1576, 1579, 2264,

2266.[1]) She has some prior work experience as a "nurse assistant" and "home attendant." *Id.* at 1372.

[1]    The Administrative Transcript is found at Dkt. Nos. 11 and 21. Citations to the Administrative Transcript will be referenced as "T." and the Bates-stamped page numbers as set forth therein will be used rather than the numbers assigned by the Court's CM/ECF electronic filing system. Citations not made to the Administrative Transcript will use the page numbers assigned by the Court's CM/ECF electronic filing system.

On April 4, 2016, Plaintiff filed applications for SSI and DIB. *Id.* at 512-21. Her alleged disability onset date is February 7, 2016. *Id.* On June 14, 2016, her applications were denied, after which she timely requested a hearing before an Administrative Law Judge ("ALJ"). *Id.* at 439, 440, 458. On April 25, 2016, Plaintiff, represented by counsel, appeared before ALJ Patrick Morrison. *Id.* at 372-412. On August 7, 2016, the ALJ issued a written decision finding Plaintiff not disabled under the Social Security Act. *Id.* at 136-45. On September 4, 2019, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. *Id.* at 1472-77. Thereafter, Plaintiff timely sought judicial review in this Court. *Id.* at 1479-81.

On April 17, 2020, the parties stipulated to remand Plaintiff's case for further proceedings. *Id.* at 1483-84. On June 25, 2020, the Appeals Council remanded the claims to an ALJ to update the record as needed, further evaluate Plaintiff's physical impairments at step two, further consider Plaintiff's residual functional capacity ("RFC"), and, if necessary, obtain evidence from a medical expert. *Id.* at 1486-90.

On October 21, 2020, ALJ David Romeo conducted a hearing where both Plaintiff, represented by counsel, and a vocational expert testified. *Id.* at 2258-99. On December 3, 2020, the ALJ issued a written decision finding Plaintiff not disabled under the Social Security Act. *Id.* at 1357-74. On June 25, 2020, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. *Id.* at 1486-92. This action followed. (Dkt. No. 1.)

**II. LEGAL STANDARDS**

**A. Standard of Review**

**\*2**  A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled. 42 U.S.C. § 405(g); *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will be reversed only if the correct legal standards were not applied, or it was not supported by substantial evidence. *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); *accord Grey v. Heckler*, 721 F.2d 41, 46 (2d Cir. 1983), *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979). "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).

If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, a court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984).

**B. Determination of Disability** [2]

[2]  While the SSI program has special economic eligibility requirements, the requirements for establishing disability under Title XVI, 42 U.S.C.

§ 1382c(a)(3) and Title II, 42 U.S.C. § 423(d), are identical, so "decisions under these sections are cited interchangeably." *Donato v. Sec'y of Health and Human Servs.*, 721 F.2d 414, 418 n.3 (2d Cir. 1983) (citation omitted).

The Commissioner has established a five-step evaluation process to determine whether an individual is disabled as defined by the Social Security Act. 20 C.F.R. §§ 404.1520, 416.920. The Supreme Court has recognized the validity of this sequential evaluation process. *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under the five-step sequential evaluation process, the ALJ determines:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *accord McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014). "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further." *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003).

**III. THE ALJ'S DECISION**

**\*3**  After reviewing the procedural history of Plaintiff's applications and stating the applicable law, the ALJ found she met the insured status requirements through March 31, 2020, and had not engaged in substantial gainful activity since February 7, 2016, the alleged onset date. *Id.* at 1357-60.

2022 WL 17721254

At step two, the ALJ determined Plaintiff has the following severe impairments:

> fibromyalgia, migraine headaches, cervicalgia, chronic pain syndrome, insomnia, hypersomnia, SI joint arthritis, lumbago with sciatica, restless leg syndrome, lumbar spondylosis, status post-traumatic brain injury, major depressive disorder, opioid, tobacco, and cannabis dependence, post-traumatic stress disorder [("PTSD")], bipolar disorder, panic disorder, and attention-deficit disorder.

*Id.* at 1360.

At step three, the ALJ found Plaintiff's impairments either singly or in combination did not meet or medically equal the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). *Id.* at 1360. Specifically, the ALJ considered Listings 1.02 (major dysfunction of a joint), 1.04 (disorders of the spine), 11.02 (epilepsy), 11.14 (peripheral neuropathy), 11.18 (traumatic brain injury), 12.02 (neurocognitive disorders), 12.04 (depressive, bipolar and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), 12.11 (neurodevelopmental disorders), 12.15 (trauma-and stressor-related disorders), 14.06 (undifferentiated and mixed connective tissue disease), and 14.09 (inflammatory arthritis). *Id.* Additionally, in accordance with SSR 12-2p, the ALJ considered Plaintiff's fibromyalgia in combination with all her other impairments, as there is no listing that specifically addresses this condition. *Id.*

Next, the ALJ determined Plaintiff has the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except:

> she can never climb ropes, ladders, or scaffolds. The claimant can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. She can frequently reach, handle, finger, and feel with both

upper extremities. The claimant should never be exposed to high, exposed places or moving mechanical parts. She can tolerate occasional exposure to weather, extreme heat and cold, wetness, humidity, vibration, and atmospheric conditions. The claimant can tolerate a moderate noise intensity level, as defined in the DOT/SCO. She can also tolerate occasional exposure to light brighter than that typically found in an indoor work environment, such as an office or retail store. Mentally, the claimant can understand, remember and carry out simple instructions and make simple work-related decisions. She can sustain an ordinary routine without special supervision and work at a consistent pace throughout the workday, but not at a production-rate pace, where each task must be completed within a strict time deadline. The claimant can tolerate occasional interaction with coworkers, supervisors and the public. She can tolerate occasional changes in the work setting. The claimant can also tolerate a low level of work pressure, which is defined as work not requiring multitasking, very detailed job tasks, significant independent judgment, very short deadlines, or teamwork in completing job tasks.

*Id.* at 1365.

At steps four and five of the sequential evaluation, based upon the RFC, the Medical Vocational Guidelines, and the testimony of a vocational expert, the ALJ determined Plaintiff was unable to perform any past relevant work; however, there were jobs that existed in significant numbers in the national economy Plaintiff could perform. *Id.* at 1372-74.

**\*4** Thus, the ALJ determined Plaintiff has not been under a disability, as defined in the Social Security Act, from April 4, 2016, through the date of decision. *Id.* at 1374.

## IV. ARGUMENTS

Plaintiff argues the ALJ failed to find her *per se* disabled under Listings 12.04, 12.06, and 12.15 and improperly assessed the medical opinions of Joshua Frank, M.D., her treating, board-certified psychiatrist. (Dkt. No. 14 at 26-31; Dkt. No. 25 at 5-7.) Plaintiff contends she is unable to perform any work because of her combination of fibromyalgia, bipolar disorder, ADHD, depression, anxiety with panic attacks, PTSD, insomnia, inflammatory arthritis, carpal tunnel syndrome, migraine headaches, pain, Reynaud's syndrome, traumatic brain injury, and side effects from medications. (Dkt. No. 14 at 32-35.) Lastly, Plaintiff maintains the ALJ erred in only crediting her testimony about her activities, but not about her limitations. (Dkt. No. 25 at 7-10.) The Commissioner responds the ALJ properly evaluated the opinion evidence regarding Plaintiff's mental impairments, properly considered Plaintiff's impairments in combination, and supportably concluded she could perform a range of light, unskilled work. (Dkt. No. 22 at 6-24.)

## V. DISCUSSION

### A. Substantial Evidence Supports the ALJ's Step Three Determination

#### 1. Legal Standards

At step three of the sequential evaluation, the ALJ must determine whether the individual's severe impairment meets or equals the criteria of any impairment listed in Appendix 1 of the regulations. 20 C.F.R. §§ 404.1520(a)(4)(iii), (d); 416.920(a)(4)(iii), (d); *see* 20 C.F.R. § 404 Subpt. P, App. 1. If an individual's impairment, or combination of impairments, matches the requirements of the relevant listing, then the individual is disabled. *Id.* §§ 404.1520(d), 416.920(d). To meet a listing, the individual's impairment "must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original).

At issue are Listings 12.04, 12.06, and 12.15. (Dkt. No. 14 at 26-31.) To meet these Listings, a claimant must satisfy the diagnostic criteria listed in "paragraph A," as well as the "paragraph B" criteria by establishing either an extreme limitation in one, or a marked limitation in two, of the following domains of mental functioning: (1) understanding, remembering, or applying information; (2) interacting with

others; (3) maintaining concentration, persistence, or pace; or (4) adapting and managing oneself. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.06, 12.15.

Alternatively, a claimant must satisfy the requirements of "paragraphs A" and "paragraph C." *Id.* To meet "paragraph C" criteria, the individual must present a "medically documented history of the existence of the disorder over a period of at least 2 years," with both "[m]edical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder," and "marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life." *Id.*

#### 2. Application

**\*5** Plaintiff argues she is disabled under Listings 12.04, 12.06, and 12.15. (Dkt. No. 14 at 26-31.) As part of his step three analysis, the ALJ determined the record does not establish the medical signs, symptoms, laboratory findings or degree of functional limitations required to meet or equal the criteria of any listed impairment. (T. at 1360.) The ALJ further noted that no acceptable medical source designated to make equivalency findings has concluded that the claimant's impairments medically equal a listed impairment. *Id.* The ALJ also evaluated Plaintiff's mental disorders pursuant to 20 C.F.R. §§ 404.1520a and 416.920a. *Id.* at 1361-65.

In determining whether she satisfied the "paragraph B" criteria, the ALJ concluded, based upon substantial evidence on the record, Plaintiff has mild limitations in the domain of understanding, remembering, and applying information; moderate limitations in interacting with others; moderate limitations in maintaining concentration, persistence, or pace; and moderate limitations in adapting or managing herself. *Id.* at 1364. The ALJ then determined Plaintiff did not satisfy the paragraph C criteria, explaining the record does not establish she has only marginal adjudgment. *Id.* In making this finding, the ALJ thoroughly discussed the extensive evidence of record. *Id.* at 1360-65.

To that end, the ALJ relied on evidence of Plaintiff's wide range of daily activities including caring for her daughter, which entailed getting her ready for school, preparing her meals, helping with her hygiene, playing with her, picking-up after school, helping with school work, and getting her

ready for bed. *Id.* at 552, 1559. She also took care of pets, did laundry, washed dishes, vacuumed, and swept. *Id.* at 553. She drove, handled money, and went out alone. *Id.* at 554-55. She shopped in stores for groceries and household items a "few times a month for a couple hours." *Id.* She spent time with friends, and attended social groups "monthly." *Id.* at 555. She sometimes went to church. *Id.* at 1597. Her reported hobbies and interests included spending time with her daughter, drawing, reading, going for walks, camping, fishing, and "relaxing." *Id.* at 555, 1597. In addition to caring for her daughter, she was attempting to become her nephew's guardian. Prior to December 2017, she lived independently in a house with her daughter and shared custody with her ex-husband. *Id.* at 1577. During her 2020 hearing, she testified she drove 80 miles round trip to attend mandated group therapy sessions three days a week and resided with her fiancé, his parents, and her daughter. *Id.* at 2264.

The ALJ also considered the opinion evidence. In June 2016, state agency psychologist J. Alpert, Ph.D., determined Plaintiff has moderate difficulties maintaining social functioning and moderate difficulties in concentrating, persisting or pace. *Id.* at 423. [3]

[3]    Dr. Alpert also concluded Plaintiff has no restriction of activities of daily living, however, as the ALJ discussed, changes to the mental Listings made this functional category obsolete. (T. at 417, 430, 1364.)

In 2020, state agency psychologists C. Walker, Ph.D., and H. Ferrin, Ph.D., determined Plaintiff has mild limitations interacting with others and moderate limitations in the other three broad areas of functioning. *Id.* at 1503, 1521, 1538, 1553.

In February 2020, Dennis Noia, Ph.D., consultatively examined Plaintiff and similarly concluded Plaintiff has no more than moderate work-related mental limitations. *Id.* at 2038-39. On examination, Plaintiff's demeanor and responsiveness to questions was cooperative, her manner of relating, social skills, and overall presentation were adequate. *Id.* at 2038. She was dressed appropriately and displayed "good" personal hygiene and grooming. *Id.* She made appropriate eye contact and exhibited normal posture and behavior. *Id.* Plaintiff demonstrated adequate expressive and receptive language skills. *Id.* Regarding her mood, Plaintiff reported feeling anxious. *Id.* She appeared tense and apprehensive and her affect was constricted. *Id.* Her thought

processes were coherent and goal directed with no evidence of delusions, hallucinations, or disordered thinking. *Id.* Her attention and concentrating were intact. *Id.* She was able to do counting, simple calculations, and serials 7s. *Id.* Her recent and remote memory skills were mildly impaired, she was able to recall three objects immediately and two after five minutes, and restate four digits forward and three digits backward. *Id.* Plaintiff's intellectual functioning appeared to be in the average range, and her insight and judgment were assessed as good. *Id.*

**\*6** The ALJ further considered Plaintiff's treatment records with Dr. Frank, which repeatedly reflected she was cooperative with normal cognition and a logical thought process, and had intact memory, judgment, insight, attention, and concentration. *See id.* at 640, 644, 659, 807, 814, 818, 824, 832, 835, 838, 1026, 1046, 1055, 1068, 1074, 1077, 1081, 1084, 1087, 1214, 1813, 1943, 1946, 1950, 1957, 1968, 2123, 2127, 2145; *but see id.* at 1006 (impaired concentration). The ALJ also discussed Dr. Frank's four medical opinions and found they were unsupported by his own progress notes and inconsistent with Plaintiff's activities, other mental status exams, and other medical opinions of record. *Id.* at 1364.

The foregoing record evidence supports the ALJ's "paragraph B" and "paragraph C" findings. *See Beau M. v. Comm'r of Soc. Sec.*, No. 8:18-CV-1170 (ATB), 2020 WL 586868, at \*5 (N.D.N.Y. Feb. 6, 2020) (finding substantial evidence consisting of plaintiff's testimony, intact daily activities, observations from his physicians, and consultative examination results supported ALJ's paragraph B analysis of no more than moderate limitation in any domain); *Gabriel C. v. Comm'r of Soc. Sec.*, No. 6:18-CV-671 (ATB), 2019 WL 4466983, at \*8 (N.D.N.Y. Sept. 18, 2019) (finding "no reasonable fact finder could have found that plaintiff had marginal adjustment" as examinations showed largely intact functioning, plaintiff had never "been hospitalized for a mental episode," and he could complete daily activities, like attend college classes, drive a vehicle, "prepare simple meals, socialize with a few close friends," and "care for his cat").

Plaintiff argues she meets Listings 12.04, 12.06, and 12.15 based on the opinions of Dr. Frank. (Dkt. No. 14 at 26-31.) Plaintiff's argument is largely conclusory and the majority of her briefing on this issue summarizes Dr. Frank's multiple opinions and restates the paragraph B criteria without applying it to the facts of her claim. (Dkt. No. 14 at 26-31.) At best, Plaintiff challenges the ALJ's decision not to fully adopt

certain extreme limitations assessed by Dr. Frank in 2018 and 2020. *Id.* at 26 ("The ALJ erred by not giving sufficient weight to the opinions of the treating board-certified psychiatrist that [Plaintiff] was unable to work. Based on Dr. Frank's well-supported opinions, she is disabled under the mental health Listings."). That argument is discussed in greater detail below.

To be sure, as the Commissioner acknowledges, if the ALJ were to adopt outright Dr. Frank's February 2018 opinion (assessing extreme limitations in every area of functioning) or his October 2020 opinion (assessing marked or extreme limitations in most areas of functioning), this would result in a finding that Plaintiff met a Listing. (Dkt. No. 22 at 16-17; T. at 1105-06, 2239-45.) But as the ALJ explained throughout his step three analysis and later in the RFC discussion, there was conflicting evidence in the record suggesting Plaintiff was not so limited. (T. at 1360-72.) Ultimately, "[t]he ALJ was well within his duty to reconcile the conflicting evidence and determine that the plaintiff's impairments, or combination of impairments, did not meet or equal a listing." *Richard B. v. Comm'r of Soc. Sec.*, No. 20-CV-0585, 2021 WL 4316908, at *5 (W.D.N.Y. Sept. 23, 2021). Although Plaintiff claims she is "disabled based on the well-supported opinions of Dr. Frank," it is not the Court's role to reweigh the evidence supporting the ALJ's contrary determination. *See Boffoli v. Comm'r of Soc. Sec.*, 20-CV-5317, 2022 WL 973754, at *9 (S.D.N.Y. Mar. 31, 2022) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve, and the deferential standard of review prevents us from reweighing it."); *see Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) ("In our review, we defer to the Commissioner's resolution of conflicting evidence.").

**\*7** Accordingly, the ALJ's thorough analysis and explanation of Plaintiff's impairments at step three indicate sufficient consideration of her mental impairments in relation to the Listings, and his findings are thus supported by substantial evidence. As such, remand is not required on this basis.

### B. Substantial Evidence Supports the ALJ's RFC Determination at Step Four

#### 1. Legal Standards

A claimant's RFC is the most he or she can do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1). "Ordinarily,

RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. A regular and continuing basis means eight hours a day, for five days a week, or an equivalent work schedule." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 210 (N.D.N.Y. 2009) (citing *Melville v. Apfel*, 198 F.3d 45 52 (2d Cir. 1999)). "In making a residual functional capacity determination, the ALJ must consider a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis." *Id.* (citing 20 C.F.R. § 404.1545(a)). "Ultimately, '[a]ny impairment-related limitations created by an individual's response to demands of work ... must be reflected in the RFC assessment.' " *Hendrickson v. Astrue*, No. 11-CV-0927 (ESH), 2012 WL 7784156, at *3 (N.D.N.Y. Dec. 11, 2012) (quoting SSR 85-15, 1985 WL 56857, at *8). The RFC determination "must be set forth with sufficient specificity to enable [the Court] to decide whether the determination is supported by substantial evidence." *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

The regulations mandate procedures an ALJ must follow in determining the appropriate weight to assign a treating physician's opinion. [4] The Second Circuit has articulated the procedure as a two-part analysis. *See Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019). First, the ALJ must decide whether the opinion is entitled to controlling weight. *Id.* "[T]he opinion of a claimant's treating physician as to the nature and severity of [an] impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.' " *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(c)(2)); *see, e.g., Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam) (holding "the opinion of the treating physician is not afforded controlling weight where, as here, the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts").

[4]    The agency has since adopted regulations that eliminated the treating physician rule for claims filed after March 27, 2017. *See* 20 C.F.R. §§ 404.1527, 416.927. Because Plaintiff filed her applications on April 4, 2016, the treating physician rule applies.

Second, if the ALJ decides the opinion is not entitled to controlling weight, he must determine how much weight, if any, to give it. *Estrella*, 925 F.3d at 95. In doing so, the ALJ must "explicitly consider" the following, nonexclusive "*Burgess* factors": "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (per curiam) (citing *Burgess*, 537 F.3d at 129 (citing 20 C.F.R. § 404.1527(c)(2))). In *Estrella*, the court emphasizes the importance of a treating source's opinion in cases concerning mental impairments, as "cycles of improvement and debilitating symptoms [of mental illness] are a common occurrence." *Estrella*, 925 F.3d at 97 (quoting *Garrison v. Colvin*, 759 F. 3d 995, 1017 (9th Cir. 2014)).

**\*8** At both steps, the ALJ must give "good reasons" for the weight given to a treating physician's opinion. *Id.* at 96 (quoting *Halloran*, 362 F.3d at 32). An ALJ's failure to "explicitly" apply the *Burgess* factors when assigning weight to a treating physician's opinion is a procedural error. *Id.* (citing *Selian*, 708 F.3d at 419-20). However, if "a searching review of the record" assures the court "that the substance of the treating physician rule was not traversed," the court will nonetheless affirm. *See id.* (citing *Halloran*, 362 F.3d at 32).

In evaluating a plaintiff's RFC for work in the national economy, the ALJ must take the plaintiff's reports of pain and other symptoms into account. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). "The ALJ must " 'carefully consider' " all the evidence presented by claimants regarding their symptoms, which fall into seven relevant factors including 'daily activities' and the 'location, duration, frequency, and intensity of [their] pain or other symptoms.' " *Del Carmen Fernandez v. Berryhill*, No. 18-CV-326, 2019 WL 667743, at \*9 (S.D.N.Y. Feb. 19, 2019) (citing 20 C.F.R. § 404.1529(c)(3); SSR 16-3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims, 81 FR 14166-01 at 14169-70, 2016 WL 1020935 (Mar. 16, 2016)).

In 2016 the Commissioner eliminated the use of term "credibility" from the "sub-regulatory policy" because the regulations themselves do not use that term. SSR 16-3p, 81 FR at 14167. Instead, symptom evaluation tracks the language of the regulations.[5] The evaluation of symptoms involves a two-step process. First, the ALJ must determine, based upon the objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged...." 20 C.F.R. §§ 404.1529(a), (b); 416.929(a), (b).

5    The standard for evaluating subjective symptoms has not changed in the regulations. Rather, the term "credibility" is no longer used, and SSR 16-3p makes it clear that the evaluation of the claimant's symptoms is not "an evaluation of the claimant's character." SSR 16-3p, 81 FR at 14167. The Court will remain consistent with the terms as used by the Commissioner.

If so, at the second step, the ALJ must consider " 'the extent to which [the claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the [objective medical evidence] and other evidence to decide how [the claimant's] symptoms affect [her] ability to work.' " *Barry v. Colvin*, 606 F. App'x 621, 623 (2d Cir. 2015) (citing *inter alia* 20 C.F.R. § 404.1529(a); *Genier v. Astrue*, 606 F.3d at 49) (alterations in original).

If the objective medical evidence does not substantiate the claimant's symptoms, the ALJ must consider the other evidence. *Cichocki v. Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013) (citing superseded SSR 96-7p). The ALJ must assess the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

### 2. Application

**\*9** Plaintiff argues the RFC determination is not supported by substantial evidence because the ALJ failed to properly evaluate Dr. Frank's opinions, erred in crediting Plaintiff's testimony about her activities but not her limitations, and did not consider the "combined effects" of all of her severe impairments. (Dkt. No. 14 at 26-35; Dkt. No. 25 at 7-9.)

### a. Dr. Frank's Opinions

In April 2017, Dr. Frank completed an employability assessment form and indicated Plaintiff had been diagnosed with bipolar disorder and PTSD and was very limited in understanding, remembering, and carrying out instructions; maintaining attention and concentration; maintaining socially appropriate behavior without exhibiting behavioral extremes; and functioning in a work setting at a consistent pace. (T. at 801-02.) He indicated she was moderately limited in making simple decisions; interacting appropriately with others; and maintaining basic standards of personal hygiene and grooming. *Id.* at 802. When asked to identify specific limitations on work activities, Dr. Frank wrote: "unable to work in any capacity." *Id.*

In January 2018, Dr. Frank completed the same employability form and indicated Plaintiff was moderately limited in understanding, remembering, and carrying out instructions (as opposed to very limited); moderately limited in carrying out instruction (as opposed to very limited); and was very limited in interacting with others (as opposed to moderately limited). *Id.* at 897-98. He again wrote "unable to work in any capacity." *Id.* at 898.

In a February 2018 medical source statement, Dr. Frank opined Plaintiff has extreme limitations in every enumerated area of functioning, including understanding; remembering simple instructions; carrying out simple instructions; making judgments on simple work-related decisions; understanding and carrying out complex instructions; making complex decisions; interacting appropriately with the public, co-workers, or supervisors; and responding appropriately to usual work situations and changes in a routine work setting. *Id.* at 1104-06. He wrote she has "severe concentration problems, sleep disturbance, [and] poor stress tolerance." *Id.* at 1104.

In an October 2020 mental impairment questionnaire, Dr. Frank indicated Plaintiff has limited but satisfactory ability to remember work-like procedures; understand, remember, and carry out very short and simple instructions; understand and remember (but not carry out) detailed instructions; adhere to basic standards of neatness and cleanliness; travel in unfamiliar places; and use public transportation. *Id.* at 2241-42. He opined she was seriously limited in the ability to make simple work-related decisions and unable to meet competitive standards in sustaining an ordinary routine

without special supervision. *Id.* Dr. Frank also opined she had "no useful ability to function" in maintaining attention for a two-hour segment; maintaining regular attendance; working in coordination with others; completing a workday without interruptions from psychological symptoms; performing at a reasonable pace; accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers; responding to changes in a work setting; and dealing with normal work stress. *Id.* at 2242.

Within the same questionnaire, Dr. Frank opined Plaintiff has moderate limitations understanding and remembering information; marked limitations persisting and maintaining pace; extreme limitations applying information, interacting with others, and concentrating; and extreme limitations adapting and managing oneself in the workplace. *Id.* at 2243. He wrote she "would not be able to complete a workday due to stress." *Id.* at 2242. Finally, he indicated Plaintiff would be absent from work more than four days per month and off task more than 25% of the workday. *Id.* at 2244.

**\*10** Contrary to Plaintiff's assertion, the ALJ applied the appropriate legal standard at this step of the sequential evaluation and provided "good reasons" for affording Dr. Frank's opinions "some limited weight, but not controlling weight." *Id.* at 1371. As detailed above, the ALJ explained that although Dr. Frank is Plaintiff's psychiatrist, his opinions were not supported by, and were inconsistent with, other evidence in the record: specifically, his own progress notes (reflecting Plaintiff was cooperative, with normal cognition and a logical thought process, and had intact memory, judgment, insight, attention, and concertation); Plaintiff's wide range of daily activities, other mental status examinations, and other medical opinions of record. *Id.* at 1371. The ALJ also noted that in addition to being inconsistent with one another,[6] the assessments were primarily check-box forms and contained few, if any, supporting clinical or diagnostic findings. *Id.*

6       The Court finds no merit to Plaintiff's statement that "Dr. Frank's reports to DSS, SSA, and the ALJ are all consistent with one each other." (Dkt. No. 14 at 31.) As detailed above, there were numerous inconsistencies, which the ALJ highlighted throughout his decision.

Where, as here, a treating physician's opinion is "internally inconsistent and inconsistent with other substantial record evidence," an ALJ can properly decline to accord it

controlling weight. *Micheli v. Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012); *see also Saxon v. Astrue*, 781 F. Supp. 2d 92, 102 (N.D.N.Y. 2011) ("The less consistent an opinion is with the record as a whole, the less weight it is to be given.") (citing *Stevens v. Barnhart*, 473 F. Supp. 2d 357, 362 (N.D.N.Y. 2007)); *Otts v. Comm'r of Soc. Sec.*, 249 F. App'x 887, 889 (2d Cir. 2007) (noting that an ALJ may reject an opinion from a treating physician "upon the identification of good reasons, such as substantial contradictory evidence in the record"). That a doctor's opinion is in conflict with his or her own clinical notes is a factor that can amount to "good reasons" for attributing limited weight. [7] *See Camille v. Colvin*, 652 F. App'x 25, 27 (2d Cir. 2016); *see, e.g., Thomas B. v. Comm'r of Soc. Sec.*, No. 5:21-CV-508 (FJS), 2022 WL 4465309, at *12 (N.D.N.Y. Sept. 26, 2022) (substantial evidence supported the ALJ's decision to not to afford treating physician's opinions controlling weight because they lacked consistency and supportability in the record).

[7]    Accordingly, the Court finds no merit to Plaintiff's assertion that "[t]he ALJ replaced the medical opinion of the long-time treating, board certified psychiatrist with his own medical opinion. The ALJ felt that Dr. Frank's opinions were not supported by his own treatment notes. This is a medical decision, rather than a legal one." (Dkt. No. 14 at 29.)

As discussed above, the three State agency psychologists who reviewed Plaintiff's claims all assessed no more than moderate limitations and Dr. Noia, who consultatively examined Plaintiff in February 2020, assessed mild to moderate limitations. *See Herzog v. Astrue*, No. 5:11-CV-1108 (GTS), 2012 WL 5334756, at *3 (N.D.N.Y. Oct. 26, 2012) (finding that, "[w]here, as here, the treating physician's opinion is not supported by, or consistent with, other evidence in the record, the ALJ is entitled to accord that opinion less than controlling weight, and may instead rely on the opinions of consultative examiners"); *see Trimm v. Comm'r of Soc. Sec.*, No. 7:15-CV-1006 (GTS/WBC), 2016 WL 7414531, at *10 (N.D.N.Y. Dec. 2, 2016) ("Overall, the ALJ did not err in failing to afford controlling weight to the opinions of [plaintiff's treating physicians] because the opinions were inconsistent with other substantial evidence in the case record. The opinions were not supported by the physician's own treatment notations which indicated normal mental status examinations[.]"), *report-recommendation adopted*, 2016 WL 7409060 (N.D.N.Y. Dec. 22, 2016).

*11   Turning to Plaintiff's activities of daily living, the ALJ noted, among other thing things, Plaintiff maintained her own household for several years; did all the cooking, laundry, and general housekeeping for at least part of the relevant period; took care of her young daughter; attended activities with her daughter; did arts and crafts projects; drove 80 miles round-trip to attend her group therapy sessions threes time a week; went grocery shopping; managed her own finances; and sought to become her nephew's guardian. *Id.* at 380, 399, 401, 551-55, 1363, 1368, 1602-03, 1837, 2075, 2286-88; *see, e.g., Sharon R. v. Kijakazi*, No. 3:20-cv-902 (ATB), 2021 WL 3884257, at *7 (N.D.N.Y. Aug. 31, 20210) (finding the claimant's ability to take care of her own and her brother's households, care for two cats, pay bills, and go grocery shopping contradicted doctor's opinion that she had a marked limitation in maintaining a routine).

The ALJ also contrasted Dr. Frank's opinions regarding frequent absences and time off task with Plaintiff's attendance record, noting in addition to the foregoing activities of daily living, there was "no evidence of [Plaintiff] routinely missing or arriving late for her scheduled appointments." *Id.* at 1371; *see, e.g., Sharon R.*, 2021 WL 3884257, at *7 ("The ability to sustain a routine, to leave the house and attend regular appointments is relevant to plaintiff's functional ability, even if in itself, this ability does not mean that plaintiff can perform full-time work.").

Further, a review of the ALJ's written decision demonstrates he considered all of the medical evidence in accordance with the appropriate legal standards and made reasonable determinations supported by substantial evidence. *See Micheli v. Astrue*, 501 F. App'x at 29. It is ultimately the ALJ's responsibility to choose between medical opinions and other evidence to piece together an overall assessment, and a mechanical recitation of the weighing criteria found in the Regulations is unnecessary as long as the record reflects that he properly applied the substance of those rules. *See, e.g., Suarez v. Colvin*, 102 F. Supp. 3d 552, 574 (S.D.N.Y. 2015). Here, the ALJ engaged in a thorough, narrative discussion of the extensive record before discussing the reasoning behind his assignment of weight to the medical sources in the record. *Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995) (holding that "the opinions of non-examining sources [can] override treating source's opinions provided they are supported by evidence in the record"); *accord Suttles v. Colvin*, 654 F. App'x 44, 46 (2d Cir. 2016) (summary order) (holding that it was not erroneous for the ALJ to give great weight to

consultative examiner's opinion because it was consistent with record evidence).

Accordingly, the Court finds the ALJ articulated sufficiently good reasons for affording Dr. Frank's multiple opinions less than controlling weight.[8] The ALJ was responsible for reviewing all of the medical and other evidence before him, resolving any inconsistencies therein, and making a determination consistent with the evidence as a whole. (Dkt. No. 14 at 29-31.) *See Bliss v. Colvin*, No. 13-CV-1086, 2015 WL 457643, at *7 (N.D.N.Y. Feb. 3, 2015) ("It is the ALJ's sole responsibility to weigh all medical evidence and resolve material conflicts where sufficient evidence provides for such."); *accord Petell v. Comm'r of Soc. Sec.*, No. 12-CV-1596, 2014 WL 1123477, at *10 (N.D.N.Y. Mar. 21, 2014); *see also Vincent F. v. Comm'r of Soc. Sec.*, No. 1:17-cv-446 (TWD), 2018 WL 4471525, at *7 (N.D.N.Y. Sept. 18, 2018) (finding that ALJ properly contrasted medical opinion with other evidence). "In general, under the substantial evidence standard of review, it is not enough for plaintiff to merely disagree with the ALJ's weighing of the evidence or to argue that the evidence in the record could support her position ... plaintiff must [instead] show that no reasonable factfinder could have reached the ALJ's conclusions based on the evidence in record." *Jonathan S. v. Comm'r of Soc. Sec.*, No. 1:20-CV-1177, 2022 WL 44700 *6 (W.D.N.Y. Jan. 5, 2022). In this case, Plaintiff has not made such a showing.

[8]     As to Dr. Frank's various statements that Plaintiff was unable to work (T. at 802, 898), as the ALJ noted, such statements concern an issue reserved to the Commissioner, and do not warrant any particular weight. *Id.* at 1371-72; *see 20 C.F.R. §§ 404.1527(d)(1)* ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."), (3) ("We will not give any special significance to [such statements].")), 416.927(d)(1), (3).

*12 Plaintiff maintains the ALJ had an obligation to contact Dr. Frank for an "explanation of his opinions" before "discrediting" his medical opinions. (Dkt. No. 14 at 31; Dkt. No. 25 at 5-7.) However, there is no obligation to recontact a treating physician where the evidence of record is "adequate to permit the ALJ to make a disability determination." *Carvey v. Astrue*, 380 F. App'x 50, 53 (2d Cir. 2010) (citing *Perez v. Chater*, 77 F.3d 41, 47-48 (2d Cir. 1996)); *see also John Q. v. Comm'r of Soc. Sec.*, No. 1:19-CV-1249, 2021 WL

1578297, at *10 (W.D.N.Y. Apr. 22, 2021) ("the ALJ is under no duty to obtain additional evidence from a treating source or ask for clarification when declining to give controlling weight to a treating source's opinion."); *see, e.g., Teresa L. v. Comm'r of Soc. Sec.*, No. 1:19-CV-682, 2020 WL 6875254, at *7 (W.D.N.Y. Nov. 23, 2020) (ALJ did not err "in failing to contact [treating physician] for a clarification of inconsistencies in his opinion and elaboration in the parts of the opinion that were not supported"). The ALJ's decision does not indicate he did not have sufficient evidence to determine whether Plaintiff was disabled and his reasonable explanations that Dr. Frank's opinions were not supported by and continent with the record did not require him to recontact Dr. Frank for further information. (T. at 1365-72.)

In light of the foregoing, the ALJ's decision demonstrates appropriate consideration of Dr. Frank's opinions considering his own treatment notes, the longitudinal medical record, and Plaintiff's own assessment of her abilities, as reflected in her hearing testimony. *See Medina v. Comm'r of Soc. Sec.*, 831 F. App'x 35, 36 (2d Cir. 2020) (finding the ALJ properly considered treating source opinion where the opined limitations were inconsistent with the doctor's own treatment notes and plaintiff's self-reported activities of daily living); *Rusin v. Berryhill*, 726 F. App'x 837, 839 (2d Cir. 2018) (finding no error where ALJ discounted treating source opinion that was inconsistent with treatment notes, other medical opinion evidence, and reported activities). In short, the Court does not find any reversible error in the ALJ's evaluation of Dr. Frank's medical opinions. As such, remand is not required on this basis.

### b. Combination of Impairments and Evaluation of Symptoms

Plaintiff argues she is disabled by the combination of her physical and mental impairments and she does not have the RFC to perform any work. (Dkt. No. 14 at 32-35.) To that end, Plaintiff claims the ALJ "did not include limitations from her chronic pain from fibromyalgia and inflammatory arthritis, her fatigue from insomnia, her migraine headaches, her limitations in using her hands from carpal tunnel, Reynaud's and arthritis. He did not include her non-exertional limitations caused by her severe mental illness." *Id.* at 34-35. Plaintiff also maintains the ALJ erred in only crediting her testimony about her activities, but not about her limitations. (Dkt. No. 25 at 7-9.) For reasons discussed herein, substantial evidence

supports the ALJ's determination that Plaintiff has the RFC to perform a range of light, unskilled, low stress-work.

First, the Court's review of the record does not support these arguments or that the ALJ failed to properly consider Plaintiff's impairments in combination. As Defendant maintains, the ALJ properly considered Plaintiff's impairments in combination throughout the sequential evaluation. (Dkt. No. 22 at 18-25; T. at 1365-72.) Second, as detailed below, Plaintiff's conclusory assertion that the ALJ did not adequately evaluate various specific impairments and/or account for them in the RFC is without merit. (Dkt. No. 14 at 32-35.) Third, the ALJ properly analyzed Plaintiff's subjective symptoms. (T. at 1365.) He cited the two-part standard governing the analysis of subjective complaints. *Id.* He discussed Plaintiff's allegations regarding her limitations, including the effects of medication, and any aggravating factors. *Id.* at 1366. Although the ALJ recognized that Plaintiff's medically determinable impairments could cause her symptoms, he found her statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely consistent with the medical evidence and other evidence in the record. *Id.* at 1372. Notwithstanding Plaintiff's argument, the Court finds no basis to disturb the ALJ's evaluation of her subjective complaints, which is supported by record-based explanations throughout the ALJ's written decision. *See Stanton v. Astrue,* 370 F. App'x 231, 234 (2d Cir. 2010) (A court may not "second-guess" the ALJ's decision to discount a claimant's statements about her symptoms "where the ALJ identified specific record-based reasons for [her] ruling[.]"). "It is the role of the Commissioner, not the reviewing court, 'to resolve evidentiary conflicts and to appraise the credibility of witnesses,' including with respect to the severity of a claimant's symptoms." *Cichocki v. Astrue,* 534 F. App'x. 71, 75 (2d Cir. 2013) (quotation omitted).

**\*13** As to Plaintiff's chronic pain from fibromyalgia and inflammatory arthritis, the ALJ reviewed Plaintiff's subjective complaints limiting her ability to lift, stand, walk, sit, kneel, and use her hands and considered her testimony that she had "constant pain" in her "whole body" but never in [the] same spot." (T. at 1366, 1445-46, 2278-79) During the 2020 hearing, she rated her pain as six or seven out of ten. *Id.* at 2279. In addition to prescribed medications, which helped "somewhat", Plaintiff reported massage, heating pads, hot showers, Bengay, and medical marijuana helped alleviate her pain. *Id.* at 2280-81. She further testified she could only walk for ten minutes before her knees would "burn

and ache", stand for fifteen minutes before needing to move around and sit down, and sit for fifteen to twenty minutes before needing to adjust because of pain in her back, hips, and knees. *Id.* at 2281. She reported having problems paying attention, concentrating, completing tasks, remembering things, handling stress or schedule changes, and getting along with other people including authority figures. *Id.* at 2284. ALJ also considered her daily activities such as doing housework, driving, taking care of her daughter, and walking for exercise (up to a mile at a time). *Id.* at 1367-69, 399, 401, 551-55, 1988, 1991, 1995, 1997-98, 2000, 2022-25, 2053, 2057, 2062, 2070, 2173, 2176, 2179. In March 2017, Plaintiff told rheumatologist, Eyal Kadar M.D., her pain was "better with activity" and that it was responding to medication. *Id.* at 697, 1367.

In formulating the physical RFC, the ALJ discussed and relied on the opinions of consultative examiners, Kalyani Ganesh, M.D., and Elke Lorensen, M.D. *Id.* at 1366-67. In May 2016, Dr. Ganesh examined Plaintiff and noted she "has fibromyalgia. She has pain in the whole body. She is on medication. It seems to help." *Id.* at 647. On examination, Dr. Ganesh observed no abnormalities other than difficulty squatting and some limitation of motion of the lumbar spine. *Id.* at 647-48. Plaintiff appeared in no acute distress, her gait was normal, she could walk on heels and toes without difficulty, her stance was normal, she used no assistive devices, and she needed no help changing for the examination or getting on and off the exam table. *Id.* at 648. Plaintiff was able to rise from a chair without difficulty. *Id.* She had decreased range of motion in her lumbar spine but negative straight leg raising bilaterally. *Id.* at 649. She demonstrated full range of motion in her cervical spine, shoulders, elbows, forearms, wrists, hips, knees, and ankles. *Id.* All of her joints were stable and without tenderness, redness, heat, swelling, or effusion. *Id.* There were no tender points and no control points. *Id.* She had no muscle atrophy or sensory deficits. *Id.* She demonstrated 5/5 strength throughout all four extremities. She had intact hand and finger dexterity bilaterally. *Id.* Spinal x-rays from 2016 were negative except for a transitional L5 vertebral body and straightening in her cervical spine. *Id.* at 651-52. Dr. Ganesh assessed no gross physical limitations sitting, standing, or walking, and mild limitations lifting, carrying, pushing, and pulling. *Id.* at 650.

Dr. Lorensen examined Plaintiff in February 2020. *Id.* at 2074. She observed six trigger points, some difficulty squatting, and somewhat limited range of motion. *Id.* at 2074-76. During the examination, Plaintiff appeared in no acute distress and

2022 WL 17721254

had a normal gait and stance. *Id.* at 2074. She used no assistive devices and had no difficulty walking on her heels and toes. She needed no help changing for the examination or getting on and off the exam table. She rose from a chair without difficulty. She had full range of motion in her cervical spine, elbows, forearms, wrists, and ankles. Her joints were stable and nontender with no redness, heat, swelling, or effusion. She had no muscle atrophy or sensory deficits, and demonstrated 5/5 strength in her upper and lower extremities. She also had 5/5 grip strength bilaterally with intact hand and finger dexterity. X-rays of her lumbar spine showed "spina bifida occulta of L5, a normal variant." *Id.* There was no fracture, dislocation, or significant degenerative change. *Id.* Dr. Lorensen concluded Plaintiff had no gross limitations for sitting, standing, walking, or handling small objects with her hands, and mild limitations for bending, lifting, and reaching. *Id.*

**\*14** The ALJ also relied, in part, on the State agency reviewing physician's physical assessments. *Id.* at 1366-67. In March 2020, Dr. J. Rosenthal reviewed the record and concluded Plaintiff's fibromyalgia and "spine disorder" were severe impairments, but she retained the ability to perform light work with certain postural and environmental limitations. *Id.* at 1540-42. In August 2020, Dr. M. Vazquez Gonzalez reviewed an updated record and concurred with Dr. Rosenthal's assessment. *Id.* at 1502, 1506-06.

The ALJ afforded all of these opinions some weight because Dr. Ganesh's and Dr. Lorensen's opinions were supported by their examinations and Dr. Rosenthal's and Dr. Vazquez Gonzalez's opinions were supported by the narrative explanations and consistent with the record. *Id.* at 1367.

As discussed above, an ALJ is entitled to rely on opinions from both examining and non-examining State agency medical consultants because such consultants are qualified experts in the field of social security disability. *See Frye ex rel. A.O. v. Astrue*, 485 F. App'x 484, 487 (2d Cir. 2012) (summary order) ("The report of a State agency medical consultant constitutes expert opinion evidence which can be given weight if supported by medical evidence in the record."); *Little v. Colvin*, No. 14-CV-0063 (MAD), 2015 WL 1399586, at \*9 (N.D.N.Y. Mar. 26, 2015) ("State agency physicians are qualified as experts in the evaluation of medical issues in disability claims. As such, their opinions may constitute substantial evidence if they are consistent with the record as a whole.") (internal quotation marks omitted).

Additionally, the ALJ included greater physical and mental limitations in the RFC than the state agency physicians opined on account of Plaintiff's testimony concerning her pain and fatigue and "physical exams that have noted multiple positive tender points" including the March 23, 2017, examination by rheumatologist, Eyal Kedar, M.D. *Id.* at 696, 1368, 1370. The ALJ further found the "pain and fatigue from [Plaintiff's] headaches, fibromyalgia, and other physical impairments could reasonably be expected to impose some mental limitations." *Id.* As such, the Court finds no merit to Plaintiff's statement the ALJ "erred, and violated the remand order by not considering the exertional and non-exertional effects of her fibromyalgia on her RFC." (Dkt. No. 14 at 33.)

Insofar as Plaintiff argues the evidence supports her assertion of greater limitations, *i.e.*, "her many limitations from fibromyalgia prevent her from performing any work", (Dkt. No. 14 at 34), under the substantial evidence standard it is not enough for Plaintiff to merely argue that the evidence in the record could support her position. Plaintiff must show that no reasonable factfinder could have reached the ALJ's conclusion based on the evidence in the record. *See Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); *see also Wojciechowski v. Colvin*, 967 F. Supp. 2d 602, 605 (N.D.N.Y. 2013) (Commissioner's findings must be sustained if supported by substantial evidence even if substantial evidence supported the plaintiff's position). In this case, Plaintiff has not made such a showing.

The ALJ also considered Plaintiff's testimony that she slept poorly, felt tired, was stiff and irritable during the day, napped frequently, and some of her medications caused drowsiness when formulating her RFC. *Id.* at 1362, 1370. However, the ALJ also addressed Plaintiff's wide variety of daily activities despite her fatigue. *Id.* at 1367-68. As the Commissioner points out, the ALJ accounted for Plaintiff's "pain and fatigue" by assessing greater physical and mental limitations than the state agency physicians assessed. (Dkt. No. 22 at 21; T. at 1370.)

**\*15** The ALJ discussed Plaintiff's migraine headaches and their effect on Plaintiff's ability to perform tasks. (T. at 1360, 1366.) Specifically, the ALJ considered Plaintiff's testimony that she had migraines several times a week, lasting from a few hours up to two days, and that medication "sometimes" helped. *Id.* at 1366, 2288-90. In November 2016, it was noted Topamax made her headaches "much more manageable" and returned only "sporadically." *Id.* at 749; *see also id.* at 647, 701, 790, 797, 799, 858, 1050, 2000, 2074 (other reports

of positive response to medications). In August 2020, she reported having only two to three headaches per month, which were controlled with sumatriptan injections. *Id.* at 2103. Additionally, as the ALJ noted, neurological exams were largely unremarkable (*id.* at 347, 714, 737, 747, 758, 886, 870, 894, 999, 2010, 2017-18, 2026, 2076-77, 2107-08, 2114-15), and on a number of occasions she denied having headaches. *Id.* at 734, 755, 867, 890, 996, 1996, 2009, 2016. The ALJ also considered Plaintiff's testimony that while she is having a headache, she is sensitive to sounds and smells, sometimes loses vision, and needs "quiet" and sleep. *Id.* at 1366. In formulating Plaintiff's RFC, the ALJ explicitly accounted for Plaintiff's migraine headaches by restricting her exposure to light and noise and limiting her to simple work. (T. at 1360, 1365, 1368.)

As to her hand impairments, variously characterized, the ALJ found that while Plaintiff fractured her left wrist while rollerblading in April 2019, has a history of bilateral carpal tunnel syndrome, and underwent a left-sided release in March 2014, these conditions imposed no more than minimal limitations on her ability to perform basic work activities. *Id.* at 1360, 1928, 1934-35, 2022, 2035. To that end, in his severity analysis, the ALJ discussed that during the consultative examinations conducted by Dr. Ganesh and Dr. Lorensen Plaintiff demonstrated full grip strength, intact hand and finger dexterity, and full range of motion and intact sensation throughout both upper extremities. *Id.* at 649, 1360, 2076-77. Dr. Lorensen also observed Plaintiff "has no problem doing fine motor activities with her hands and filled out her paperwork with very neat, meticulous handwriting." *Id.* at 2074-78. Additionally, the state agency reviewing physicians did not assess any manipulative limitations. *Id.* at 1506, 1541.

The ALJ also discussed Plaintiff's hand impairments when formulating the RFC findings. In particular, he considered Plaintiff's testimony that she had difficulty moving her hands, could not write for long because they got stiff, and had difficulty holding things because her medications made her hands shake. *Id.* at 1366, *see id.* at 1436-37, 2280. However, he also noted evidence reflecting Plaintiff could bathe, dress, and groom herself; prepare food; do general cleaning and laundry; and take care of her daughter. *Id.* at 1368, *see id.* at 399, 551-55, 648, 2075. The ALJ explicitly accounted for Plaintiff's hands by finding her capable of frequently reaching, handling, fingering, and feeling with her upper extremities. *Id.* at 1368.

There is no merit to Plaintiff's assertion that the ALJ "did not include her non-exertional limitations caused by her severe mental illness." (Dkt. No. 14 at 32.) The ALJ included multiple mental limitations to account for Plaintiff's various psychiatric impairments and any mental limitations imposed by her pain, fatigue, headaches, traumatic brain injury, and other physical impairments by limiting her to handling only simple instructions and tasks; making simple decisions; not working at a production-rate pace; only occasionally interacting with co-workers, supervisors, and the public; tolerating only occasional changes in the work setting; and tolerating low levels of work pressure. (T. at 1365, 1371.) In doing so, the ALJ considered the entire record including opinions from Dr. Frank, Dr. Noia, Dr. Alpert, Dr. Walker, and Dr. Ferrin. The ALJ assigned some weight to the opinions of Dr. Noia, Dr. Alpert, Dr. Walker, and Dr. Ferrin, discussed above, finding them consistent with each other and supported by the evidence of record. (T. at 1370.) *See* 20 C.F.R. §§ 404.1527(c)(3), (4), 416.927(c)(3), (4). Substantial evidence supports the ALJ's evaluation and weighing of the opinion evidence including Dr. Frank's opinions, discussed above, and the ALJ's determination that Plaintiff has no more than moderate work-related mental limitations. (T. at 1365-72.)

**\*16** Furthermore, as a general matter, moderate limitations are not an impediment to the ability to perform gainful activity, particularly when an RFC has already limited a claimant to unskilled and/or low-stress work. *See Whipple v. Astrue*, 479 F. App'x 367, 370 (2d Cir. 2012) (consultative examiners' findings that plaintiff's depression caused moderate limitations in social functioning ultimately supported the ALJ's determination that plaintiff was capable of performing work that involved simple tasks and allowed for a low-stress environment); *see Ridley G. v. Comm'r of Soc. Sec.*, No. 20-cv-773, 2021 WL 4307507, at \*5, 8-9 (N.D.N.Y. Sept. 22, 2021) (upholding RFC for low-stress work where unremarkable examination findings, opinion evidence, and the plaintiff's ability to perform various activities supported no more than moderate mental limitations); *see also Melisa G. v. Berryhill*, No. 3:18-CV-508 (DJS), 2019 WL 2502726, at \*5 (N.D.N.Y. June 17, 2019) (holding moderate limitations are not prohibitive of performing unskilled work); *see, e.g., see also Tamara M. v. Saul*, No. 3:19-CV-1138 (CFH), 2021 WL 1198359, at \*11 (N.D.N.Y. Mar. 30, 2021) (finding no error by ALJ in declining to include limitations to being off-task and/or attendance in RFC determination, where substantial evidence supported the ALJ's assignment of weight and rejection of treating physician's restrictive limitations).

In sum, as the ALJ reviewed the subjective and objective information in the record relating to Plaintiff's both severe and non-severe impairments including fibromyalgia, inflammatory arthritis, chronic pain, fatigue, migraine headaches, hand impairments, and mental health limitations, the resulting symptoms, and medical opinions related thereto from across the relevant time period, remand is not warranted. *See, e.g., Anysha M. v. Comm'r of Soc. Sec.*, No. 3:19-CV-0271 (CFH), 2020 WL 1955326, at *5 (N.D.N.Y. Apr. 23, 2020) ("The ALJ's references to fibromyalgia and chronic widespread pain throughout her RFC analysis indicate that she properly considered [the plaintiff's] fibromyalgia in determining [her] physical limitations that are supported by the evidence of record.").

Plaintiff's challenge regarding the ALJ's RFC determination appears premised upon a disagreement over how the ALJ weighed evidence about Plaintiff's limitations. However, as discussed above, this Court will not reweigh the evidence presented to the ALJ. *See Warren v. Comm'r of Soc. Sec.*, No. 3:15-CV-1185 (GTS/WBC), 2016 WL 7223338, at *9 (N.D.N.Y. Nov. 18, 2016); *Vincent v. Shalala*, 830 F. Supp. 126, 133 (N.D.N.Y. 1993) ("[I]t is not the function of the reviewing court to reweigh the evidence.") (citing *Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)); *Gogos v. Comm'r of Soc. Sec.*, No. 18-CV-1188, 2020 WL 128445, at *3 (W.D.N.Y. Jan. 10, 2020) ("It is the ALJ's job to resolve conflicting record evidence and the Court must defer to that resolution.").

Here, the ALJ resolved conflicts between the various medical opinions by assigning the greatest weight to those portions of the medical opinions deemed most consistent with Plaintiff's overall treatment record and activities. In doing so, the ALJ appropriately evaluated the conflicting medical evidence, and made an RFC finding consistent with the overall record. *See Matta v. Astrue*, 508 F. App'x. 53, 56 (2d Cir. 2013) (although ALJ's conclusion did not perfectly correspond with any of the opinions of medical sources, ALJ was entitled to weigh all the evidence available to make an RFC finding consistent with the record as a whole).

Based on the foregoing, the Court finds the ALJ properly applied correct legal standards and the RFC determination was supported by substantial evidence. Accordingly, remand is not required on this basis.

## VI. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court finds the ALJ properly applied the correct legal standards and considered the evidence of record. The ALJ's findings are supported by substantial evidence. Accordingly, the Court finds no error.

**\*17 WHEREFORE**, it is hereby

**ORDERED** that Plaintiff's motion for judgment on the pleadings (Dkt. No. 14) is **DENIED**; and it is further

**ORDERED** that Defendant's motion for judgment on the pleadings (Dkt. No. 22) is **GRANTED**; and it is further

**ORDERED** that the Commissioner's decision is **AFFIRMED**; and it is further

**ORDERED** that Plaintiff's complaint (Dkt. No. 1) is **DISMISSED**; and it is further

**ORDERED** that the Clerk of the Court serve copies of this Memorandum-Decision and Order on the parties in accordance with the Local Rules; and it is further

**ORDERED** the Clerk of Court shall enter Judgment and close this case.

**All Citations**

Slip Copy, 2022 WL 17721254

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

**Melisa G. v. Berryhill, Not Reported in Fed. Supp. (2019)**

2019 WL 2502726

2019 WL 2502726
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

MELISA G., Plaintiff,

v.

Nancy A. BERRYHILL, Acting
Comm'r of Soc. Sec., Defendant.

Civ. No. 3:18-CV-508 (DJS)
|
Signed 06/17/2019

**Attorneys and Law Firms**

OF COUNSEL: PETER A. GORTON, ESQ., LACHMAN &
GORTON, P.O. Box 89, 1500 East Main Street, Endicott, NY
13761, Counsel for Plaintiff.

OF COUNSEL: JUNE L. BYUN, ESQ., DAVID L. BROWN,
ESQ., U.S. SOCIAL SECURITY ADMIN. OFFICE OF
REG'L GENERAL COUNSEL - REGION II, 26 Federal
Plaza, Room 3904, New York, NY 10278, Counsel for
Defendant.

**DECISION AND ORDER** [1]

[1]
Upon Plaintiff's consent, the United States' general
consent, and in accordance with this District's
General Order 18, this matter has been referred
to the undersigned to exercise full jurisdiction
pursuant to 28 U.S.C. § 636(c) and Federal Rule
of Civil Procedure 73. See Dkt. No. 8 & General
Order 18.

DANIEL J. STEWART, United States Magistrate Judge

**\*1** Currently before the Court, in this Social Security
action filed by Melisa G. against the Commissioner of Social
Security pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3),
are Plaintiff's Motion for Judgment on the Pleadings and
Defendant's Motion for Judgment on the Pleadings. Dkt.
Nos. 12 & 14. For the reasons set forth below, Plaintiff's
Motion is **denied** and Defendant's Motion is **granted**. The
Commissioner's decision denying Plaintiff disability benefits
is **affirmed**, and Plaintiff's Complaint is **dismissed**.

# I. RELEVANT BACKGROUND

## A. Factual Background

Plaintiff was born on February 1, 1987. Dkt. No. 9, Admin. Tr.
("Tr."), p. 101. Plaintiff reported completing eleventh grade.
Tr. at p. 255. She has past work experience as a cashier,
cook, ice cream server, and in temporary labor. Id. Plaintiff
alleges disability due to mental illness, obsessive compulsive
disorder, back problems, and heart problems. Tr. at p. 101.

## B. Procedural History

Plaintiff filed for Supplemental Security Income on June
16, 2014 alleging disability beginning on February 1, 2013.
Tr. at pp. 100-101. Plaintiff was denied benefits, and on
Plaintiff's request, a hearing was held on October 27, 2016
before ALJ John P. Ramos, at which Plaintiff was represented
and testified. Tr. at pp. 38-61 & 117-120. The ALJ then
held a supplemental hearing on May 23, 2017, at which he
obtained the testimony of a medical expert and a vocational
expert ("VE"). Tr. at pp. 62-99. On August 4, 2017, the
ALJ rendered a determination finding Plaintiff not disabled.
Tr. at pp. 10-31. Plaintiff appealed the determination, and
the Appeals Council denied Plaintiff's request for review,
making the ALJ's determination the final decision of the
Commissioner. Tr. at pp. 1-6. Plaintiff commenced this action
appealing the determination on April 26, 2018. Dkt. No. 1.

## C. The ALJ's Decision

In his decision, the ALJ made the following findings of fact
and conclusions of law. First, the ALJ found that Plaintiff
had not engaged in substantial gainful activity since June 16,
2014, the application date. Tr. at p. 12. The ALJ found that
Plaintiff had the following severe impairments: degenerative
disc disease of the lumbar spine, degenerative disc disease
of the cervical spine, lumbosacral myofascitis, obesity,
attention deficit hyperactivity disorder, obsessive-compulsive
disorder, bipolar disorder, anxiety disorder, post-traumatic
stress disorder, and learning disorder. Tr. at pp. 12-13. The
ALJ found that Plaintiff did not have an impairment or
combination of impairments that met or medically equaled the
severity of one of the listed impairments in 20 C.F.R. Part 404,
Subpart P, Appendix 1. Tr. at p. 13. The ALJ next determined

that Plaintiff had the following residual functional capacity ("RFC"):

[S]he can continuously lift or carry up to ten pounds; she can sit for up to six hours in an eight-hour day, she can stand for up to two hours in an eight-hour day, and walk for up to two hours in an eight-hour day; standing and walking, she can each do [sic] at one-hour intervals; she could frequently reach overhead and could continuously reach in all other directions; continuously handle, finger, feel, push, and pull with both hands and upper extremities; she should not climb ladders or scaffolds; she can occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl as those terms are defined in the DOT; she can occasionally use foot controls bilaterally; she could frequently work at unprotected heights, with moving mechanical parts, and operate a motor vehicle; she can occasionally be exposed to humidity and wetness, be exposed to dust, odors, fumes and pulmonary irritants, and extremes of cold or heat; she should not be exposed to vibrations; she retains the ability to understand and follow simple instructions and directions; she can perform simple tasks with supervision and independently; she can maintain attention and concentration for simple tasks; she can regularly attend to a routine and maintain a schedule; she can relate to and interact with others to the extent necessary to carry out simple tasks; and she can handle reasonable levels of simple work-related stress, in that she can make decisions directly related to the performance of simple work, and she can handle usual workplace changes and interactions associated with simple work.

**\*2** Tr. at p. 16. Next, the ALJ determined that Plaintiff has no past relevant work. Tr. at p. 29. The ALJ found that Plaintiff was born on February 1, 1987, and was 27 years old, which is defined as a younger individual age 18-49, on the date the application was filed, has limited education, and is able to communicate in English. *Id.* The ALJ found that transferability of job skills is not an issue, because the claimant does not have past relevant work. *Id.* The ALJ then determined that, considering Plaintiff's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform, and that Plaintiff was not under a disability since the date the application was filed. Tr. at pp. 29-31.

### D. The Parties' Briefings on Their Cross-Motions

In her brief, Plaintiff contends that the Commissioner failed to meet its burden to demonstrate that jobs exist in significant numbers in the national economy that Plaintiff can perform. Dkt. No. 12, Pl.'s Mem. of Law, pp. 11-13. Plaintiff argues that the Information Clerk job the ALJ identified is inconsistent with the RFC limiting Plaintiff to lifting 10 pounds because it is categorized as a light job, and the definition of light work involves lifting up to 20 pounds. *Id.* at p. 11. Plaintiff further points to her attorney's cross-examination of the VE, during which the VE testified that it was possible that an individual performing the Information Clerk job may have to lift over 10 pounds occasionally. *Id.* at p. 12. Plaintiff asserts that the VE's testimony is therefore also inconsistent with the ALJ's hypothetical. *Id.* at p. 13.

In addition, Plaintiff contends that the ALJ's finding that Plaintiff could regularly attend to a routine and maintain a schedule is not supported by substantial evidence. *Id.* at pp. 13-15. Plaintiff argues that her treating physician opined that she would be off task more than 33% of the day and absent more than four days per month, and that this opinion should have been credited. *Id.* at pp. 13-14. She also argues that Dr. Harding assessed a moderate limitation to maintaining attention and concentration, performing activities within a schedule, and maintaining regular attendance. *Id.* at p. 14. Plaintiff argues that the ALJ's limitation of Plaintiff to simple

Case 6:21-cv-01316-BKS-TWD    Document 38    Filed 01/30/23    Page 121 of 124

Melisa G. v. Berryhill, Not Reported in Fed. Supp. (2019)

2019 WL 2502726

work does not appropriately account for Plaintiff's limitations to attention and concentration. *Id.* at pp. 14-15.

In response, Defendant contends that jobs categorized as light work may involve lifting less than the maximum in that category, and that Plaintiff's RFC does not preclude her from performing the Information Clerk job. Dkt. No. 14, Def.'s Mem. of Law, pp. 6-7. Defendant also contends that substantial evidence supported the mental limitations contained in the ALJ's RFC finding, and that Plaintiff is able to perform unskilled work even if she has moderate limitations in concentration, persistence, or pace. *Id.* at pp. 8-10.

## II. RELEVANT LEGAL STANDARD

### A. Standard of Review

A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled. 42 U.S.C. § 405(g); *Wagner v. Sec'y of Health & Human Servs.,* 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will be reversed only if the correct legal standards were not applied, or it was not supported by substantial evidence. *See Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); *accord Grey v. Heckler,* 721 F.2d 41, 46 (2d Cir. 1983); *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir. 1979). "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir. 1982).

**\*3** "To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen,* 859 F.2d 255, 258 (2d Cir. 1988).

If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan,* 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." *Valente v. Sec'y of Health & Human Servs.,* 733 F.2d 1037, 1041 (2d Cir. 1984).

### B. Standard to Determine Disability

The Commissioner has established a five-step evaluation process to determine whether an individual is disabled as defined by the Social Security Act. 20 C.F.R. § 416.920. The Supreme Court has recognized the validity of this sequential evaluation process. *Bowen v. Yuckert,* 482 U.S. 137, 140-42 (1987). The five-step process is as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's

Case 6:21-cv-01316-BKS-TWD    Document 38    Filed 01/30/23    Page 122 of 124

Melisa G. v. Berryhill, Not Reported in Fed. Supp. (2019)

2019 WL 2502726

severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform. Under the cases previously discussed, the claimant bears the burden of the proof as to the first four steps, while the [Commissioner] must prove the final one.

*Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir. 1982); *accord McIntyre v. Colvin,* 758 F.3d 146, 150 (2d Cir. 2014). "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further." *Barnhart v. Thompson,* 540 U.S. 20, 24 (2003).

### III. ANALYSIS

#### A. The Step Five Determination

Plaintiff first contends that she cannot perform the job that the VE identified and the ALJ adopted, Information Clerk. Pl.'s Mem. of Law at pp. 11-13. She contends that the job requires lifting more than 10 pounds, while the RFC limited Plaintiff to lifting no more than 10 pounds. *Id.*

Plaintiff points out that the Information Clerk job is rated at the light exertional level pursuant to the Dictionary of Occupational Titles, and that light work is defined as lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds; she argues that the requirement of lifting up to 20 pounds is inconsistent with the RFC. *Id.* In addition, Plaintiff notes that during the hearing, the VE testified that the Information Clerk job could require at least occasionally lifting more than 10 pounds, which again is inconsistent with the RFC. *Id.* Plaintiff further contends that the VE's testimony was inconsistent with the ALJ's RFC because the VE testified that the Information Clerk job can require occasional lifting of over 10 pounds, and therefore does not provide substantial evidence for the finding. *Id.*

**\*4** The ALJ determined that vocational expert testimony was necessary because the ALJ determined that Plaintiff did not have the RFC to perform the full range of light work, having additional exertional and nonexertional limitations. Tr. at p. 30. The testimony of vocational experts is utilized when a claimant is not able to perform all of the requirements for a particular exertional level, in order to determine whether there are jobs the claimant can perform with those additional limitations. *Zabala v. Astrue,* 595 F.3d 402, 410 (2d Cir. 2010); *Valenti v. Sec. of Health and Human Servs.,* 600 F. Supp. 54, 57 (E.D.N.Y. 1984) ("A vocational expert's testimony is unnecessary when a claimant can, for example, perform *any type* of sedentary work. However, when the claimant can perform only limited types of sedentary work, then a vocational expert must be called to testify.") (internal citations omitted); *Gilmore v. Comm'r of Soc. Sec.,* 2016 WL 4079535, at \*6 (N.D.N.Y. July 29, 2016). Because Plaintiff's RFC is for less than the full range of light work, the ALJ consulted a VE, and the ALJ credited the VE's determinations.

Here, the VE testified that Plaintiff would be able to perform the Information Clerk job with the limitation that she could only lift up to 10 pounds. Tr. at p. 95. Given that the ALJ's hypothetical to the VE accurately reflected Plaintiff's limitations, the VE's testimony that Plaintiff could perform this work provided substantial evidence for the ALJ's finding. *Boyer v. Berryhill,* 2017 WL 120833, at \*5 (N.D.N.Y. Mar. 31, 2012). The ALJ explained that he found "[t]he conclusions of the vocational expert to be credible and persuasive, because of the vocational expert's knowledge regarding the types and numbers of jobs in the national economy, and because of the vocational expert's knowledge regarding the exertional and nonexertional requirements of jobs in the national economy," and noted that he gave "due consideration to the cross-examination of the vocational expert by the claimant's attorney." Tr. at pp. 30-31. "It is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses." *Aponte v. Sec., Dep't of Health and Human Servs.,* 728 F.2d 588, 591 (2d Cir. 1984) (second alteration in original) (internal quotation marks omitted). The ALJ considered the cross examination of the VE by Plaintiff's counsel, but nonetheless found "the conclusions of the vocational expert to be credible and persuasive" for specific reasons. Tr. at p. 30. The ALJ consulted with a VE, who the ALJ found to be credible, and found that Plaintiff could perform work that existed in significant numbers in the national economy; this satisfied the Commissioner's burden of establishing Plaintiff can perform work. *See Pratt v. Bowen,* 1988 WL 108431, at \*2 (S.D.N.Y. Oct. 3, 1988).

2019 WL 2502726

#### B. The Work Pace and Attendance Determination

Plaintiff next contends that the ALJ's determination that Plaintiff can regularly attend to a routine and maintain a schedule was not supported by substantial evidence. Pl.'s Mem. of Law at pp. 13-15. In particular, Plaintiff argues that this finding is contrary to the opinion of her treating physician, Dr. Denzien, regarding Plaintiff's time off task and number of days that she would be absent from work. Plaintiff argues that this is the only opinion that addresses the limitation as caused by Plaintiff's physical impairments, and that the ALJ's determination that this opinion is speculative is flawed. *Id.* In addition, Plaintiff points out that Dr. Harding assessed a moderate limitation in maintaining attention and concentration, performing activities within a schedule, and maintaining regular attendance based on Plaintiff's psychiatric impairments, and that the ALJ gave this opinion significant weight. *Id.* Finally, Plaintiff argues that limiting her to simple work does not account for limitations in attention or concentration. *Id.*

**\*5** In determining Plaintiff's RFC, the ALJ gave some weight to the opinion of Dr. Kim, the psychiatric consultative examiner, finding support in the record for her determination that Plaintiff did not evidence any limitations in her ability to maintain a regular schedule. Tr. at pp. 28-29. The ALJ explained that he took "into account the concerns that Dr. Kim expressed regarding the claimant's ability to maintain attention and concentration and deal with stress appropriately by restricting the claimant to simple instructions and directions, simple tasks, simple work-related stress, and simple work decisions." *Id.*

The ALJ gave little weight to the opinion of Dr. Denzien, including her opinion regarding Plaintiff's off-task time and frequent absences, finding them unsupported by Plaintiff's medical records from Dr. Denzien and inconsistent with Plaintiff's reported activities, in addition to being speculative, and contrary to the opinion of the medical expert and the internal medicine consultative examiner. Tr. at pp. 27-28. In discounting Dr. Denzien's opinion, the ALJ noted the short period of time that Plaintiff treated with her, and that Dr. Denzien's treating notes provide little support for her opinion. *Id.* The ALJ gave substantial weight to the opinion of Dr. Jenouri, who did not include any limitations in Plaintiff's ability to maintain a regular schedule. Tr. at pp. 27 & 477.

Plaintiff also argues that the form completed by Dr. Harding supports a finding that Plaintiff is moderately limited in attention and concentration, performing activities within a schedule, and maintaining regular attendance. Pl.'s Mem. of Law at p. 14. The ALJ noted that Dr. Harding determined that Plaintiff maintained the ability to meet the basic demands of work with her psychiatric problems. Tr. at p. 29. In any event, moderate limitations are not prohibitive of performing unskilled work. *See Zabala v. Astrue,* 595 F.3d at 410; *Lowry v. Comm'r of Soc. Sec.,* 2017 WL 1290685, at \*4 (N.D.N.Y. Mar. 16, 2017) ("The ability to maintain a regular schedule falls under the category of concentration and persistence. The Second Circuit has held that a moderate limitation in the area of concentration, persistence, or pace would not necessarily preclude the ability to perform unskilled work.") (internal citation omitted).

As for the ALJ's weighing of the opinion evidence, "it is the ALJ's sole responsibility to weigh all medical evidence and resolve material conflicts where sufficient evidence provides for such." *Bliss v. Colvin,* 2015 WL 457643, at \*7 (N.D.N.Y. Feb. 3, 2015); *Petell v. Comm'r of Soc. Sec.,* 2014 WL 1123477, at \*10 (N.D.N.Y. Mar. 21, 2014) (same). The ALJ sufficiently explained why he afforded the various opinions different amounts of weight. The Court will not "reweigh the evidence." *Vincent v. Shalala,* 830 F. Supp. 126, 133 (N.D.N.Y. Aug. 12, 1993) (citing *Carroll v. Sec. of Health and Human Servs.,* 705 F.2d 638, 642 (2d Cir. 1983)). The ALJ's determination is supported by substantial evidence.

Plaintiff asserts that the ALJ's determination regarding attendance is contrary to the opinion of her treating physician. Pl.'s Mem. of Law at pp. 13-14. "In order to override the opinion of the treating physician ... the ALJ must explicitly consider, *inter alia*: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue,* 708 F.3d 409, 418 (2d Cir. 2013). In the event the ALJ does not give controlling weight to the treating physician, he must specifically state the reasons for doing so. 20 C.F.R. § 416.927(c)(2). After considering these factors, "the ALJ must 'comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion,' " giving "good reasons for not crediting the opinion." *Greek v. Colvin,* 802 F.3d 370, 375 (2d Cir. 2015) (internal quotation marks omitted) (quoting *Burgess v. Astrue,* 537 F.3d 117, at 129-30 (2d Cir. 2008)). However, "[w]here an ALJ's reasoning and adherence to the Regulations

is clear, she is not required to explicitly go through each and every factor of the Regulation." *Blinkovitch v. Comm'r of Soc. Sec.*, 2017 WL 782979, at *4 (N.D.N.Y. Jan. 23, 2017), *report and recommendation adopted,* 2017 WL 782901 (N.D.N.Y. Feb. 28, 2017) (citing *Atwater v. Astrue,* 512 Fed. Appx. 67, 70 (2d Cir. 2013)); *Colvin on behalf of G.R.K. v. Colvin,* 2017 WL 1167292, at *6 (N.D.N.Y. Mar. 28, 2017) (quoting *Atwater v. Astrue,* 512 Fed. Appx. at 70) (collecting cases) ("Although an explicit and 'slavish recitation of each and every factor' is not required, 'the ALJ's reasoning and adherence to the regulation [must be] clear.' ").

**\*6** Here, the ALJ gave little weight to the opinion of Dr. Denzien, explaining that the opinion was inconsistent with Dr. Denzien's medical records, Plaintiff's activities of daily living, and was contrary to the opinion of the medical expert and the internal medicine consultative examiner. Tr. at pp. 27-28. The ALJ thus explicitly considered the consistency of the opinion with the remaining medical evidence, and the amount of evidence supporting the opinion. The ALJ also considered the length of Plaintiff's treatment with Dr. Denzien. While the ALJ did not consider all of the factors in detail, his "reasoning and adherence to the regulations [is] clear." *Colvin on behalf of G.R.K. v. Colvin,* 2017 WL 1167292, at *6. The ALJ therefore complied with the treating physician rule.

## IV. CONCLUSION

For the reasons stated herein, it is hereby

**ORDERED**, that Plaintiff's Motion for Judgment on the Pleadings (Dkt. No. 12) is **DENIED**; and it is further

**ORDERED**, that Defendant's Motion for Judgment on the Pleadings (Dkt. No. 14) is **GRANTED**; and it is further

**ORDERED**, that Defendant's decision denying Plaintiff benefits is **AFFIRMED**; and it is further

**ORDERED**, that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Decision and Order upon the parties to this action.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 2502726

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.